**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re:<br><br>**WATER'S EDGE LIMITED PARTNERSHIP**,<br><br>Debtor. | Chapter 11<br>Case No. 24-12445-CJP |

**INTERIM OMNIBUS OBJECTION OF DIV OA LENDER, LLC TO**
**DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

DIV OA Lender, LLC ("DIV OA"), through this objection (the "Objection"), objects to the following motions for first day relief filed by Water's Edge Limited Partnership (the "Debtor"): (a) *Emergency Motion filed by Debtor Water's Edge Limited Partnership for Entry of Orders: (I) Authorizing the Debtor to Obtain Junior Secured Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* [ECF No. 34] (the "DIP Motion"); (b) *Motion filed by Debtor Water's Edge Limited Partnership for Entry of Order (I) Authorizing the Debtor to Enter into Letter of Intent with Eastern Acquisitions, LLC and (II) Granting Related Relief* [ECF No. 35] (the "LOI Motion" and together with the DIP Motion, the "Motions"). In support of the Objection, DIV OA respectfully states as follows:

**BACKGROUND**

**A.    The Loan and Loan Documents.**

1.    On or about May 23, 2018, M&T Bank ("Original Lender") agreed to loan $19,400,000 (the "Loan") to the Debtor, Carabetta Management Company ("Carabetta Management"), and Carabetta Enterprises, Inc. ("Carabetta Enterprises" and collectively with the

1

Debtor and Carabetta Management, the "Borrowers"). The Borrowers' obligations were evidenced by, *inter alia*, that certain Promissory Note dated May 23, 2018 in the original principal sum of $19,400,000 (the "Original Note"). *See* ECF 25-1.

2.     Repayment of the Note is secured by, among other things, that certain (i) Mortgage (as amended and/or assigned, the "Mortgage") dated May 23, 2018, executed by the Debtor, as mortgagor, in favor of Original Lender, as mortgagee with respect to properties currently known and numbered as 364, 370, and 388 Ocean Avenue, Revere, Suffolk County, Massachusetts (individually and collectively, the "Premises"), which was recorded with Suffolk County, Massachusetts Registry of Deeds in Book 59625, Page 127, *see* ECF 25-2; (ii) General Assignment of Rents (the "Rent Assignment"), dated as of May 23, 2018, executed by the Debtor in favor of Original Lender which was recorded with the Suffolk County, Massachusetts Registry of Deeds in Book 00502, Page 116, *see* ECF 25-3; and (iii) Assignment of Management Agreement dated May 23, 2018 (the "Management Agreement Assignment") pursuant to which the Debtor assigned to the Original Lender all of the Debtor's rights and interests in the management agreement (the "Management Agreement") between the Debtor and Carabetta Management under which Carabetta Management agreed to manage the Premises, *see* ECF 25-4.

3.     Through the Rent Assignment, as security for the satisfaction of its obligations under the Loan Documents, the Debtor absolutely, unconditionally, and irrevocably transferred to Original Lender the leases ("Leases") and rents ("Rents") associated with the Premises.

4.     On May 23, 2018, the Debtor and Original Lenders executed a side letter (the "Side Letter") to address the repairs and maintenance necessary to bring the Premises into compliance with the requirements of the Mortgage and applicable building, fire and health codes and ordinances. *See* ECF 25-5. Specifically, the Side Letter identified certain necessary repairs and

2

code violations that would not be deemed an Event of Default (as that term is defined in the Mortgage), provided they were remedied by the Borrowers by the completion date specified in the Side Letter.

5.      The Original Note was amended and restated as of March 20, 2020 (the "A&R Note") in the principal amount of $18,292,206.14. *See* ECF 25-6. The Borrowers' obligations thereunder were guaranteed under the terms of the Continuing Guaranty (Personal) (the "Personal Guaranty" and collectively with the Loan Agreement, the A&R Note, the Mortgage, the Rent Assignment, the Management Agreement Assignment, the "Loan Documents") executed by Joseph F. Carabetta (the "Guarantor") on behalf of Borrowers and in favor of Original Lender, dated as of March 20, 2020. *See* ECF 25-7.

6.      On or about September 26, 2024, the Loan Documents and related documents were assigned from the Original Lender to DIV OA, pursuant to (i) that certain Assignment of Mortgage (the "Mortgage Assignment"), *see* ECF 25-8; and (ii) Assignment of General Assignment of Rents (the "GAR Assignment"), recorded with the Suffolk County Massachusetts Registry of Deeds in Book 70661 at Page 235, *see* ECF 25-9.

7.      The assignment to DIV OA was further evidenced by an Allonge to the A&R Note executed by Original Lender (the "Allonge"). *See* ECF 25-10.

8.      As of the Petition Date, the Debtor was indebted to DIV OA in the amount of $16,685,484.38 under the Loan Documents.

**B.      Debtor's Defaults under the Loan Documents and Planned Foreclosure Sale.**

9.      As detailed in the *Motion of DIV OA Lender, LLC for Entry of an Order Dismissing Debtor's Chapter 11 Case* [ECF No. 24] (the "Motion to Dismiss"),[1] the Premises have been in a

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion to Dismiss.

state of disrepair for years, and continue to deteriorate to the point that two out of the three apartment buildings located on the Premises were condemned due to their unsafe and uninhabitable conditions.

10.     On February 7, 2024, Original Lender notified Borrowers by letter (the "Maturity and Default Notice and Reservation of Rights Letter") that (i) the Maturity Date under the A&R Note occurred on September 1, 2023 in accordance with it terms, and that all indebtedness, liabilities, and other obligations of Borrowers (the "Loan Obligations") under the Loan Documents were due and payable in full; and (ii) one or more Events of Default had occurred under the Loan Documents, including, without limitation, Borrowers' failure to pay and satisfy, as and when due, all real estate taxes and other municipal charges due and payable to the City of Revere, Massachusetts, with respect to the Premises (the "Specified Municipal Payment Defaults"). *See* ECF 25-11.

11.     On May 14, 2024, Original Lender notified by Borrowers by letter (the "Borrower Demand Letter") that (A) Borrowers failed, neglected and/or refused to pay (i) the outstanding unpaid Loan Obligation upon the maturity of the Loan and (ii) all real estate taxes and other municipal charges which are presently due and payable by Borrower to the City of Revere, Massachusetts with respect to the Premises (the "Past Due Real Estate Taxes and Impositions"); (B) Original Lender made Demand upon the Borrower for the immediate payment in full of (i) all Loan Obligations, including, without limitation, all outstanding principal, interest (accrued and hereafter accruing), charges, fees, and expenses (including, without limitation, all attorneys' fees and expenses) incurred by Original Lender in connection with the Loan Documents and Original Lender's enforcement of its rights and remedies thereunder and (ii) all Past Due Real Estate Taxes and Impositions required to be paid by Borrower in accordance with the terms and provisions of

the Loan Documents, and (C) Original Lender advised the Borrower that, as a result of the
occurrence of such Events of Default (including, without limitation, the Specified Municipal
Payment Defaults), interest accrues on the outstanding principal balance of the A&R Note at the
applicable *"Default Rate"* of interest set forth in the Note as and when provided in accordance
with the terms and provisions thereof. *See* ECF 25-12.

12.    Due to Borrowers' failure to satisfy the Loan Obligations as set forth in the
Borrower Demand Letter, and their continued failure to pay the Past Due Real Estate Taxes and
Imposition, on May 30, 2024, Original Lender sent a demand letter to the Guarantor (the
"Guarantor Demand Letter") to enforce the Personal Guaranty and demand immediate payment
and performance by Guarantor of all obligations under the Personal Guaranty (the "Guaranteed
Obligations"), including without limitation, the immediate payment in full of the "Guaranteed
Amount" (as defined and otherwise described in the Personal Guaranty) in the amount of the
sum of (A) twenty-five percent (25.00%) of the principal amount of the Obligations as of the
Maturity Date with respect to the Loan Obligations, plus (B) one hundred percent (100.00%) of
all accrued and unpaid interest (including at the applicable Default Rate per annum under the A&R
Note), premiums and "Expenses" (as defined and otherwise described in the Personal Guaranty)
incurred with respect to the Obligations, and (C) all of the Expenses incurred with respect to the
Personal Guaranty. *See* ECF 25-13.

13.    On November 12, 2024, after determining that foreclosure was necessary, DIV OA
sent a *Notice of Intention to Foreclose and of Deficiency After Foreclosure of Mortgage* (the
"Notice of Intent to Foreclose") to the Debtor, providing notice the DIV OA intended to foreclose
on the Premises by sale (the "Foreclosure Sale") on or after December 5, 2024. *See* ECF 25-13.

14.    On November 20, 2024, DIV OA sent the Debtor a *Notice of Mortgagee*

*Foreclosure Sale* regarding the Premises (the "<u>Foreclosure Notice</u>"), notifying Borrowers that DIV

OA would be exercising the Power of Sale under the Mortgage and conducting a foreclosure sale

of the Premises on December 5, 2024 at 11:00 a.m. *See* ECF 25-14.

15.     On December 3, 2024, the Debtor filed a motion requesting the Housing Court to

issue an order staying the foreclosure sale of the Premises from December 5, 2024 to January 30,

2025. On December 4, 2024, the Housing Court issued an order denying the request to stay the

Foreclosure Sale, explaining that Housing Court lacked jurisdiction to issue such emergency

injunctive relief.

16.     The following day (the same day the Foreclosure Sale was scheduled to take place),

the Debtor filed a skeleton chapter 11 filing to commence the above-captioned chapter 11 case (the

"<u>Chapter 11 Case</u>") and stay the Foreclosure Sale.

**C.     The Debtor's Bankruptcy Case and the Motions.**

17.     On December 5, 2024 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition

under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District

of Massachusetts (the "<u>Bankruptcy Court</u>"). *See* ECF No. 1.

18.     While the Premises are encumbered by the Mortgage, and DIV OA has a lien on all

Rents and Leases, the Debtor had not sought authority to use DIV OA's cash collateral until it filed

the DIP Motion a full three weeks after the Petition Date.

19.     On December 16, 2024, proposed counsel for the Debtor entered notices of

appearance. *See* ECF Nos. 19, 20.

20.     On December 26, 2024, the Debtor filed the Motions.

21.     Through the DIP Motion, the Debtor has requested, among other things:

> (a)     authority to obtain postpetition financing (the "<u>DIP Financing</u>") on an
> interim basis up to $1,350,000 through February 1, 2025 and on a final basis

in an amount up to $3.4 million from Eastern Acquisition, LLC (the "DIP Lender") carrying interest at Secured Overnight Finance Rate ("SOFR") for a 90 day tenor plus 5.5% per annum, in addition to various fees due from the Debtor to DIP Lender, including (i) a $25,000 monthly collateral monitoring, (ii) a $60,000 closing fee, and (iii) a $90,000 exit fee (refundable if the Debtor is able to propose and confirm a plan in accordance with the terms of the LOI); and

(b) use of cash collateral securing its obligations to DIV OA under the Loan Documents (the "Cash Collateral") to fund its administrative expenses through February 1, 2025 in exchange for granting DIV OA purported adequate protection liens solely to the extent of diminution in value of DIV OA's collateral, an adequate protection superpriority claim, and adequate protection payments equal to the applicable nondefault contract rate of interest on the value of DIV OA's liens against the Premises, commencing on February 15, 2025.

22. The proposed order granting the DIP Motion on an interim basis (the "Proposed Interim DIP Order") attaches: (1) the term sheet for the proposed DIP Financing (the "DIP Term Sheet") as Exhibit 1, and (2) a budget (the "Budget") for the period of December 21, 2024 through April 19, 2025 (the "Budget Period"), attached as Exhibit 2.

23. The Debtor asserts that the DIP Financing (together with its requested use of DIV OA's Cash Collateral) will allow it to pay its operating and administrative expenses through the Budget Period. DIP Motion, ¶ 39.

24. Through the LOI Motion, the Debtor has requested authority to enter into a proposed joint venture agreement with the DIP Lender, to be effectuated through the terms of the Debtor's chapter 11 plan, and under which the Debtor would contribute its primary asset, the Premises, to the joint venture in exchange for (a) a 35% interest in the joint venture entity, (b) and DIP Lender's contribution of up to $23.5 million exclusive of the DIP Financing, to pay holders of allowed non-insider claims in full. LOI Motion, ¶ 3. Significantly, the LOI Motion includes material "miscellaneous" terms that prohibit the Debtor from negotiating with any party other than DIP Lender for a period of up to 120 days, entitle DIP Lender to a break up fee of $1.9 million,

and expense reimbursements of up to $500,000. LOI Motion, ¶ 4.

25. On December 27, 2024, the court granted the Debtor's request to have the Motions heard on an emergency basis, and scheduled a hearing for December 30, 2024 at 3:00 p.m. (Eastern). *See* ECF No. 39.

### **OBJECTION**

**I.** **The DIP Motion Should be Denied Because the Debtor has Failed to Comply with the Requirements of the Bankruptcy Code to Obtain Secured Financing and Use Cash Collateral.**

  **A. The Debtor Has Not Satisfied Its Burden to Obtain DIP Financing.**

26. As an initial matter, the Debtor cannot meet its burden to obtain the proposed DIP financing. Pursuant to section 364(c) of the Bankruptcy Code, the Debtor must establish that (i) the debtor is unable to obtain unsecured financing, (ii) the financing is necessary to preserve the estate, and (iii) the financing terms are fair and reasonable. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re TBH19 LLC*, No. 2:19-BK-23823-VZ, 2021 WL 275490, at *8 (C.D. Cal. Jan. 27, 2021); *In re Sterling Min. Co.*, No. 09-20178-TLM, 2009 WL 2514167, at *3 (Bankr. D. Idaho Aug. 14, 2009). The Debtor has failed in each respect.

27. First, the Debtor cannot establish that it was unable to obtain unsecured financing as required by section 364(c) of the Bankruptcy Code because the Debtor does not appear to have sought alternative financing. The Debtor states in the DIP Motion that:

> Given the Debtor's liquidity needs and the fact that substantially all of the Debtor's material assets are encumbered, it is unlikely that a lender other than the DIP Lender would be willing to provide postpetition financing, let alone on an unsecured basis. The Debtor asserts that the terms of the DIP Loan are consistent with the market for similar loans and that they would have been unable to procure alternative financing on more favorable terms and conditions. The Debtor respectfully submits that additional efforts to obtain alternative postpetition financing opportunities would have been futile and therefore the standards required under section 364(c) of the Bankruptcy Code are satisfied.

DIP Motion at ¶¶ 31, 32.  What the Debtor does **not** state is that it sought additional financing and was unable to obtain other actionable offers.[2] This alone is fatal to the DIP Motion. *See L.A. Dodgers* 457 B.R. at 312 (refusing to approve post-petition financing where the "Debtors are unable to prove that they are unable to obtain unsecured credit allowable under section 503(b)(1) as an administrative expense.") (alteration in original); *In re Phase-I Molecular Toxicology Inc.*, 285 B.R. 494, 496 (Bankr. D.N.M. 2002) (denying post-petition financing where debtor "failed to meet its burden of showing that no alternative financing is available on any other basis."); *In re TBH19 LLC*, 2021 WL 275490, at *8  (refusing to approve post-petition financing based on the debtor's unsupported "conclusory statements" that it "sought alternative financing without success.").

28.      Second, the Debtor makes no effort to demonstrate the terms of the proposed DIP facility (the "DIP Facility") are fair and reasonable. Given that the Debtor apparently declined to solicit additional financing proposals, the Court cannot look to the market to determine whether the proposed DIP Facility is fair and reasonable. Instead, the Debtor asks that the Court defer to its business judgment—but that, without more, is insufficient. *See* DIP Motion at ¶¶ 31, 36, 38.

29.      Finally, the Debtor seeks relief on an interim basis that is well-beyond that which may enter on an interim basis—particularly on one business day's notice afforded to parties in interest.

30.      Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provide that, in any hearing relating to obtain credit conducted on fewer than fourteen (14) days' notice, "the court may authorize the obtaining of credit only to the extent necessary to avoid

---

[2] The DIP Motion references "extensive prepetition discussions regarding potential funding for necessary and critical repairs to remediate the effects of the 2022 fire, renovations to modernize and stabilize the Property, and a potential Chapter 11 Filing." DIP Motion, ¶ 28.  However, it does not state who these discussions were with, including whether they were with potential lenders, or their result.

immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2).  Here, the Debtor has requested Bankruptcy Court authority on a one business day turnaround for authority to obtain $1.35 million in financing on an interim basis, of which the initial draw is $688,000.

31.     The Debtor fails to show that this level of financing is necessary to preserve the estate. Here, the Budget reflects only $524,600 in operational expenditures through the week ending January 25, 2025.[3]  Of the $524,600 of operating expenses, $55,000 is for a Debtor-affiliate management company that is also a co-Borrower of under the Loan Documents.  During that same period, the Debtor projects operating revenues of $369,700.  That leaves a projected cash shortfall in the ability to cover necessary projected operating expenses, even including the insider management fees, of $154,900, and less than $100,000 if the $55,000 in insider management fees are deferred.

32.     The remaining of the proposed borrowings are allocated to professional fees, and interest on and fees associated with the DIP Facility. None of these payment amounts are necessary to avoid immediate and irreparable harm.  The Debtor's affiliates, its professionals, and its DIP Lender's desire to have their respective fees funded one business day after notice is first served ought not be viewed as an emergency so dire as to override the directives of Bankruptcy Rule 4001(c) and effectively deprive creditor representatives, including potentially an official committee of unsecured creditors, of the opportunity to review and assess the proposed financing before having any concerns they may have mooted by section 364(e) of the Bankruptcy Code.

33.       To the extent the Bankruptcy Court is inclined to grant the DIP Motion, any relief

---

[3] This amount is exclusive of the "Contingency" line item in the Budget, which totals approximately $45,000 and, by the very definition of "contingency," may not be necessary.

granted on an interim basis should be limited solely to that which is necessary to avoid irreparable harm pending a final hearing. *See, e.g.*, *In re Adamson Co., Inc.*, 29 B.R. 937, 940 (Bankr. E.D. Va. 1985) (declining to approve postpetition financing absent a showing it was necessary to avoid "immediate and irreparable injury, loss or damage").

> **B.  The DIP Motion Cannot be Approved as Proposed Because the Debtor has Failed to Provide DIV OA Adequate Protection.**

34.     Section 363 of the Bankruptcy Code prohibits the use of cash collateral unless either (i) each entity that has an interest in such cash collateral consents; or (ii) the court authorizes it. On request of a party that holds a secured interest in property of the estate, the court "shall prohibit or condition such use [of such property] as is necessary to provide adequate protection of such interest. . . ." 11 U.S.C. § 363(e). A debtor may only use a secured lender's cash collateral if the debtor provides the lender with adequate protection sufficient to "provide [the secured creditor] with the value of [its] bargained for rights." *Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994); *see In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to assure that the lender's economic position is not worsened because of the bankruptcy case."). DIV OA does not consent to the use of cash collateral as currently proposed. As such, the Debtor bears the burden to prove that DIV OA's interests are adequately protected. As set forth below, DIV OA would not be adequately protected under the terms of the proposed DIP order because, *inter alia*, (i) the replacement liens the Debtor seeks to grant DIV OA are illusory, (ii) the Debtor has not satisfied its burden of establishing that DIV OA is protected by a significant equity cushion, and (iii) the contract interest-only periodic payments represent a step backwards, therefore do not constitute adequate protection.

(i)    The Replacement Liens are Illusory.

35.    While replacement liens are a statutory form of adequate protection, purporting to grant a replacement lien on collateral that DIV OA already holds a lien against is patently inadequate. *See, e.g.*, *In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011) ("Providing [a secured creditor] replacement lien on assets against which [it] already has a lien is illusory."); *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696 (Bankr. S.D. Tex. 2009) (stating that "it is disingenuous to argue that the Debtors can grant replacement liens to the Lender on post-petition [property] . . . because the Lender already has a lien on the [property]"); *Kimbrough Inv. Co. v. Royal d'Iberville Corp. (In re Royal d'Iberville Corp.)*, 10 B.R. 37, 39 (Bankr. S.D. Miss. 1981) (finding that a debtor could not satisfy its adequate protection burden with property already subject to creditor's security interest); *In re Smithville Crossing, LLC,* No. 11-02573-8-JRL, 2011 WL 5909527, at *10 (Bankr. E.D.N.C. Sept. 28, 2011) ("Virtually every case addressing this issue has held that the proffer of a replacement lien on post-petition [property] is illusory by virtue of § 552(b) of the Bankruptcy Code."); *see also* 3 COLLIER ON BANKRUPTCY ¶ 364.05 (16th ed. 2022) ("Providing a lender with a replacement lien on assets on which it already has a lien is illusory and will not support an adequate protection finding."). Here, DIV OA already has liens on substantially all of the Debtor's property, which extend to any proceeds thereof. *In re Endresen*, 548 B.R. 258, 268 (B.A.P. 9th Cir. 2016) (stating that "if a pre-petition security interest encumbers collateral and its proceeds, any proceeds of that pre-petition collateral remain subject to the security interest even if they are received post-petition."). Accordingly, the replacement liens the Debtor seeks to grant DIV OA are illusory and do not adequately protect DIV OA.

36.    DIV OA's collateral already includes the Debtor's real estate. It also already

includes the Debtor's leases and rents. That interest in lease and rents automatically extends to post-petition lease and rents. 11 U.S.C. § 552. There is nothing that the Debtor has or will create that DIV OA does not already have as its collateral.

### (ii)    The Debtor's Equity Cushion is Illusory.

37.    The Debtor asserts that DIV OA's interests are adequately protected by the existence of a significant equity cushion based upon a $44 million valuation that was prepared **<u>eighteen months ago</u>**, *see* DIP Motion at ¶ 14 (stating that the Debtor does not have a current appraisal, and instead relies on an appraisal prepared in June of 2023), and fourteen (14) months prior to condemnation of one of the three buildings supporting that valuation. And to be sure, a senior lien securing $16.7 million in debt on assets valued at $44 million would provide adequate protection—but more than just an assertion is required to support that valuation, the Debtor must have evidence. The Debtor admits it does not have a current valuation. *Id*.

38.    To rely on an equity cushion as adequate protection of DIV OA's interest, the Debtor must prove its current value. *See Sonora Desert Dairy, L.L.C.*, No. AZ-13-1471-KIDJU, 2015 WL 65301, at *11 (B.A.P. 9th Cir. Jan. 5, 2015) ("The debtor bears the burden of proof on the issue of adequate protection."). An appraisal from mid-2023 does not substantiate that an equity cushion exists today. This is especially true under the circumstances given that, *inter alia*, the August 29, 2024 condemnation of 364 Ocean Avenue occurred 14 months after the June 14, 2023 appraisal and the property has been subjected to significant unrepaired fire and flood damage for *years*. Accordingly, the Debtor has not established that DIV OA is protected by an equity cushion sufficient to adequately protect DIV OA.

### (iii)    The Periodic Payments Are Insufficient to Provide Adequate Protection.

39.    The Debtor provides for, and the projections reflect, payments of non-default rate interest to DIV OA, but makes no provision for DIV OA's fees as required under the Loan

Documents and the Bankruptcy Code (as discussed below). The Debtor provides for that limited

payment amount at the same time it posits that the terms of the proposed transactions with DIP

Lender will render it able to successfully recapitalize and pay all non-insider claims in full. DIP

Motion, ¶¶ 17, 19. Additionally, despite not having a current appraisal for the Premises, the Debtor

summarily asserts that – based on an appraisal conducted in June 2023 – DIV OA is oversecured

and has an equity cushion in the Premises. DIP Motion, ¶ 43.

40.     Section 506(b) of the Bankruptcy Code provides that an oversecured creditor is

entitled to receive, as part of its secured claim, "interest on [its] claim, and any reasonable fees,

costs, or charges **provided for under the agreement** . . . under which such claim arose." 11 U.S.C.

§ 506(b) (emphasis added).

41.     Here, several Events of Default had occurred prepetition and are continuing,

rendering the Debtor in default of its obligations under the Loan Documents and entitling DIV OA

to interest at the Default Rate. *See A&R Note*, at p. 2 ("Default Rate. If an Event of Default (defined

below) beyond any applicable cure period occurs, the interest rate on the unpaid Principal Amount

shall immediately be automatically increased to five (5) percentage points per year above the

otherwise applicable rate per year, and any judgment entered hereon or otherwise in connection

with any suit to collect amounts due hereunder shall bear interest at such default rate.").

42.     Where, a debtor is in default to an oversecured creditor, there is a strong

presumption that postpetition interest should be computed at the default rate provided for in the

applicable agreement. As the United States Court of Appeals for the First Circuit explained:

"enforcing the contract rate is consistent with the general premise that creditors' entitlements in

bankruptcy arise in the first instance from the underlying substantive law creating the debtor's

obligation...." *In re SW Bos. Hotel Venture, LLC*, 748 F.3d 393, 413 (1st Cir. 2014) (quoting *Gen.*

*Electric Capital Corp. v. Future Media Prods. Inc.*, 536 F.3d 969, 973 (9th Cir. 2008)); *see also In re Residential Cap., LLC*, 508 B.R. 851, 857 (Bankr. S.D.N.Y. 2014) (granting oversecured creditor post-petition interest at the contractual default rate). If the Court determines that DIV OA LLC is oversecured, then section 506(b) entitles it to contractual default interest.

43.    In addition to the payment of the contractual default interest rate, section 506 entitles an oversecured creditor to payment of its reasonable fees and costs as provided under the applicable loan documents. *See* 11 U.S.C. § 506(b) (providing that oversecured creditors are entitled to payment of "any reasonable fees, costs, or charges" provided for under the applicable loan documents); *see also* A&R Note, p. 1 ("For value received, intending to be legally bound, Borrower promises to pay to the order of the [DIV OA], . . . all fees and costs (including without limitation attorneys' fees and disbursements whether for internal or outside counsel) [DIV OA] incurs in order to collect any amount due under this [A&R Note], to negotiate or document a workout or restructuring, or to preserve its rights or realize upon any guaranty or other security for the payment of this [A&R Note]."). The Budget makes no provision for DIV OA's reasonable fees and costs. *See In re Residential Cap., LLC*, 508 B.R. at 862 (noting that after finding oversecured creditor to be entitled to interest at the contractual default rate "the Court easily concludes that [creditor] should be awarded its legal fees in pursuing that relief" and explaining that it would have awarded legal fees in accordance with the loan documents even if the creditor had been unsuccessful in its motion to obtain post-petition default rate interest).

44.    Accordingly, the DIP Motion should be denied due to the Debtor's failure to make provision contractual default interest and fees in the Budget as required by section 506 of the Bankruptcy Code and provided under the applicable loan documents.

### C.  The DIP Financing Imposes an Improper Non-Consensual Carve Out.

45.     The Proposed Interim DIP Order provides that "Permitted Prior Liens" (defined to include DIV OA's senior mortgage lien) is to be subject to a carve out (the "Carve Out"), which is equal to the fees due to the Bankruptcy Court, the U.S. Trustee quarterly fees, budgeted and allowed fees of professionals to the Debtor and any Official Committee of Unsecured Creditors, and limited post-default or post-conversion wind-down expenses. Proposed Interim DIP Order, ¶ 23.

46.     Section 506(c) enumerates the interest carveouts that can be involuntarily imposed on a secured creditor, and further provides that even those reasonable, necessary fees and costs are recoverable "to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). The debtor bears the burden to establish that a secured creditor will enjoy a benefit sufficient to justify imposition of a non-consensual carve out. *See, e.g., In re Emons Industries, Inc.*, 50 B.R. 692, 695 (Bankr. S.D.N.Y. 1985) (explaining that to impose a non-consensual carve out, "[t]he benefit to the secured party which must be shown to prevail under Bankruptcy Code § 506(c) imposes a heavy burden on the party seeking to invade the secured party's collateral."); *See also In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) (noting that "[a] debtor does not meet this burden of proof by suggesting possible or hypothetical benefits" but rather "[p]roof of direct benefits sought and received by [the secured creditor]" must be shown).

47.     DIV OA does not consent to the Carve Out. No showing has yet been made as to the extent to which the carveout amounts will be beneficial to DIV OA. Accordingly, the Carve Out is impermissible under section 506(c) of the Bankruptcy Code, and the DIP Motion should be denied.

**D. The Imposition of an Event of Default under the DIP Facility if a Chapter 11 Trustee is Appointed – and Reserving the DIP Lender's Rights to Trigger that Event of Default – is Inappropriate.**

48.     The DIP Term Sheet outlines various breaches that, absent waiver by the DIP Lender, constitute an "Event of Default" (a "DIP EOD") under the DIP Facility, including "the appointment of a chapter 11 trustee or a special examiner with enlarged powers." *See* DIP Term Sheet ("Events of Default", subpar. (n)).

49.     In light of the well-documented history of gross mismanagement of the Premises by the Debtor and its affiliates, as detailed in the Motion to Dismiss, if the Bankruptcy Court does not grant the Motion to Dismiss, there is a substantial risk that a chapter 11 trustee may be appointed. Among other things, the occurrence of a DIP EOD would trigger the addition of a default margin of 5% to the interest rate, saddling the Debtor with interest at the rate of SOFR +10.5%. By way of illustration, as of Friday, December 27, 2024, the 90 day SOFR was 4.71339%, so the occurrence of a DIP EOD would trigger a post-default rate would of 15.2%. The financial disincentive to the Bankruptcy Court's ability to issue appropriate relief is improper and should not be imposed.

50.     Additionally, the Proposed Interim DIP Order not only fails to reference the appointment of a chapter 11 trustee as a DIP EOD, but expressly reserves the right of the DIP Lender to, among other things, "request . . . the appointment of a chapter 11 trustee or examiner with expanded powers." Proposed Interim DIP Order, ¶ 40. Apparently not content with the DIP Term Sheet identifying a not unlikely (if not probable) event to be a DIP EOD, the DIP Lender decided to go for the belt and suspenders and have it baked into a Bankruptcy Court order that it itself has the right to cause the occurrence of that DIP EOD.

**E.  The DIP Motion Seeks Inappropriate Retroactive Remediation of the Debtor's Pre-Existing and Presumably Continuing Bankruptcy Code Violations.**

51.     Entry of the Proposed Interim DIP Order in its current form would also operate to have the Bankruptcy Court retroactively bless pre-existing violations of the Bankruptcy Code. The Debtor's obligations to DIV OA under the Loan Documents are secured not only by the Mortgage, but also the Cash Collateral as a result of the GAR Assignment. Admittedly, the Debtor has indicated that it has spent no money since this Chapter 11 Case started—a statement that presents its own set of issues to be dealt with at another time.  If that is true, there is no need for retroactive effectiveness of authority to use Cash Collateral.  If upon further reflection or review it proves not to be true, retroactive absolution is inappropriate.

52.     Although the Debtor waited until 21 days into this Chapter 11 Case to seek authority to use Cash Collateral, it requests entry of the Proposed Interim DIP Order providing in relevant part:

> The Debtor is further authorized to use collateral (including Cash Collateral) subject to the Existing Mortgage Liens (the "Prepetition Collateral") during the period **from the Petition Date through and including the Maturity Date** (as defined in the DIP Term Sheet) in accordance with the terms and conditions of this Interim Order.

Proposed Interim DIP Order, ¶ 15 (emphasis added).

53.     DIV OA respectfully submits that any authority to use Cash Collateral granted by the Bankruptcy Court should only be effective going forward, and ought not cleanse three weeks of non-compliance with the Bankruptcy Code.

**II.    Contrary to the Narrative the Debtor Presents in the DIP Motion, the Debtor Impermissibly Seeks to Subordinate DIV OA and the Proposed DIP Financing Deprives DIV OA of Bargained for Collateral Control Rights.**

54.     While the Debtor represents that the proposed DIP Financing would be junior to DIV OA's perfected liens, a closer read of the Proposed Interim DIP Order reveals that, if granted,

the Debtor's requested relief would in fact prime DIV OA's senior secured status.

    **A. The Debtor Seeks to Redirect Proceeds of Subsequent Financing to the DIP Lender, Priming DIV OA as Senior Lender.**

55.    The Proposed Interim DIP Order provides that 100% of any subsequent financing is to be applied to the DIP Lender until the Debtor's obligations under the DIP Facility have been satisfied in full. Proposed Interim DIP Order, ¶ 19 (providing that if the Debtor or its representatives obtain credit or incur debt prior to repayment in full of the DIP Financing, "unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Interim Order and the DIP Loan Documents"). This is antithetical to what the DIP Motion asserts is the non-disturbance of DIV OA's senior position of DIV OA and the junior position of the DIP Lender.

56.    For the avoidance of doubt, in the event there is a subsequent financing, DIV OA as the senior lender should receive proceeds of such financing until it is paid in full, prior to any diversion of the financing proceeds to the DIP Lender as junior lender.

57.    The Proposed Interim DIP Order would inappropriately subordinate DIV OA and should not be entered as proposed.

    **B. The Proposed Interim DIP Order Would Inappropriately Divert Insurance Proceeds to the DIP Lender, Again Subordinating DIV OA.**

58.    Similarly, notwithstanding the repeated assurances that the DIP Lender would be junior to DIV OA, paragraph 30 of the Proposed Interim DIP Order provides the DIP Lender with control over all insurance proceeds constituting DIP Collateral,[4] making no mention of DIV OA's

---

[4] "DIP Collateral" is defined to include "collectively, the Debtor's right, title, and interest in, to and under all the Debtor's assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: . . . insurance proceeds . . . and accessions, products, rents, profits, and proceeds of the foregoing, wherever located, including insurance proceeds or other proceeds . . . ." Proposed Interim DIP Order, ¶ 5.

senior secured interest in the same collateral. *See* Proposed Interim DIP Order, ¶ 30 ("Notwithstanding anything to the contrary herein or in any other DIP Loan Document, the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used, directly or indirectly, by the Debtor, the Creditors' Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Case (or any Successor Case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Lender. . . .").[5]

### C. The Proposed Interim DIP Order Would Subordinate DIV OA By Providing for Delivery of Excess Carve Out Funds to DIP Lender Over DIV OA.

59.    The Proposed Interim DIP Order provides that, after satisfaction of professional fees, "all remaining funds [held in a reserve account to fund the Carve Out] shall be returned to the DIP Lender, for application to the outstanding balance of the DIP Facility, or to hold as Cash Collateral for the obligations of the Debtor under the DIP Facility." Proposed Interim DIP Order, ¶ 23(c)(1).

60.    Because DIV OA's cash collateral encompasses 100% of the Debtor's operating revenues, and DIV OA has both a replacement lien and a superpriority claim to the extent of any diminution, the terms of the Proposed Interim DIP Order impermissibly subordinate DIV OA, again notwithstanding the Debtor's assertions to the contrary in the DIP Motion.

---

[5] While the DIP Term Sheet provides a modicum of protection to DIV OA on this point, DIV OA submits that the contemplated subordination of its rights in the Proposed Interim DIP Order is inappropriate. *See* DIP Term Sheet "Mandatory Prepayments" ("Subject to the rights of the holder of the Existing First Mortgage Financing, the Borrower shall promptly, and in any event, within one business day, prepay the DIP Facility obligations in an amount equal to (a) 100% of net insurance and condemnation proceeds, (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted hereunder and (c) 100% of the net cash proceeds of any sale of all or any material portion of the Debtor's assets. At the election of the DIP Lender in its sole discretion, all or a portion of such mandatory prepayments may be declined and available to the Borrower to be used in accordance with the Approved DIP Budget.").

**D. The Payment of the DIP Lender's Fees, Professional Fees, and Debt Service Further Subordinates DIV OA.**

61.     Again, the operation of the Proposed Interim DIP Order would permit the DIP Lender to "leap frog" DIV OA and take a first priority position with respect to DIV OA's Cash Collateral. Paragraph 15 of the Proposed Interim DIP Order provides that the Debtor is "authorized to use Cash Collateral, subject to and as set forth in the Approved DIP Budget (subject to Permitted Variances), this Interim Order, and the other DIP Loan Documents." Proposed Interim DIP Order, ¶ 15. The Budget provides for the payment of fees, professional fees, and debt service to the DIP Lender.

62.     As referenced above, all of the Debtor's operating revenues constitute DIV OA's Cash Collateral. Any portion of that Cash Collateral used to pay the DIP Lender, the DIP Lender in effect primed DIV OA with respect to that Cash Collateral.

**E. Approval of the DIP Motion Would Deprive DIV OA of Contractual Consent Rights for the Use of Its Cash Collateral.**

63.     The Proposed Interim DIP Order provides that upon the occurrence of a DIP Termination Event (as defined therein), the DIP Lender may declare a DIP EOD and impose various restrictions, including to "declare the termination, restriction, or revocation of the ability of the Debtor to use Cash Collateral." Proposed Interim DIP Order, ¶ 24(b). During the five day "waiting period," however, the Debtor may use Cash Collateral "solely to pay any expenses which are critical to preserving the Debtor's assets subject to the Approved DIP Budget." *Id.*, ¶ 24(c).

64.     The Proposed Interim DIP Order precludes the Debtor from using the Cash Collateral to challenge the DIP Lender's position. *Id.*, ¶ 30(e) (providing that the Debtor may not use Cash Collateral in connection with "litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, DIP Collateral (including Cash Collateral) or any other claims held by or on behalf of the DIP Lender").

65.     It is understandable that the DIP Lender would like to impose these restrictions on the use of Cash Collateral, but as the junior secured creditor, it is not the DIP Lender's prerogative to dictate permissible uses of Cash Collateral subject to DIV OA's senior consent rights.

66.     Accordingly, although the Debtor has presented the DIP Financing as junior funding that will not disturb DIV OA's senior secured rights, this is simply not the case. Due to the numerous provisions of the Proposed Interim DIP Order that would effectively prime DIV OA or otherwise impair its contractual rights as the senior lender, the DIP Motion must be denied.

## III.    **The Motions Present an Improper *Sub Rosa* Plan.**

67.     The terms of the DIP Facility and LOI constitute an impermissible *sub rosa* plan and circumvent the basic procedures and safeguards of chapter 11. The proposed financing and LOI have an impermissible *sub rosa* plan effect because it seeks to predetermine material plan terms and distribute reorganization value without the safeguards of the larger plan confirmation process. The Motions must be denied on that basis. *See In re Laffite's Harbor Development I, LP*, No. 17-36191-H5-11, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) ("The Bankruptcy Court cannot, under the guise of Section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.").

68.     As the Supreme Court has explained, debtors in chapter 11 are not permitted to enter into transactions that "circumvent the [Bankruptcy] Code's procedural safeguards." *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017). So-called "*sub rosa* plans are prohibited . . . based on a fear that a debtor-in-possession will enter into transactions that will, in effect, short circuit the requirements of Chapter 11 for confirmation of a reorganization plan." *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (internal quotation marks omitted) (*citing Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)).

69.     Here, the DIP Motion seeks approval of a construct which prohibits the Debtor from negotiating with any party other than the DIP Lender regarding potential restructuring transactions for a period of up to 120 days – i.e. in excess of the plan exclusivity period under 11 U.S.C. § 1121(b), while also requiring the Debtor to, *inter alia*, (i) enter into a letter of intent with the DIP Lender regarding a transaction whereby the Debtor will contribute its primary assets to a joint venture with the DIP Lender, in which the Debtor will receive a 35% interest in the joint venture, and (ii) file a plan and disclosure statement which would effectuate the terms of the transaction. *See, e.g.*, DIP Motion at ¶¶ 17, p. 14 (Milestones). The proposed structure is further burdened by the imposition of significant fees due to the DIP Lender as administrative expense obligations, and providing that if the Debtor were to seek to negotiate with any party other than DIP Lender, it would be on the hook for a  $1.9 million break up fee.

70.     As discussed, the Debtor admits it does not have a current appraisal—how can entering into a transaction like the one contemplated in the DIP Motion and the LOI Motion be a prudent exercise of its business judgment if the Debtor does not have evidence of the present value of its assets? How does the Debtor know that its 35% post-bankruptcy stake in the joint venture is appropriate?  What diligence has the Debtor undertaken to ensure that the DIP Lender can, and will, effectuate the transactions outlined in the current motions?  Entry of an order approving the DIP Facility would, in the first month of this case, lock in the terms of the Debtor's chapter 11 plan despite the fact that the proposed DIP Facility appears to not have been marketed and the Debtor does not have a current valuation. The Court should not approve the DIP Motion under these circumstances. *Jevic*, 137 S. Ct. at 984; *see also In re Belk Properties, LLC*, 421 B.R. 225-26 (Bankr. N.D. Miss. 2009) (rejecting as "sub rosa chapter 11 plan" proposed DIP financing that would enable the lender to obtain a controlling equity stake in the debtor).

## RESERVATION OF RIGHTS

DIV OA expressly reserves rights, claims, defenses, and remedies, including the right to supplement and amend the Omnibus Objection, to raise additional objections to the DIP Motion and its corresponding proposed order and to introduce evidence at or before any hearing on the DIP Motion. To the extent the Court will consider the DIP Motion further, DIV OA respectfully submits that the Court cannot grant the DIP Motion as requested by the Debtor without first conducting a full evidentiary hearing following a full and complete discovery process.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, DIV OA respectfully requests that the Court enter an order (i) denying the Motions; and (ii) granting such other and further relief as may be just and proper.

Dated:  Boston, Massachusetts
         December 30, 2024

                                                  Respectfully submitted,


                                                  By:
                                                  /s/ *John J. Monaghan*
                                                  John J. Monaghan (Mass. Bar. #546454)
                                                  Lynne B. Xerras (Mass. Bar #632441)
                                                  Kathleen M. St. John (Mass. Bar. #681565)
                                                  10 St. James Avenue, 11th Floor
                                                  Boston, Massachusetts 02116
                                                  Tel.: (617) 523-2700
                                                  Facsimile: (617) 523-6850
                                                  Bos-Bankruptcy@hklaw.com
                                                  Lynne.Xerras@hklaw.com
                                                  Kathleen.StJohn@hklaw.com

                                                  *Counsel to DIV OA Lender, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, John J. Monaghan, counsel to DIV OA Lender, LLC in connection with the above-captioned bankruptcy proceeding, hereby certify that on this 30th day of December, 2024, I served copies of the foregoing *Interim Omnibus Objection of DIV OA Lender, LLC to Debtor's Motions for First Day Relief* upon the parties on the attached service list via ECF or electronic mail, as indicated.

/s/  *John J. Monaghan*
John J. Monaghan

#515018808_v4

## SERVICE LIST

### VIA CM/ECF

**Counsel to the Debtor**
- Kathleen R. Cruickshank          kcruickshank@murphyking.com
- Harold B. Murphy                 hmurphy@murphyking.com, aspanos@murphyking.com

**United States Trustee**
- Justin Kesselman                 justin.a.kesselman@usdoj.gov
- Richard King - B                 USTPRegion01.BO.ECF@USDOJ.GOV

**Counsel to Creditor City of Revere**
- Albert J. Moscone                amoscone@mosconelawboston.com

**Counsel to Creditor Carabetta Enterprises, Inc.**
- Mark W. Powers                   mpowers@princelobel.com, norourke@princelobel.com
- George W. Tetler                 gtetler@princelobel.com, btaylor@bowditch.com

### VIA EMAIL

**Top 20 Largest Unsecured Creditors**
- AFA PROTECTIVE SYSTEMS, INC          JLEES@AFAP.COM
- National Grid Gas                    monica.booth@nationalgrid.com
- Parham Pouladdej                     PARHAM.POULADDEJ@GMAIL.COM
- National Grid Electric- House Meters jeffrey.evanchak@nationalgrid.com
- Brown Rudnick, Llp                   LCHARRON@BROWNRUDNICK.COM
- Jensen Hughes                        scott.sutherland@jensenhughes.com
- First Insurance Funding              firstinsite@firstinsurancefunding.com
- Affordable Mold and Duct Cleaning    GUYOLIVER1975@GMAIL.COM
- Environmental Design Engineering Corp Inc   ksafari@ede-inc.com
- Russo, Frye & Associates, LLP        RRUSSO@RUSSOFRYELLP.COM
- Stevenson Consulting                 JEFF@STEVENSON-CONSULTING.NET
- Valere Architects                    MO@VALEREARCHITECTS.COM
- Mammoth Fire Protection Systems Inc. billy.pappas@mfpflow.com
- The Guard Alliance                   accounting@theguardalliance.com
- Coastal Carpet                       BSPELLMAN@COASTALCARPETINC.COM
- Combustion Power Equipment, Inc.     COMBUSTION.POWER200@GMAIL.COM
- Republic Services                    media@republicservices.com;
                                       customerexperience@republicservices.com
- WSMD, Inc.                           RICH@WESTSIDEMETALDOOR.COM
- Intrepid                             ctenaglia@intrepid-usa.com
- Maguire Equipment                    MAGEQUIP1@AOL.COM
- Williamson Pump & Motor              daver@weco-group.com
- Joseph Carabetta                     joseph.carabetta@carabetta.com

**Counsel to DIP Lender**
- Greenberg Traurig, LLP               Jeffrey.wolf@gtlaw.com; greerb@gtlaw.com

**Governmental Units**
- IRS                                  Jeffrey.h.reynolds@irs.gov
- MDOR                                 murphys@dor.state.ma.us
- City of Revere                       cmicciulla@revere.org; dmasiello@revere.org;
                                       AVOZZELLA@REVERE.ORG