## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**WATER'S EDGE LIMITED PARTNERSHIP,**<br><br>Debtor. | **Chapter 11**<br><br>**Case No. 24-12445-CJP** |

### DEBTOR'S MOTION FOR ENTRY OF AN INTERIM AND FINAL ORDER: (I) AUTHORIZING THE DEBTOR TO OBTAIN ADDITIONAL JUNIOR SECURED POSTPETITION FINANCING; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING CONTINUED USE OF CASH COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION; (V) MODIFYING THE AUTOMATIC STAY; AND (VI) GRANTING RELATED RELIEF
### (*Emergency Determination Requested*)

Water's Edge Limited Partnership, the above-captioned debtor and debtor-in-possession (the "Debtor"), respectfully moves the Court (the "Motion") for entry of an interim order on an emergency basis (the "Interim DIP Financing Order"),[1] substantially in the form attached hereto as Exhibit A, and a final order (the "Final DIP Financing Order") following further notice and hearing, authorizing the Debtor, among other things, to obtain additional junior secured postpetition financing (as further defined below, the "Extended DIP Loan") from Fairbridge Credit, LLC or a subsidiary or affiliate thereof (the "Fairbridge DIP Lender"), to continue to use cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code, "Cash Collateral") pursuant to the terms and conditions of the term sheet attached to the Interim DIP Financing Order as Exhibit 1, and to provide adequate protection to DIV OA Lender, LLC

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Interim DIP Financing Order.

846314 v.4

("DIV OA Lender") on account of the Debtor's use of the Cash Collateral.  The Debtor further

requests that the Court set a hearing on the Debtor's request for the entry of the Final DIP

Financing Order within fourteen days following the entry of the Interim DIP Financing Order, or

to such date as is convenient to the Court's calendar.

The Extended DIP Loan provides for the Debtor to borrow up to $9,050,600.00 with a

maturity date of December 1, 2025 under a budget which extends approximately ninety (90) days

beyond the maturity date of the Debtor's existing DIP financing.  In addition, the Extended DIP

Loan provides the Debtor with an option to extend the maturity date through January 1, 2026 and

provides an additional $1 million in availability for that extension period.

**In order to permit the Debtor to timely satisfy its obligation to the Fairbridge DIP**

**Lender under its existing DIP Loan, to continue to use cash collateral, and to continue to**

**fund the expenses essential to the operation of its business and the expenses in this Chapter**

**11 case, the Debtor requests that an emergency hearing be scheduled on this matter on**

**September 2, 2025 after noon, September 3, 2025, or as soon as the Court's calendar**

**permits.**

In further support of this motion, the Debtor states as follows:

### JURISDICTION

1.      This Court has jurisdiction to consider and determine this Motion pursuant to 28

U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND

**A.      General Background**

2.      On December 5, 2024 (the "Petition Date"), the Debtor commenced this case by

filing a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code to stay a foreclosure

sale scheduled with respect to the Property (defined below) by DIV OA Lender, the holder of an

asserted first secured mortgage against the Property (the "Prepetition Mortgage") purchased from

M&T Bank shortly prior to the Petition Date.

3.      The Debtor continues to operate as debtor-in-possession pursuant to Section

1107(a) and 1108 of the Bankruptcy Code.

4.      The Debtor is a Massachusetts limited partnership.  It owns and operates an

approximately 306-unit residential community located in Revere, Massachusetts known as

Water's Edge Apartments (the "Property").  Additionally, each of the buildings include three (3)

commercial suites that are approximately 400 square feet.  A parking garage is located on both

the upper and lower level of each building.  Improvements at the Property include a fitness

center, laundry facilities, pool, and elevators.

5.      The factual background regarding the Debtor, including its business operations,

its capital and debt structures, and the events leading to the filing of this chapter 11 case, is set

forth in detail in the *Amended Declaration of Evelyn Carabetta in support of the Debtor's

Chapter 11 Petition and First Day Motions* [doc. no. 50] (the "First Day Declaration")[2], which is

incorporated by reference herein.

6.      On December 31, 2024, the Court entered an interim order and on January 17,

2025, the court entered a second interim order granting the Debtor authority, among other things,

to obtain interim postpetition financing from Eastern Acquisitions, LLC ("Eastern") on a junior

secured superpriority basis, consisting of a multi-draw term loan credit facility and the loans

issued thereunder (the "First DIP Loan") in the aggregate principal amount of $3,400,000 and to

continue to utilize cash collateral.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the First Day Declaration.

7.      In connection with the First DIP Loan, on December 26, 2024, the Debtor filed a motion for approval of its agreement with Eastern on a Letter of Intent to recapitalize the Property (the "LOI") pursuant to a joint venture agreement to be substantially effectuated through the Debtor's plan of reorganization, that contemplated that the Debtor would contribute the Property and related assets to a joint venture entity, and would receive in exchange: (a) a 35% interest in the joint venture entity, and (b) a capital contribution from the Eastern (exclusive of the Existing DIP Loan) sufficient to pay holders of allowed non-insider claims against the Debtor in full, unless otherwise agreed, with any amounts remaining from such capital contribution to be used by the joint venture entity to fund operations.

8.      The First DIP Loan provided funding through April 24, 2025 and required the Debtor to achieve a series of milestones under a compressed time frame.  Among other costs, it charged an interest rate based on a term SOFR for a 90-day term plus 5.5% per annum (10.25%) and a $25,000 per month collateral monitoring fee.

9.      In lieu of pursuing a plan with Eastern, DIV OA Lender approached the Debtor with a proposed DIP loan not predicated on a transaction with any party and on terms that were more favorable to the Debtor.

10.     On February 6, 2025, following motion by the Debtor, the Court entered an Interim Order [ECF No. 155] and on February 25, 2025, the Court entered a Final Order [ECF No. 180] authorizing a replacement DIP Loan of up to $3.4 million and its continued use of cash collateral under an approved budget.  The DIP Loan with DIV OA Lender was scheduled to mature on May 26, 2025, following which it would bear interest at the rate of 18% per annum.

11.     In order to provide the Debtor with additional time to conclude its Chapter 11 case, the Debtor reached agreement with the Fairbridge DIP Lender on the terms of a loan providing for a maturity date of September 1, 2025 (the "Initial Fairbridge DIP Loan").

12.     During the term of the Initial Fairbridge DIP Loan, the Debtor solicited offers from approximately eight to ten parties interested in acting as a plan sponsor and/or joint venture partner to fund payments to creditors under a plan of reorganization and the necessary repairs and renovations to the Property.  Following its extensive review, the Debtor determined that none of the offers submitted were acceptable. As a consequence, the Debtor cancelled the Selection Day scheduled for June 26, 2025.

13.     The Debtor thereafter determined in its business judgment to market the some or all of the Property for an outright sale as necessary to pay creditors in full, and to concurrently seek recapitalization of the Property to the extent that a portion of the Property is not required to be sold.

14.     In connection therewith, the Debtor filed the *Application of Debtor to Retain Commercial Real Estate Services Firm* (the "Application"), pursuant to which the Debtor sought authority to retain Newmark Real Estate of Massachusetts, LLC ("Newmark") in order to assist the Debtor in offering the Property, in its entirety and in various combinations, for an outright sale to a third party and/or for debt financing to pay creditors in full and fund necessary costs to repair and renovate all or a portion of the Property.

15.     The Debtor has also sought the entry of the *Amended and Restated Order Approving Sale Procedures, Authorizing the Debtor to Designate a Stalking Horse Offeror, and Granting Related Relief* (the "Amended and Restated Sale Procedures Order"), authorizing the Debtor, with the assistance of Newmark, to offer the Property in its entirety and in various

combinations to solicit offers for (each, a "Transaction") an outright sale to a third party and/or

debt financing to allow the Debtor to refinance existing capital under the Revised Timeline

provided for in the Amended and Restated Sale Procedures Order, for the purpose of paying all

claims in full except as otherwise agreed and funding necessary repairs and renovations.

16.    The Debtor, with the assistance of Newmark, is engaged in a marketing process

and following a call for offers, will require 2-4 iterative rounds of bidding to improve pricing and

structure, with a goal of reaching an agreement on one or more Transactions to be approved by

the Court in connection with the confirmation of the Debtor's plan.

17.    In order to provide the Debtor with sufficient time to complete the Sale Process

contemplated by the Amended and Restated Sale Procedures Order and close on one or more

Transactions with respect to the Property, the Debtor and the Fairbridge DIP Lender have

entered into a term sheet providing for the Extended DIP Loan to extend through December 1,

2025, with an option to extend through January 1, 2026.

18.    In order to provide adequate protection to DIV OA Lender on account of the

Prepetition Mortgage during the term of the Extended DIP Loan, the Debtor proposes to continue

to provide adequate protections liens and superpriority claims to DIV OA Lender solely to the

extent of any diminution of its Cash Collateral and to pay interest only payments to DIV OA

Lender during the budget period of the Extended DIP Loan, as is set forth in the Extended DIP

Financing Order and the Extended DIP Budget.

19.    The Extended DIP Loan does not require the Debtor to enter into any transaction

with Fairbridge DIP Lender.  The Extended DIP Loan contains substantially similar terms as the

Initial Fairbridge DIP Loan, except for the following:

   (i)    The interest rate charged under the Extended DIP Loan is based on the 1-month
          Term SOFR plus 5.0% (approximately 9.35%), with an interest floor of 12.5%

(the interest rate charged under the Initial Fairbridge DIP Loan was 1-month Term SOFR plus 4.5%, with an interest floor of 12%).

(ii)    The fees under the Extended DIP Loan are as follows: (a) a Closing Fee of $181,012 versus $130,000; (b) a Collateral Monitoring Fee of $10,000 per month, which is the same and (c) to the extent the Extended DIP Loan is extended for 1 month in accordance with the terms thereof, an Extension Fee of $65,253. No exit fee is required as was required by the Initial Fairbridge DIP Loan.

(iii)    The Extended DIP Loan requires payment to Fairbridge DIP Lender of a breakup fee in the amount of $75,000 and reimbursement of Fairbridge DIP Lender's expenses in the event that the Debtor enters into an agreement for another DIP loan prior to the closing of the Extended DIP Loan and the payment of the Closing Fee.

(iv)    The Extended DIP Loan requires that First Tower Funding, LLC, a Massachusetts limited liability company (the "Guarantor"), will provide an unlimited guarantee of payment and performance of the Extended DIP Loan. The Guarantor is an affiliate of the Debtor as a result of the common indirect ownership of 100% of the equity interests in both the Debtor and the Guarantor by Evenly M. Carabetta.

(v)    In addition to the Property, the real property owned by the Guarantor, located at 394 Ocean Avenue, Revere, Massachusetts (the "Non-Debtor Property"), shall serve as additional collateral for the Extended DIP Loan.

(vi)    The term sheet includes a provision providing the Guarantor with an option to refinance its existing first mortgage against the Non-Debtor Property in an amount of up to $7 million, a transaction which would be separate and apart from the Extended DIP Loan.

20.    The Extended DIP Loan is the best interests of the Debtor and its creditors because it will provide the Debtor with funding necessary for the Debtor to conclude its Chapter 11 case, including with respect its ongoing efforts to market the Property for outright sale or other Transaction(s) which will pay creditors in full unless otherwise agreed, and is therefore in the best interest of the Debtor and its creditors.

<b><u>NOTICE</u></b>

21.    Notice of this Motion was served on: (a) the United States Trustee; (b) counsel to the Prepetition Mortgage Lender; (b) each of the Debtor's twenty (20) largest non-priority

7

unsecured creditors; (d) counsel to Fairbridge DIP Lender; (e) any party asserting a lien against any of the Debtor's assets; and (f) all known taxing authorities which may assert claims against the Debtor (collectively, the "Notice Parties"). Such notice constitutes sufficient and adequate notice of the Motion and the relief granted in this order pursuant to the applicable Federal Rules of Bankruptcy Procedure and the Local Rules.

**WHEREFORE,** based upon the foregoing and for the reasons set forth herein, the Debtor requests that the Court (i) enter an order substantially in the form of the Interim DIP Financing Order attached hereto as Exhibit A granting the relief requested herein; (ii) set a hearing to consider the entry of the Final DIP Financing Order within fourteen days of the entry of the Interim DIP Financing Order, or to such date as is convenient to the Court's calendar; and (iii) grant such other relief the Court deems just and proper.

Respectfully submitted,

WATER'S EDGE LIMITED PARTNERSHIP,
By its counsel,

*/s/ Kathleen R. Cruickshank*
Harold B. Murphy (BBO # 362610)
Kathleen R. Cruickshank (BBO #550675)
Murphy & King, Professional Corporation
28 State Street, Suite 3101
Boston, Massachusetts 02109
Telephone No.: (617) 423-0400
kcruickshank@murphyking.com

Dated: August 28, 2025

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

In re:

WATER'S EDGE LIMITED
PARTNERSHIP

                              Debtor.

Chapter 11

Case No. 24-12445 (CJP)

---

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN JUNIOR
SECURED POSTPETITION FINANCING; (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE
OF CASH COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION;
(V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING A CONTINUED
HEARING; AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[1] of Water's Edge Limited Partnership, as debtor and

debtor-in-possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11**

**Case**"), seeking entry of an interim order (the "**Interim Order**"), pursuant to sections 105, 361,

362, 363, 364, 503, 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the

"**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and Rule 2002-1, 4001-2, and 9013-1 of the Local

Bankruptcy Rules of the United States Bankruptcy Court for the District of Massachusetts (the

"**MLBR**"), that, among other things:

   i.    authorizes the Debtor to obtain postpetition financing on a junior secured
         superpriority basis, consisting of a multi-draw term loan credit facility (the "**DIP
         Facility**," and the loans issued thereunder, collectively, the "**DIP Loan**") in an
         aggregate principal amount of up to $9,050,600.00 (as the same may be increased
         from time to time in accordance with the "Extension Option" (defined in Section
         3(b) below) hereunder, "**DIP Loan Commitment**") with a maturity date of
         December 1, 2025, with the option to extend to January 1, 2026, pursuant to the
         terms and conditions set forth in the Debtor in Possession Financing Term Sheet

---

[1] Unless stated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to
them in the Motion or the DIP Term Sheet (as defined below), as applicable.

attached hereto as **Exhibit 1** (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Term Sheet**" and, together with this Interim Order (as defined below), the Approved DIP Budget (as defined in the DIP Term Sheet), collectively, the "**DIP Loan Documents**"), by and among the Debtor, as borrower, First Tower Funding, LLC, a Massachusetts limited liability company, as guarantor (the "**Guarantor**") and Fairbridge Credit LLC, or a subsidiary or affiliate thereof as lender (together with its successors and/or assigns, the "**DIP Lender**"). The Guarantor has agreed to provide an unlimited guarantee of payment and performance of the Debtor's obligations in connection with the DIP Facility by entering into the DIP Term Sheet and certain other DIP Loan Documents in favor of the DIP Lender (collectively, the "**Guarantor DIP Documents**"). The Guarantor's obligations are secured by the Guarantor Collateral (as defined in the DIP Term Sheet).  The Guarantor DIP Documents are being provided in consideration of DIP Lender's willingness to modify, amend and increase its existing DIP financing in the maximum principal amount of $6,500,000 (the "**Existing DIP Financing**") in accordance with the terms of this Interim Order and the DIP Term Sheet. The Guarantor is not a party to the Chapter 11 Case but is an affiliate of the Debtor as a result of the common ownership in the Debtor and Guarantor by Evelyn Carabetta;

ii.   authorizes the Debtor to enter into the DIP Term Sheet and any other DIP Loan Document and to take such other and further acts as may be required in connection with the DIP Loan Documents;

iii.   authorizes the Debtor to grant security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to sections 364(c)(1) and 503(b) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code) in the DIP Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting Cash Collateral (as defined below), to the DIP Lender to secure all obligations of the Debtor under and with respect to the DIP Facility (collectively, the "**DIP Obligations**"), including, subject to entry of this Interim Order, such (x) liens and security interests subject only to, as provided herein, the (a) the Carve Out (as defined below), (b) any valid, enforceable, non-avoidable prepetition liens, security interests, and mortgages in existence as of the Petition Date held by the DIV OA Lender, LLC ("**Existing Lender**" or "**DIV OA Lender**") securing the obligations in respect of the Debtor's existing pre-petition first mortgage facility (the "**Existing Mortgage Facility**" and the mortgages, liens and interests granted thereunder the "**Existing Mortgage Liens**"), (c) any other valid, enforceable, non-avoidable liens that are (i) either perfected as of the Petition Date or perfected on or after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code and (ii) not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (the "**Prepetition Liens**" and together with the Existing Mortgage Liens, the "**Permitted Prior Liens**"), and (d) the Adequate Protection Liens (as defined below), and (y) superpriority claims subject only to the DIP Liens (as defined below), Permitted Prior Liens, Carve Out and the Adequate Protection Superpriority Claim (as defined below);

2

iv.     authorizes the Debtor to pay the DIP Obligations, including all principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents as such become due and payable;

v.      authorizes and directs the Debtor to use the proceeds of the DIP Facility and "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), including with respect to the collateral subject to the Existing Mortgage Liens (the "**Prepetition Collateral**"), subject to the permitted variances provided for in the DIP Term Sheet ("**Permitted Variances**"), or as otherwise permitted under this Interim Order or the DIP Loan Documents;

vi.     authorizes the Debtor to provide adequate protection of the Existing Mortgage Liens, as more fully set forth in this Interim Order, any such adequate protection liens and superpriority claims to be subject to any other Permitted Prior Liens, in each case, as set forth in this Interim Order, solely to the extent of any Diminution (as defined below); provided, however, only to the same validity, priority, and extent as any Existing Mortgage Lien or claim asserted by the DIP Lender, and without waiver of the Debtor's and any other party's right to assert any and all challenges, causes of action, and claims against the DIP Lender;

vii.    modifies the automatic stay provided by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtor and the DIP Lender to implement and effectuate the terms and provisions of the DIP Loan Documents, including this Interim Order;

viii.   upon entry of a Final Order, (x) waives all of the Debtor's rights to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code; and (y) waives the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender for the benefit of any party other than the DIP Lender;

ix.     schedules a final hearing (the "**Final Hearing**") to consider entry of a final order approving the continued use of Cash Collateral and additional DIP Financing;

x.      waives any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including a waiver pursuant to Bankruptcy Rule 6004(h)); and

a hearing to consider approval of the Motion having been held by this Court on _____, 2025

(the "**Interim Hearing**"); and this Court having considered the Motion, the DIP Term Sheet, the

proposed Interim Order, and all pleadings related thereto, including the record made by the Debtor

at the Hearings; and pursuant to due and sufficient notice of the Motion and the relief sought at the

Interim Hearing having been given under the particular circumstances by the Debtor; and after due

deliberation and consideration, and good and sufficient cause appearing therefor:

846318 v7

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND EVIDENCE SUBMITTED DURING THE INTERIM HEARING:**[2]

A.      **Petition Date**.  On December 5, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing this Chapter 11 Case.

B.      **Debtor in Possession**.  The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On January 7, 2025, the Office of the United States Trustee for the District of Massachusetts (the "**United States Trustee**") filed a statement that there was an insufficient number of creditors to form an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**") in this Chapter 11 Case, and no request has been made for the appointment of a trustee or an examiner.

C.      **Jurisdiction and Venue**.  This Court has core jurisdiction over the Chapter 11 Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for relief sought in this Motion are sections 105, 361, 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and MLBR 2002-1, 4001-2, and 9013-1.

---

[2]      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry hereof. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

846318 v7

D.      **Notice**.  Under the circumstances, the notice of the Initial Hearing given by the

Debtor of, and as described in, the Motion, the relief requested therein, constitutes adequate notice

thereof and complies with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014 and MLBR

4001-2(e), and no further notice of the relief sought at the Interim Hearing and the relief granted

herein is necessary or required.

E.      **Good Cause**.  Good cause has been shown for immediate entry of this Interim

Order, and the entry of this Interim Order is in the best interests of the Debtor, its estate, and its

stakeholders.  Among other things, the Debtor has an immediate need for the liquidity provided

by the DIP Facility.  The relief requested in the Motion is necessary, essential, and appropriate,

and is in the best interest of and will benefit the Debtor, its creditors, and its estate, as its

implementation will, among other things, provide the Debtor with the necessary liquidity to

(1) minimize disruption to the Debtor's business and ongoing operations, (2) preserve and

maximize the value of the Debtor's estate for the benefit of all the Debtor's creditors, and (3) avoid

potential immediate and irreparable harm to the Debtor as well as its creditors, business,

employees, and assets.

F.      **No Credit Available on More Favorable Terms**.  As junior secured, non-priming

financing, the DIP Facility is the best source of debtor-in-possession financing available to the

Debtor.  From and after the Petition Date, the Debtor has solicited and received multiple offers for

debtor-in-possession financing. After evaluation of the competing proposals and consultation with

its professionals, the Debtor has determined in its business judgment that the provisions of the DIP

Facility are the most competitive and in the best interests of the estate. Based on the proffer by the

Debtor, the Debtor is unable to procure financing in the form of unsecured credit allowable as an

administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code.  The

Debtor is also unable to obtain secured credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims (each as defined below) under the terms and conditions set forth in the DIP Loan Documents, and the DIP Facility provides the most favorable terms available to the Debtor. The Debtor has been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by DIP Lender pursuant to the DIP Loan Documents.

G. **Best Interests of Estate**. It is in the best interests of the Debtor's estate and creditors that the Debtor be allowed to obtain postpetition secured financing from the DIP Lender under the terms and conditions set forth herein and in the DIP Loan Documents, as such financing is necessary to avoid immediate and irreparable harm to the Debtor's estate and for the continued operation of the Debtor's business.

H. **Willingness to Provide Financing**. The DIP Lender has committed to provide financing to the Debtor subject to: (a) entry of this Interim Order; (b) approval of the terms and conditions set forth in the DIP Loan Documents (including, but not limited to, any closing conditions contained therein); and (c) findings by this Court that (i) the DIP Facility is essential to the preservation of the Debtor's estate, (ii) the DIP Lender is extending credit to the Debtor pursuant to this Interim Order, (iii) the DIP Loan Documents were negotiated in good faith, and (iv) that the DIP Lender's claims, superpriority claims, security interests, liens, and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code

I. **Good Faith**. Based upon the papers filed in this Chapter 11 Case and the proceedings of record in this Chapter 11 Case, (a) the extension of credit and financial accommodations under the DIP Loan Documents are fair, reasonable, in good faith, negotiated at

arm's length, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's-length with the Debtor, with the assistance and counsel of their respective advisors; (c) any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtor by the DIP Lender pursuant to this Interim Order have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Lender in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; (d) the liens, claims, and other covenants and payments as set forth in this Interim Order and the DIP Term Sheet, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code are integral, critical, and essential components of the DIP Facility provided by the DIP Lender to the Debtor; and (e) the DIP Facility, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision thereof or hereof is vacated, reversed, or modified, on appeal or otherwise. Accordingly, the DIP Lender is entitled to the protections of section 364(e) of the Bankruptcy Code, and such protections are necessary in order to induce the DIP Lender to provide the DIP Facility to the Debtor.

J.      **Initial DIP Budget**.  The Debtor has prepared and delivered to the DIP Lender and its advisors an initial DIP budget attached hereto as **Exhibit 2** (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet, the "**Initial DIP Budget**").  The Initial DIP Budget reflects, among other things, for the newly budgeted, 13-week period commencing on September 1, 2025, the Debtor's projected

operating receipts, operating disbursements, non-operating disbursements, net operating cash flow and liquidity for each one-week period covered thereby. The Initial DIP Budget has been reviewed by the Debtor, its management and advisors, and the Debtor believes that the Initial DIP Budget is reasonable under the circumstances. The DIP Lender is relying, in part, upon the Debtor's agreement to comply with the Initial DIP Budget (and any subsequently Approved DIP Budget), subject only to Permitted Variances.

K.    **Adequate Protection**. Pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any decrease in the value of its interest, if any, in the Cash Collateral of the DIP Lender under the Existing Mortgage Liens resulting from (i) the use, sale, or lease by the Debtor of such Cash Collateral during the pendency of the Chapter 11 Case, (ii) the DIP Liens pursuant to this Interim Order, the DIP Term Sheet, and/or the other DIP Loan Documents, or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such actual diminution, collectively, "**Diminution**"), the DIP Lender is entitled to the adequate protection set forth herein. The terms of the Adequate Protection are fair and reasonable, reflect the Debtor's prudent exercise of business judgment, and are sufficient to (a) allow the Debtor's use of the Cash Collateral and (b) to permit the relief granted in this Interim Order.

L.    **Section 506(c) and Marshaling**. In light of, among other things, the DIP Lender's agreement to extend financing and to have its DIP Liens and DIP Superpriority Claims be subject to the Carve Out and the Permitted Prior Liens as provided herein, the DIP Lender has negotiated for, and the Debtor is seeking, subject only to the entry of a Final Order, (a) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the collateral of the DIP Lender.

846318 v7

M.  **Business Judgment**.  Based on the Motion and the record presented to this Court at the Hearings, (i) the terms of the financing embodied in the DIP Loan Documents, including the fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, (ii) the Adequate Protection authorized by this Interim Order, and (iii) the terms on which the Debtor may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the other DIP Loan Documents, are fair and reasonable, reflect the Debtor's exercise of prudent business judgment, constitute reasonably equivalent value and fair consideration, and represent the best financing and terms available under the circumstances.

N.  **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable MLBR.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.  **Motion Granted**. The Motion is GRANTED on an interim basis as set forth herein. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.  **Authorization of the DIP Facility.**

a.  <u>DIP Facility</u>.  The Debtor is expressly and immediately authorized to enter into and perform the transactions contemplated in this Interim Order and the other DIP Loan Documents and following the entry of this Interim Order, to continue to receive financial accommodations and continue to borrow funds up to the DIP Loan Commitment during the period commencing on the date of this Interim Order

through and including the occurrence of a DIP Termination Event (as defined below), in each instance subject to disbursement in accordance with the Approved DIP Budget and the terms set forth in the DIP Loan Documents.  The DIP Term Sheet and the other DIP Loan Documents (if applicable) shall constitute and are hereby deemed to be the legal, valid, and binding obligations of the Debtor and its estate, enforceable in accordance with the terms thereof in this Chapter 11 Case or any Successor Case (as defined below) against the Debtor, its estate, and any successor of the Debtor or any representative of the estate (including a trustee, responsible person, or examiner with expanded powers).

b. <u>Authorization.</u>  Each officer of the Debtor (and in the case of requests for advances under the DIP Facility, Debtor's financial advisor, Craig Jalbert and Don Swanson at Verdolino & Lowey), each, acting individually is hereby authorized to execute and deliver each of the DIP Loan Documents, including to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtor under the DIP Loan Documents, and for the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan Documents.

c. <u>Use of Proceeds</u>.  The Debtor is authorized to utilize the proceeds of the DIP Facility only: (i) to pay off the Existing DIP Financing from DIP Lender; (ii) to pay professional fees and expenses incurred by those professionals authorized and approved to act for and on behalf of the Debtor as and to the extent provided in the Approved DIP Budget, which advances for the Debtor's Professionals during the operative period of the Interim Order shall be governed by paragraph 22(c)(i) of

846318 v7

this Interim Order; and (iii) to fund postpetition corporate and operating expenses of the Debtor incurred in the ordinary course of business of the Debtor consistent with the Approved DIP Budget, which advances shall be deposited in the Debtor's Chapter 11 debtor-in-possession account in accordance with the United States Trustee operating guidelines (the "**DIP Account**") and shall be in an amount equal to the estimated negative cash flow for the subsequent week per the DIP Budget <u>minus</u> the current cash position as of the date of the funding request <u>plus</u> $25,000 (the "**Target Cash Amount**"). Target Cash Amount shall mean the cash amount on deposit in the Debtor's DIP Account after funding actual and projected corporate and operating expenses in accordance with the Approved DIP Budget.

d. <u>Collections</u>. The Debtor shall collect accounts, rents, and revenues in the ordinary course of business and apply the proceeds thereof to operational expenses in accordance with the Approved DIP Budget before requesting advances under the DIP Facility.

3. **DIP Obligations; Fees and Expenses; Exclusivity; Break-Up Fee.**

a. <u>DIP Obligations</u>. This Interim Order and the other DIP Loan Documents shall constitute and evidence the validity and binding effect of the Debtor's DIP Obligations. The DIP Obligations shall bear interest at the applicable rate set forth in the DIP Term Sheet (including, if applicable, the "Default Rate" set forth in the DIP Term Sheet (the "**Default Rate**") after the occurrence of an "Event of Default" (as defined in the DIP Term Sheet, as further supplemented by this Interim Order)) and accrued interest thereunder shall be due and payable monthly, beginning on the first (1st) day of the first full calendar month following the advance of the initial

846318 v7

DIP Loan and on the first (1st) day of each and every calendar month thereafter throughout the term of the DIP Facility. On the "Maturity Date" (as such term is defined in the DIP Term Sheet), all principal, interest and all other fees and expenses due under this Interim Order and the other DIP Loan Documents shall be due and payable, in full.  The "Closing Fee" and "Collateral Monitoring Fee" referred to in the DIP Term Sheet are hereby deemed to be fully earned, part of the DIP Obligations, when and as payable in accordance with the terms of the DIP Term Sheet without the need for any further order of this Court.

b.  Extension Option. DIP Lender will grant Debtor an extension option to extend the "Stated Maturity Date" (as such term is defined in the DIP Term Sheet) until January 1, 2026 (an "**Extension Period**"), subject to Debtor's satisfaction of the following requirements (as determined by DIP Lender in its sole but reasonable discretion), (i) payment to DIP Lender of the "Extension Fee" referred to in the DIP Term Sheet, (ii) no Event of Default is then existing under any of the DIP Loan Documents, including the Guarantor DIP Documents, at the time of the extension request or the date of extension, and (iii) delivery of notice of Debtor's election to extend the DIP Facility to DIP Lender not less than 10 days before the start of the Extension Period. During the Extension Period, the DIP Loan Commitment shall be increased by $1,000,000, in accordance with a revised Approved DIP Budget provided by Debtor to DIP Lender with such notice.

c.  Fees and Expenses.  To the extent this Interim Order is entered and for so long as the DIP Obligations remain outstanding, the Debtor agrees to pay all reasonable and documented out-of-pocket fees and expenses incurred by the DIP Lender in

connection with (i) the preparation, execution, delivery, funding and administration of the DIP Loan Documents, including without limitation, legal fees, closing costs, property condition assessments, UCC and other public records searches, recording and filing fees, and collateral examination costs incurred by DIP Lender, (ii) the Chapter 11 Case or any Successor Case, or (iii) enforcement of any rights or remedies under the DIP Loan Documents, including the Guarantor DIP Documents, in each case, whether or not the transactions contemplated hereby are fully consummated (collectively, the "**Expenses**").

d.   Exclusivity; Break-Up Fee. Following entry of this Interim Order and until such time that the DIP Lender has received payment in full of its Closing Fee pursuant to this Interim Order, neither Debtor nor any of its affiliates, principals, equity-holders, directors, officers or representatives shall, directly or indirectly, (i) solicit or encourage any inquiries, discussions or proposals regarding, (ii) continue, propose or enter into negotiations or discussions with respect to, or (iii) enter into any agreement or other understanding providing for, in each case, any Alternative Transaction (as defined below); nor shall any of such persons or entities provide any information to any other person or entity for the purpose of making, evaluating or determining whether to make or pursue, any inquiries or proposals with respect to, any Alternative Transaction. For the purposes hereof, "**Alternative Transaction**" means any substitution for or addition to the DIP Facility or other financing with respect to any portion of the DIP Collateral prior to the closing of the DIP Facility and the payment of the Closing Fee but does not mean the Debtor's entry into a joint venture agreement or similar agreement with a third party with

respect to all or a portion of the Properties (as defined in the DIP Term Sheet).  If any of the restrictions set forth in this paragraph are breached or violated, contemporaneously with the closing of any Alternative Transaction, DIP Lender shall be entitled to a break-up fee equal to Seventy-Five Thousand Dollars ($75,000.00) (the "**Break-Up Fee**"). **For the avoidance of doubt, the Break-Up Fee <u>will not</u> be due and payable if the Closing Fee is paid.**

e.  <u>Section 364(e) of the Bankruptcy Code</u>. For the avoidance of doubt, and without limiting any of the forgoing or any other provision of this Interim Order, to the extent the DIP Facility closes in accordance with this Interim Order, the Closing Fee and Collateral Monitoring Fee or, to the extent applicable, the Break-Up Fee, specified in the DIP Term Sheet that by the terms of such section are payable prior to the entry of this Interim Order are, upon entry of this Interim Order and irrespective of any subsequent order approving or denying the DIP Facility or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of section 364(e) of the Bankruptcy Code and are deemed fully earned, indefeasibly paid, non-refundable, irrevocable, and non-avoidable as of the applicable dates specified in the DIP Term Sheet.

4.  **DIP Superpriority Claims**.

a.  Upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the Chapter 11 Case (the "**DIP Superpriority Claims**") for all DIP Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtor's or its estate in the Chapter 11 Case and any

Successor Case, at any time existing or arising, of any kind or nature whatsoever; provided, further, that the DIP Superpriority Claim shall be subordinate to (i) the DIP Liens, (ii) Permitted Prior Liens, (iii) the Carve Out, and (iv) the Adequate Protection Superpriority Claim. The Debtor acknowledges and agrees that, to the best of its knowledge after due inquiry, including its own projections as to interest accrued and to be accrued on such senior claims, but without full knowledge of the amount of professional fees and similar costs to be asserted by each claimant (and noting that, in particular, the holder of the first mortgage lien has to date declined repeated requests to provide that information), as of November, 2025, the DIP Facility is and will be junior and subordinate in repayment only to the following:

| | | |
|---|---|---|
| Existing First Mortgage Financing | $ | 17,901,804.46 |
| City of Revere | $ | 3,689,777.41 |
| Mechanics' Lien Claims | $ | 183,135.44 |
| **Total Permitted Prior Liens** | **$** | **21,774,717.30** |

For the avoidance of doubt, the DIP Obligations under this Interim Order include all DIP Obligations that were incurred under and/or pursuant to this Interim Order. Notwithstanding the foregoing, no DIP Superpriority Claim may be paid from proceeds and property recovered in respect of the Debtor's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law.

b.  All DIP Obligations shall be enforceable against the Debtor, its estate, and any successor thereto, including without limitation, any trustee appointed in the

846318 v7

Chapter 11 Case, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceeding superseding or related to any of the foregoing (the "**Successor Case**").

c.   No obligation, payment, transfer, or grant of collateral as security in favor of the DIP Lender hereunder or under the DIP Loan Documents (including any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547–550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.   **DIP Collateral**.  To secure the DIP Obligations, pursuant to sections 361, 362, 364(c)(2), and 364(c)(3) of the Bankruptcy Code, the DIP Lender is hereby granted, subject only to the Carve Out and Permitted Prior Liens, continuing, valid, binding, enforceable, nonavoidable, and automatically and properly perfected pre and postpetition (including, but not limited to, the Avoidance Actions (defined below) if and to the extent same are approved pursuant to a final order) security interests in and liens and mortgages (the "**DIP Liens**") on the DIP Collateral.  The term "**DIP Collateral**" means, unless otherwise provided herein, collectively, the Debtor's right, title, and interest in, to and under all the Debtor's assets, including, but not limited to the following,

in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: any and all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, inventory (wherever located), instruments (including, without limitation, promissory notes), documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of the Debtor, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), hedge agreements, ships and vessels, furniture, fixtures, equipment (including documents of title), goods, vehicles, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles and hedging arrangements), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, insurance proceeds, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and accessions, products, rents, profits, and proceeds of the foregoing, wherever located, including insurance proceeds or other proceeds and, to the extent granted pursuant to a final order, the Avoidance Actions. DIP Collateral also includes (a) all fixtures and fee owned by the Debtor, including the "Properties" (as defined in the DIP Term Sheet), (i) all leases by the Debtor, as lessor, and all rents, income, and other proceeds with respect thereto, with respect to such real property, and (ii) all proceeds of real property leased by the Debtor, as lessee; (b) actions brought under

section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; and (c) all products and proceeds of any of the foregoing, including proceeds of insurance (including business interruption insurance).

6.      **DIP Liens**.  To secure the DIP Obligations, the DIP Lender is hereby granted the following DIP Liens with respect to the Debtor, its estate and all DIP Collateral: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, first priority liens on and security interests in all unencumbered DIP Collateral (the "**Section 364(c)(2) Liens**"), which Section 364(c)(2) Liens shall be subject to the Carve Out and the Adequate Protection Liens; and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, security interests and liens in all DIP Collateral that are subject only to the Permitted Prior Liens (the "**Section 364(c)(3) Liens**"), which Section 364(c)(3) Liens shall also be subject to the Carve Out and the Adequate Protection Liens.  The foregoing DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, automatically, and fully perfected. Subject to the entry of a final order, the DIP Collateral shall include, and DIP Liens are granted with respect to, any claims and causes of action by the estate under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law, or proceeds or property recovered on account thereof (the "**Avoidance Actions**").

Other than as set forth herein or in the DIP Loan Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or Successor Case.  The DIP Liens shall not be subject

18

to section 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the Debtor's estate pursuant to section 551 of the Bankruptcy Code shall rank *pari passu* with or senior to the DIP Liens.

7.    **Insurance Proceeds and Policies**. To the fullest extent provided by applicable law, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insured and insured mortgagee/lender loss payable on each insurance policy maintained by the Debtor that in any way relates to the DIP Collateral.

8.    **Maintenance of DIP Collateral**.  Until the payment in full of the DIP Obligations, the Debtor shall (a) maintain "all risk" fire and casualty insurance, general liability insurance and such other insurance required by the DIP Lender related to the DIP Collateral, in each case, issued by insurers and covering such risks and subject to such deductibles and co-insurance amounts (if any), as are acceptable to the DIP Lender and (b) maintain its cash management system in accordance with the DIP Term Sheet.

9.    **No Obligation to Extend Credit**.  The DIP Lender shall have no obligation to make any loan or advance under the DIP Loan Documents unless (a) all of the conditions precedent under the DIP Term Sheet and this Interim Order have been satisfied in full or waived by the DIP Lender (in its sole discretion) in accordance with the terms of the DIP Term Sheet and (b) such loans or advances are consistent with the Approved DIP Budget.

10.    **Approved DIP Budget**.    The Approved DIP Budget may be amended, supplemented, extended, or otherwise modified from time to time as provided in the DIP Term Sheet or as the Debtor and the DIP Lender mutually agree in writing without further order of this Court as provided in the DIP Term Sheet; provided, however, that notice of any amendments shall

be given to the United States Trustee and filed with the Court; and provided, further, that the United

States Trustee shall have three (3) business days from such notice to object to any such amendment.

11.     **DIP Budget Reporting**.  The Debtor shall prepare and provide to DIP Lender and

its counsel the budgets and reports as required under the DIP Term Sheet.

12.     **No Monitoring Obligation**.  The DIP Lender shall not have any obligation or

responsibility to monitor the Debtor's use of the DIP Facility, and the DIP Lender may rely upon

the Debtor's representation that the use of the DIP Facility at any time is in accordance with the

requirements of this Interim Order and the DIP Loan Documents, including but not limited to the

Approved DIP Budget.

13.     **Use of Cash Collateral.**  The Debtor is authorized to use Cash Collateral, subject

to and as set forth in the Approved DIP Budget (subject to Permitted Variances), this Interim

Order, and the other DIP Loan Documents, during the period from entry of this Interim Order

through and including the Maturity Date.

14.     **Reasonable Access.**  Without limiting the rights of access and information afforded

to the DIP Lender under the DIP Loan Documents, the Debtor will be required to afford

representatives, agents, consultants, partners, and/or employees of the DIP Lender and its affiliates

reasonable access to the Debtor's premises (including, the Properties) and their records in

accordance with the DIP Loan Documents, and shall cooperate, consult with, and provide to such

persons all such information.

15.     **Adequate Protection for DIP Lender's Existing Mortgage Liens**.  As adequate

protection of the DIP Lender's interest in and under the Existing Mortgage Liens, including its

interest in Cash Collateral, the DIP Lender shall receive the protections listed below (collectively,

the "**Adequate Protection**").

a.  <u>Adequate Protection Liens</u>.  Continuing valid, binding, enforceable and perfected postpetition liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be limited to the extent of any Diminution of the DIP Lender's asserted interest arising under the Existing Mortgage Facility in the Cash Collateral, shall be subject and subordinated only to the Prepetition Liens (the "**Adequate Protection Liens**") and which shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any Successor Case to the extent provided herein; <u>provided</u>, <u>however</u>, that the Adequate Protection Liens shall not attach to the Carve Out to the extent that the Carve Out is funded directly by the DIP Lender, including the Professional Fee Escrow (as defined below) and the funds therein, and further provided that the Adequate Protection Liens shall be subject to the same validity, priority and extent as the Existing Mortgage Liens.

b.  <u>Adequate Protection Superpriority Claim</u>.  Administrative superpriority expense claims in the Chapter 11 Case pursuant to section 507(b) of the Bankruptcy Code (the "**Adequate Protection Superpriority Claim**"), which shall be limited to the extent of any Diminution of the DIP Lender's asserted interest arising under the Existing Mortgage Facility in the Cash Collateral, and shall be subject and subordinate to the Permitted Prior Liens with priority over any and all other administrative expenses and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code and provided

herein; provided, however, that the Adequate Protection Superpriority Claim shall have no recourse to the Carve Out, including the Professional Fee Escrow and the funds therein.

16.      **Perfection of DIP Liens and Adequate Protection Liens**.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lender to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender is authorized, but not required, to file, as it deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the date of the commencement of the Chapter 11 Case; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  The Debtor shall execute and deliver to the DIP Lender all such financing statements, mortgages, security agreements, notices and other documents, and otherwise cooperate and assist in any such filings, as the DIP Lender may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens. The DIP Lender may, in its discretion, file an electronic copy or

photocopy of this Interim Order as a mortgage and/or financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.

17. **Modification of Automatic Stay**. The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtor and/or the DIP Lender to accomplish the transactions contemplated by this Interim Order. Upon and after the occurrence of any DIP Termination Event (as defined in paragraph 23(a) below), the DIP Lender, to the extent expressly permitted under this Interim Order (including, but not limited to, paragraph 23 below) and the DIP Loan Documents, shall be immediately entitled to exercise all of their rights and remedies in respect of the DIP Collateral, in accordance with this Interim Order and the other DIP Loan Documents, as applicable.

18. **Proceeds of Subsequent Financing**. If the Debtor, any trustee, any examiner, or any responsible officer subsequently appointed in any of the Chapter 11 Case or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Loan Documents) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, unless otherwise agreed by the DIP Lender in writing, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Interim Order and the DIP Loan Documents. No consents required hereunder by the DIP Lender shall be implied by any inaction or acquiescence by the DIP Lender.

19.     **Right to Credit Bid**.  In connection with any sale process or sale authorized by the Court, the DIP Lender, or any assignee or designee of the DIP Lender, shall have the right to credit bid any or all of the DIP Obligations outstanding under the DIP Facility in connection with any disposition of property or assets of the Debtor's estate, including, without limitation, any sale occurring pursuant to section 363 of the Bankruptcy Code, and the Debtor shall not oppose such right.

20.     **Proofs of Claim**.  The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Case or Successor Case, and the entry of this Interim Order shall be deemed to constitute a timely filed proof of claim.  Any order entered by this Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in the Chapter 11 Case or Successor Case shall not apply to the DIP Lender.  Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, but is not required to, file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Case or any Successor Case for any claim allowed herein.

21.     **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.  The DIP Lender has acted in good faith in connection with the DIP Facility, the DIP Loan Documents, and this Interim Order, and is entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of any DIP Loans made hereunder or the DIP Liens or DIP Superpriority Claims authorized or created hereby. Notwithstanding any modification, amendment, or vacatur of any or all of the provisions of this Interim Order by a subsequent order of this Court or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code.

22. **Carve Out**.

a. <u>Generally</u>. The DIP Liens, the Permitted Prior Liens (other than the Existing Mortgage Liens), and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out.

b. <u>Carve Out</u>. The term "**Carve Out**" shall mean the sum of: (a) all unpaid fees required to be paid to the Clerk of this Court and to the United States Trustee under 28 U.S.C. § 1930(a); (b) to the extent allowed by the Court at any time (regardless of whether the order allowing such fees is entered before or after the Carve Out Notice is received): (i) all accrued and unpaid fees and expenses through and including the date of delivery of the Carve Out Notice (as defined below) in an aggregate amount on a line item basis not exceeding the cumulative amounts for professional fees and expenses reflected in the Approved DIP Budget incurred by each person or firm retained by the Debtor pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "**Debtor's Professionals**") (all such amounts set forth in this clause (b)(i), the "**Pre-Termination Carve Out**"); and (ii) all unpaid fees and expenses incurred by the Debtor's Professionals after the delivery of a Carve Out Notice, in an aggregate amount not to exceed $50,000 (the "**Post-Termination Carve Out**"); and (c) in the event of a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, allowed fees and expenses incurred by a trustee and any professional retained by such trustee, in an aggregate amount not to exceed $50,000 (all such amounts set forth in clauses (a) through (c), collectively the "**Carve Out Cap**"); <u>provided</u> that no portion of the Carve-Out or proceeds of the DIP Facility or the DIP Collateral may be used for the payment of the fees and

846318 v7

expenses of any person incurred in prosecuting any claims or causes of actions against the DIP Lender, its advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof, and/or any DIP Liens of the DIP Lender under the DIP Loan Documents. For purposes of the foregoing, (A) "**Carve Out Notice**" shall mean a written notice delivered by the DIP Lender to the Debtor and its counsel, the United States Trustee, which notice may be delivered following (x) the occurrence and during the continuance of an Event of Default and acceleration of the obligations under the DIP Facility (or other DIP Termination Event referred to herein) or (y) the DIP Termination Date (as defined below), and (B) "**Trigger Date**" means the date the Carve Out Notice is delivered to the parties set forth in clause (A).

    c. <u>Carve Out Reserves; Carve Out Funding</u>.

        i. On Monday of every other calendar week, commencing with the week following this Court's approval of this Interim Order, the DIP Lender shall advance directly to the Debtor, and the Debtor shall deposit into a segregated account maintained by or on behalf of the Debtor in trust for only those of the Debtor's Professionals who have filed applications to be retained in this Chapter 11 Case (the "**Professional Fee Escrow**"), an amount equal to the professional fees as set forth in the Approved DIP Budget for the two weeks then-ended plus any professional fees set forth in the Approved DIP Budget which were not previously funded for any prior period for such Debtor's Professionals in accordance with the DIP Loan Documents. The Debtor shall advise the DIP Lender of the amounts funded

into funding the Professional Fee Escrow. All funds in the Professional Fee Escrow shall be used first to pay the Carve Out for Debtor's Professionals (whether such fees are allowed on an interim or final basis). If, after payment in full of all amounts included in the Carve Out Cap, the Professional Fee Escrow has not been reduced to zero, all remaining funds shall be returned to the DIP Lender, for application to the outstanding balance of the DIP Facility, or to hold as Cash Collateral for the obligations of the Debtor under the DIP Facility. Notwithstanding anything to the contrary in this Interim Order, the DIP Lender's obligation to advance a DIP Loan to fund the Professional Fee Escrow shall not exceed the Pre-Termination Carve Out and the DIP Lender shall have no obligation to fund the Professional Fee Escrow if the Debtor has exhausted its ability to access the DIP Facility. In addition, there shall be no obligation under this Interim Order to fund the Professional Fee Escrow in an amount greater than the amount set forth in the Approved DIP Budget for the period commencing on the date hereof through the Trigger Date.

ii. The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Debtor's Professionals, the U.S. Trustee, Clerk of the Bankruptcy Court, any chapter 7 trustee, or any professional retained by the chapter 7 trustee (or of any other entity) incurred in connection with the Chapter 11 Case or any Successor Case, and nothing in this Interim Order or otherwise shall be construed to obligate

846318 v7

such parties in any way to pay such compensation to or to reimburse such expenses.

    iii.   The Approved DIP Budget and the Carve Out shall not be construed as a cap or limitation on the amount of the allowed fees and expenses of Debtor's Professionals payable by the Debtor after the DIP Obligations are indefeasibly paid in full in cash; provided, however, that until the DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder terminated, the Debtor shall not be permitted to use the DIP Facility proceeds, the DIP Collateral (including proceeds of the DIP Collateral), and Prepetition Collateral (including Cash Collateral and the proceeds of the Prepetition Collateral) to pay any allowed fees and expenses of Debtor's Professionals in excess of what was provided for in the Approved DIP Budget, nor shall the DIP Lender be required to fund such amounts into the Professional Fee Escrow.

23.    **DIP Termination Event; Exercise of Remedies**.

    a.   <u>DIP Termination Events</u>.  A "**DIP Termination Event**" shall exist upon the occurrence of an event which causes the "Maturity Date" in the DIP Term Sheet to occur.

    <u>Exercise of Remedies</u>.  Upon the occurrence of a DIP Termination Event, without further notice to, hearing of, application to, or order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: (i) deliver a written notice (which

may be via electronic mail) to counsel for the Debtor and the United States Trustee (the "**Remedies Notice**") declaring the occurrence of a DIP Termination Event (such date, the "**DIP Termination Declaration Date**") and/or deliver a Carve Out Notice, (ii) declare the termination, reduction or restriction of the commitments under the DIP Facility (to the extent any such commitment remains) but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations, (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtor, (iv) charge default interest at the Default Rate, (v) subject to the terms of paragraph 23(c) below, declare the termination, restriction, or revocation of the ability of the Debtor to use Cash Collateral, and (vi) take any other action or exercise any other right or remedy (including, without limitation, with respect to the DIP Liens in favor of the DIP Lender) permitted under the DIP Loan Documents, or by applicable law.

b.  <u>Waiting Period Procedures</u>.  The Debtor may seek an emergency hearing during the period beginning on the delivery of the Remedies Notice and prior to the expiration of the five (5) business days following such delivery (the five business day period, or at the first available hearing date scheduled by the Court during such period, the "**Waiting Period**") at which hearing any party in interest may appear and be heard; <u>provided</u>, <u>however</u>, that the sole issue to be heard at any such hearing shall be whether an Event of Default has occurred.  During the Waiting Period, the Debtor shall continue to have the right to use DIP Collateral (including Cash Collateral) in accordance with the terms of this Interim Order, solely to pay any then due expenses

which are critical to preserving the Debtor's assets provided for in the Approved DIP Budget.

c.  <u>Rights and Remedies Following Termination Date</u>.  Following a DIP Termination Declaration Date and unless this Court has entered an order prior to the expiration of the Waiting Period finding that a DIP Termination Event has not occurred, and subject to further order of the Court granting the DIP Lender stay relief, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with this Interim Order, the other DIP Loan Documents, and applicable law, and the automatic stay of section 362 of the Bankruptcy Code shall be lifted to allow the DIP Lender to pursue all rights and remedies in accordance with this Interim Order, the other DIP Loan Documents, and applicable law.

d.  <u>Effect of Guarantor and Guarantor Collateral</u>.  The DIP Lender's ability to exercise its rights and remedies vis-à-vis the Debtor or the DIP Collateral is in no way affected by the DIP Lender's rights and remedies against the Guarantor, the Guarantor Property or the Guarantor Collateral (as defined in the DIP Term Sheet). The DIP Lender may proceed against the Debtor in accordance with this Interim Order, the other DIP Loan Documents, and applicable law, as though no guarantor exists.

24.  **No Waiver by Failure to Seek Relief.**  The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Interim Order, the other DIP Loan Documents, applicable law, or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the other DIP Loan Documents, or applicable law, as the case

may be, shall not constitute a waiver of any of its respective rights hereunder, thereunder, or otherwise.  Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Interim Order or the other DIP Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consents required hereunder by the DIP Lender shall be implied by any inaction or acquiescence by the DIP Lender.

25. **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees**.  Other than funding the Professional Fee Escrow in accordance with the terms set forth herein, the DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Debtor's Professionals incurred in connection with the Chapter 11 Case or any Successor Case.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Debtor's Professionals, or to guarantee that the Debtor or its estate has sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any fees and/or expenses of any Debtor's Professionals in the Chapter 11 Case or any Successor Case, or of any other person or entity, or shall affect the right of the Debtor, the DIP Lender, and/or any other party in interest to object to the allowance and/or payment of any such fees and expenses or amounts incurred or requested.

26. **Limitation of Liability**.  Nothing in this Interim Order, the other DIP Loan Documents, or any other documents, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtor and its "affiliates" (as defined in section 101(2) of the Bankruptcy Code), including in the operation of the Debtor's business or in connection with

the Debtor's restructuring efforts or (b) any fiduciary duties to the Debtor, its creditors, shareholders, or the estate.  The DIP Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person", an "owner" or an "operator" with respect to the operation or management of the Debtor under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq., as either may be amended from time to time, or any similar federal or state statute), by virtue of making the DIP Loan.  The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtor.

27.      **Indemnification**.  The Debtor shall indemnify the DIP Lender and its affiliates and their respective advisors, investment managers, employees, officers, directors, attorneys, consultants, agents, subagents, and representatives in relation to the DIP Loan and this Interim Order except to the extent solely arising out of fraud, gross negligence or willful misconduct of the DIP Lender as determined by a court of competent jurisdiction, in a final, non-appealable order. **For the avoidance of doubt, and to alleviate any concerns of the United States Trustee, the DIP Lender shall not be permitted to obtain indemnification hereunder from the Debtor for actions taken by the DIP Lender outside the scope of this Interim Order.**

28.      **Releases**.  To the fullest extent permitted by applicable law, the Debtor, on its own behalf and its estate, forever and irrevocably: (a) releases, discharges, and acquits the DIP Lender

and each of its affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors, and assigns in each case solely in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, which the Debtor may now have or have ever had against the Releasees, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened, including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Loan Documents and/or the transactions contemplated hereunder or thereunder; and/or (y) any and all claims and causes of action arising under the Bankruptcy Code; and (b) waives, discharges, and releases any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations and/or the transactions contemplated hereunder or thereunder.

29.     **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve Out and Other Funds**.  Notwithstanding anything to the contrary herein or in any other DIP Loan Document, the DIP Facility, the DIP Collateral, and the Carve Out may not be used, directly or indirectly, by the Debtor or any trustee or other estate representative appointed in the Chapter 11 Case (or any Successor Case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with (a) preventing, hindering, or delaying any of the DIP Lender's enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) selling or otherwise disposing of DIP Collateral without the consent of

the DIP Lender or as permitted by the DIP Loan Documents; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Lender, or further order of the Court; (d) seeking to amend or modify any of the rights granted to the DIP Lender under this Interim Order or the DIP Loan Documents, including seeking to use DIP Collateral on a contested basis; (e) litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, DIP Collateral or any other claims held by or on behalf of the DIP Lender; (f) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, avoidance actions or applicable state law equivalents or actions to recover or disgorge payments, against the DIP Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; or (g) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations.

30.    **Waiver of Section 506(c)**.  Upon entry of the Final Order, no costs or expenses of administration of the Chapter 11 Case or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral, pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

31.    **No Marshalling**.  Subject to entry of a Final Order granting such relief and as a further condition of the DIP Loan Documents and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Loan, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or DIP Obligations, and all proceeds shall be received and applied in accordance with this Interim Order and the DIP Loan Documents.

32.     **No Waivers or Modifications of Interim Order**.  The Debtor has agreed not to, and shall not seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

33.     **Necessary Actions**.  The Debtor is authorized and directed to take all necessary actions as are reasonable and appropriate to implement the terms of this Interim Order.

34.     **Interim Order Controls**.  In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order and any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" any of the DIP Loan Documents, the terms and provisions of this Interim Order shall govern and control.

35.     **No Third-Party Beneficiaries**. Except as explicitly provided for herein, this Interim Order does not create any rights for any third party, whether as a creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

36.     **Disposition of Collateral**.  Notwithstanding anything otherwise provided herein, it shall be an "Event of Default" within the meaning of the DIP Loan Documents if the Debtor sells, transfers, leases, encumbers or otherwise disposes of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order or the Approved DIP Budget (subject to the Permitted Variances), without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or from any order of this Court). Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale

of DIP Collateral shall be used to immediately satisfy the DIP Obligations, subject only to the satisfaction of the Carve Out and any applicable Permitted Prior Liens on such DIP Collateral.

37.    **Discharge**.  Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization of the Debtor (the "**Plan**") in the Chapter 11 Case, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed Plan.

38.    **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any Plan in the Chapter 11 Case; (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Case or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Case or Successor Case.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender pursuant to this Interim Order and the other DIP Loan Documents shall continue in the Chapter 11 Case and in any Successor Case, and shall maintain their priority as provided by this Interim Order until, in respect of the DIP Facility, all the DIP Obligations pursuant to this Interim Order and the other DIP Loan Documents, have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The terms and provisions concerning the indemnification of the DIP Lender herein and elsewhere in the DIP Loan Documents shall continue in the Chapter 11 Case, in any Successor Case, following dismissal of any of the Chapter 11 Case or any Successor Case, following termination of the DIP Facility and/or the indefeasible repayment of the DIP Obligations.

39.     **Rights Reserved**.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Lender to seek any other or supplemental relief in respect of the Debtor; (b) the rights of the DIP Lender under the DIP Loan Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Chapter 11 Case, conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lender. For the avoidance of doubt, it shall not be an Event of Default under the DIP Term Sheet if a chapter 11 trustee or examiner with expanded powers is appointed in this Chapter 11 Case based on the DIP Lender's motion to appoint such person.

40.     **Immediate Effect of Order**.  This Interim Order shall take effect immediately upon execution hereof, and, notwithstanding anything to the contrary contained in the Bankruptcy Rules, including Bankruptcy Rule 4001(a)(3), there shall be no stay of execution of effectiveness of this Interim Order.

41.     **Headings**.  All paragraph headings used in this Interim Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

42.     **Final Hearing**.  Counsel to the Debtor will file a budget-to-actual report and a proposed form of order (the "**Final DIP Order**") that includes a DIP Budget for any additional weeks for which the Debtor seeks the continued use of Cash Collateral and additional DIP

37

Financing required, approving the continued use of Cash Collateral and additional DIP Financing required, if any, by _____, **2025 at 4:00 p.m. (prevailing Eastern Time)**. A final hearing (the "**Final Hearing**") on the Final DIP Order is scheduled for _____, **2025 at __ _.m. (prevailing Eastern Time),** at which time any party in interest may present any timely filed objections to the entry of the proposed Further DIP Order.   The Continued Hearing shall be conducted in Courtroom 1, John W. McCormack Post Office and Court House, 5 Post Office Square, Boston, Massachusetts 02109, with the option for parties in interest to appear by Zoom video. To obtain the video access information, parties in interest shall email the Courtroom Deputy at cjp_courtroom_deputy@mab.uscourts.gov by ___, **2025 at 4:30 (prevailing Eastern Time)**, providing the contact information for the party seeking to appear by video.   The Debtor shall promptly serve a copy of this Interim Order and a notice of the Final Hearing by regular mail upon (i) the parties that were provided notice of the Interim Hearing; and (ii) any party that has filed prior to such date a request for notices with this Court.   Objections to the entry of the proposed Final DIP Order shall be in writing and shall be filed with this Court no later than **____, 2025 at 4:00 p.m. (prevailing Eastern Time)**, which objections shall be served so as to be received on or before such date by (a)  counsel to the Debtor, Murphy & King, P.C., 28 State Street, Suite 3101, Boston, Massachusetts 02109, Attn: Harry B. Murphy, Esq. (HMurphy@murphyking.com) and Kathleen R. Cruickshank, Esq.  (KCruickshank@murphyking.com); (b) counsel to the DIP Lender, Braunstein Turkish LLP, 7600 Jericho Turnpike, Suite 402, Woodbury, New York 11797, Attn: Vincent L. Georgetti, Esq. (vg@braunsteinturkish.com) and Nicholson Devine LLC, 21 Bishop Allen Drive, Cambridge, MA 02139, Attn: Christine Devine, Esq. (christine@nicholsondevine.com); (c) the United States Trustee, 5 Post Office Square, Suite 1000, Boston, Massachusetts 02109, Attn: Justin A. Kesselman, Esq. (Justin.A.Kesselman@usdoj.gov);

and (d)  any party that has requested notice pursuant to Bankruptcy Rule 2002.  Any objections by creditors or any other parties in interest to any of the provisions of the proposed Final DIP Order incorporating the terms of this Interim Order, or including any other or different provisions, shall be deemed waived unless filed and served in accordance with this paragraph.

43.     **Retention of Jurisdiction**.  This Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Loan Documents and/or this Interim Order.

Dated: August [●], 2025

_____
CHRISTOPHER J. PANOS
UNITED STATES BANKRUPTCY JUDGE

## <u>Exhibit 1</u>

DIP Term Sheet

[To Follow]



**DEBTOR IN POSSESSION FINANCING**
**TERM SHEET**
**August 28, 2025**

This letter (the "**Term Sheet**") is intended to set forth the terms under which Lender (defined below) is willing to extend a debtor-in-possession facility to Borrower (defined below) in order to fund operating expenses for the Borrower's real property and improvements located at 364, 370, and 388 Ocean Avenue, Revere, MA 02151 (each, a "**Property**" and collectively, the "**Properties**") throughout the Borrower's Chapter 11 Case (defined below), including payment of all necessary administrative expenses in the Chapter 11 Case. This letter is being provided to outline the major terms and conditions of the financing to be provided and will be supplemented and modified under and accordance with the terms of the Financing Orders (defined below). This Term Sheet and the subject matter hereof are subject to the applicable provisions of state and federal law and its enforceability is conditioned on and subject to (i) the entry of the Financing Orders and (ii) internal authorization and approval by the Lender.

The proposed terms for the DIP Facility are as follows:

| | |
|---|---|
| **Borrower:** | Waters Edge Limited Partnership, a Massachusetts limited partnership, as debtor and debtor-in-possession (the "**Borrower**" or "**Debtor**") under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") pursuant to the chapter 11 case (the "**Chapter 11 Case**") pending in the United States Bankruptcy Court for the Eastern District of Massachusetts (the "**Bankruptcy Court**"). |
| **Guarantor:** | First Tower Funding, LLC, a Massachusetts limited liability company (the "**Guarantor**") will provide an unlimited guarantee of payment and performance of the DIP Facility (the "**Guaranty**"). The Guarantor is an affiliate of the Debtor as a result of the common indirect ownership of 100% of the equity interests in both the Borrower and Guarantor by Evelyn M. Carabetta. There will be no individual guarantors. |
| **Lender:** | Fairbridge Credit LLC, a Delaware limited liability company and/or one or more of its affiliates (the "**Lender**"). Lender, Borrower and Guarantor are collectively hereinafter referred to as the "**DIP Loan Parties**". |
| **DIP Facility:** | A non-amortizing, debtor-in-possession credit facility (as described herein, the "**DIP Facility**") in an aggregate principal amount not to exceed Nine Million Nine Million Fifty Thousand Six Hundred and 00/100 Dollars ($9,050,600.00) (the "**Maximum Loan Amount**"), as the same may be |

increased from time to time in accordance with the "Extension Option" (defined below) hereunder, comprised of junior term loans made by Lender to Borrower from time to time up to the Maximum Loan Amount (such loans, the "**DIP Loans**") in accordance with this Term Sheet, and the Financing Orders (defined below), a promissory note evidencing the indebtedness hereunder (the "**Note**"), the Mortgages (defined below), the Guaranty and, if requested by Lender, any other loan and security documentation in form satisfactory to the Debtor, the Lender and the Bankruptcy Court (such Term Sheet, Financing Orders, Note, Mortgages, Guaranty and all other loan documentation are collectively, the "**DIP Documents**"). Following approval of this Term Sheet the parties hereto shall cooperate in effectuating the execution of any DIP Documents requested by Lender which are consistent with the terms of this Term Sheet and the Interim Financing Order. The DIP Facility is intended to rank junior to (i) valid, enforceable, non-avoidable liens in existence as of the date on which the Chapter 11 Case commenced (the "**Petition Date**"), including, without limitation, the Borrower's existing pre-petition first mortgage facility (inclusive of all accruals, fees and expenses incurred prior to and following the Petition Date) (the "**Existing First Mortgage Financing**") and (ii) the Carve-Out (defined below), but senior to any other indebtedness of the Borrower. The Borrower acknowledges and agrees that, to the best of its knowledge after due inquiry, including its own projections as to interest accrued and to be accrued on such senior claims, but without full knowledge of the amount of professional fees and similar costs to be asserted by each claimant (and noting that, in particular, the holder of the first mortgage lien has to date declined repeated requests to provide that information), as of November, 2025, the DIP Facility is and will be junior and subordinate in repayment only to the following:

| | | |
|---|---|---|
| Existing First Mortgage Financing | $ | 17,901,804.46 |
| City of Revere | $ | 3,689,777.41 |
| Mechanics' Lien Claims | $ | 183,135.44 |
| **Total Liens in Front of DIP Facility** | **$** | **21,774,717.30** |

**Purpose of DIP Facility:**  Following entry of the Interim Financing Order (as defined below) Amounts available under the DIP Facility shall be used (a) to pay costs and expenses of administration of the Chapter 11 Case (including professional fees) solely as specified and included in the Approved DIP Budget (as defined below), (b) to pay fees and expenses of the Lender provided for herein and in the Approved DIP Budget, (c) to support the working capital and general corporate (ordinary course) purposes of the Borrower, including post-

petition operating expenses set forth in the Approved DIP Budget, and other expenses arising in the Borrower's Chapter 11 Case as may be approved by the Bankruptcy Court and the Lender, and (d) as otherwise provided for in the Financing Orders and in accordance with the Approved DIP Budget.

No proceeds of the DIP Facility shall be transferred to, or used by, any entity other than the Borrower, except as permitted under the DIP Budget and the Interim Financing Order or Final Financing Order, as applicable. No portion of the DIP Facility or the Carve-Out shall be used to assert any claim, cause of action or objection against the Lender or any its affiliates, successors and assigns, or any of their respective employees, officers, directors, advisors, investment managers, agents and subagents.

**DIP Funding:**     Advances under the DIP Facility (each, an "**Advance**") shall, unless otherwise requested by Debtor and agreed to by the Lender, be made as follows:

(a)     within one (1) business day of the entry of the Interim Financing Order and the satisfaction of all conditions precedent hereunder, an initial Advance (the "**Initial Advance**") in an amount which, when combined with the current cash position of the Properties, pays off the existing interim DIP financing provided by Lender to Borrower in the maximum loan amount of $6,500,000 (the "**Existing DIP Financing**"), the Closing Fee and all Expenses (defined below) incurred through closing of the DIP Facility; and thereafter

(b)     on Monday of every calendar week, Borrower's financial advisor shall make a funding request to Lender in accordance with the Approved DIP Budget and after receipt of same, Lender shall fund an Advance to Borrower's DIP Account (defined below) in an amount equal to the estimated negative cash flow for the subsequent week per the Approved DIP Budget minus the current cash position as of that day plus $25,000, which shall be the target cash position for the Properties;

(c)     on Monday of every other calendar week, starting with the calendar week following the Bankruptcy Court's approval of the Interim Financing Order, Borrower's financial advisor shall make a funding request to Lender in accordance with the Approved DIP Budget and after receipt of same, the Lender shall Advance directly to the Borrower's Professional Reserve Account (defined below) in trust for the benefit of the Debtor's Professionals (defined below) in an amount equal to the professional fees as set forth in the Approved DIP Budget for the two weeks then-ended plus any professional fees set forth in the Approved DIP Budget which were not previously

funded for any prior period for such Debtor's Professionals in accordance with the DIP Documents; and

(d)    beginning on the first (1ˢᵗ) day of the first full calendar month following the Initial Advance and on the first (1ˢᵗ) day of each and every calendar month thereafter throughout the term of the DIP Facility, Lender shall be permitted to advance to itself (without the requirement of consent from Borrower), interest only debt service payments due under the DIP Facility.

**Maturity Date:**    All obligations under the DIP Facility, accrued or otherwise, shall be due and payable in full on the earliest to occur of (i) December 1, 2025 (subject to extension, as provided below, the "**Stated Maturity Date**"); (ii) the occurrence of an Event of Default (as defined below) or any other termination event specified in the Financing Orders, provided that during the remedies notice period referred to in the Financing Orders, the Borrower shall not be entitled to borrow under the DIP Facility or use DIP Facility funds other than to pay payroll and other essential operating expenses as set forth in the DIP Budget and approved by the Lender, (iii) a sale of substantially all of the assets of the Borrower, (iv) the confirmation of a plan of reorganization or liquidation (including a Chapter 11 plan in the Chapter 11 Case, if any) (the date of the earliest to so occur, the "**Maturity Date**").

**Extension Option:**    Lender will grant Borrower an extension option to extend the Stated Maturity Date until January 1, 2026 (an "**Extension Period**"), subject to Borrower's satisfaction of the following requirements (as determined by Lender in its sole but reasonable discretion), (i) payment to Lender of an extension fee in the amount of Sixty-Five Thousand Two Hundred Fifty-Three and 00/100 Dollars ($65,253.00) (the "**Extension Fee**"), (ii) no Event of Default is then existing under any of the DIP Documents at the time of the extension request or the date of extension, and (iii) delivery of notice of Borrower's election to extend the DIP Facility to Lender not less than 10 days before the start of the Extension Period. During the Extension Period, the Maximum Loan Amount shall be increased by $1,000,000, in accordance with a revised DIP Budget provided by Borrower to Lender with such notice.

**Financing Orders:**    As used herein, "**Interim Financing Order**" means an order entered by the Bankruptcy Court consistent with the terms hereof and otherwise reasonably satisfactory in form and substance to the Lender that authorizes and approves the DIP Facility on the terms described herein on an interim basis. "**Final Financing Order**" (together with the Interim Financing Order, collectively, the "**Financing Orders**") shall mean an order entered by the Bankruptcy Court consistent with the terms hereof and otherwise reasonably satisfactory in form and substance to the Lender after a final hearing under applicable provisions of the Bankruptcy Code and

Bankruptcy Rules, authorizing the DIP Facility on a final basis on the terms described herein (or as amended in a manner acceptable to the Lender), which order shall not be subject to appeal, reconsideration or review.

Without limiting in any way the Lender's discretion consistent with the terms described herein, the Interim Financing Order (except as otherwise provided below) and Final Financing Order shall provide for the following, among other things:

(a)     That all obligations of the Borrower to Lender under the DIP Facility, including without limitation, the loans and all fees, charges and expenses contemplated by the DIP Documents, shall be secured by a first-priority lien and security interest in all Collateral, subject only to valid, enforceable, non-avoidable liens in existence as of the Petition Date (including the Existing First Mortgage Financing), and the Carve-Out.

(b)     That adequate notice under the circumstances has been given to all necessary parties of the hearing pursuant to which the Bankruptcy Court has entered the Interim Financing Order or Final Financing Order.

(c)     No costs, expenses or other charges may be assessed or attributed to the Lender for the Collateral pursuant to Section 506(c) of the United States Bankruptcy Code or otherwise.

(d)     A finding that the Lender has acted in good faith.

**Security:**     To secure all obligations of the Borrower under the DIP Facility the Lender will receive, pursuant to Section 364(c) of the Bankruptcy Code and the Financing Orders, a fully perfected security interest in all of the existing and after acquired assets of the Borrower (including all owned real estate and all personal property, whether tangible or intangible assets), including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing agreements, securities (whether or not marketable), equipment, real estate fixtures and leasehold interests and/or the proceeds thereof, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles, proceeds of all avoidance actions under Chapter 5 of the Bankruptcy Code (effective only upon entry of a Final Financing Order), investment property, commercial tort claims, and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds (collectively, the "**Collateral**"), which shall be evidenced by, among other things, a recorded and insured <u>second</u> priority mortgage on the Debtor's Properties. The Lender's liens in the Collateral shall be subject only to (i) valid, enforceable,

non- avoidable liens in existence as of the Petition Date (including, without limitation, the Existing First Mortgage Financing), and (ii) the Carve-Out.

All liens and security interests granted by the Borrower to the Lender in the Collateral shall be automatically perfected, without further action of any kind by the Financing Orders. In addition, upon Lender's reasonable request, Borrower shall execute in favor of Lender such security agreements, mortgages, control agreements, assignments and other security instruments as Lender shall deem necessary or advisable.

All borrowings and all other obligations of the DIP Loan Parties under the DIP Facility shall at all times be entitled to superpriority claim status under Section 364(c)(1) of the Bankruptcy Code and have priority over any and all administrative expenses specified in Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1114, or otherwise, subject only to the Carve-Out.

In addition to the foregoing, to secure all obligations of the Guarantor under the DIP Facility as evidenced by its Guaranty, the Lender will receive (i) a recorded and insured <u>second</u> priority mortgage on the Guarantor's fee estate to the real property located at 394 Ocean Avenue, Revere, MA 02151 (the "**Guarantor Property**"), (ii) a recorded <u>second</u> priority assignment of all leases, rents and other receivables of the Guarantor Property, (iii) a perfected <u>second</u> priority security interest in all personal property of the Guarantor (iv) an ADA and Environmental Indemnity Agreement for the Guarantor Property (defined below) and (v) to the extent applicable, a subordination of management fees if any property manager is managing the Guarantor Property (collectively, the "**Guarantor Collateral**") (such documents, together with the Guaranty are collectively hereinafter referred to as, the "**Guarantor DIP Documents**").

Lender's closing requirements for the Guarantor DIP Documents shall be customary for a transaction of this size and nature and shall include, without limitation: (i) preparation, execution and delivery of Guarantor DIP Documents acceptable to Lender in all respects; (ii) such inspections of the Guarantor Property as Lender shall deem necessary; (iii) review and approval of all organizational documents of Guarantor and its upstream owners of direct or indirect interests of Guarantor, if applicable, and certificates of good standing from applicable governmental authorities with respect to Guarantor; (iv) review and approval of opinions of Guarantor's counsel with respect to Guarantor, the Guarantor Property, the Guarantor Collateral and the Guarantor DIP Documents; (v) a lender's title insurance policy with respect to the Guarantor Property (at Guarantor's expense), in form and substance and from a title insurance company selected by Lender, in the amount of the Maximum Loan Amount; (vi) updated survey; (vii) review and approval of clean litigation, judgment, tax lien and bankruptcy

searches of Guarantor, and its upstream owners of direct or indirect interests of Guarantor as Lender or its counsel shall determine; (viii) receipt and approval of the annual operating budget for the Guarantor Property for the current fiscal year; (ix) receipt and approval of the annual capital budget for the Guarantor Property for the current fiscal year; (x) review and approval of Guarantor's financial conditions; (xi) review and approval of the property management agreement, if any (and to the extent one exists, the subordination thereof to Lender's interest in the Guarantor Property); (xii) review and approval of all in-place leases; (xiii) review and approval of the first lien deed of trust loan documents for the Guarantor Property; (xiv) review and approval of any third party reports obtained for the Guarantor Property in connection with the existing first lien loan secured by the Guarantor Property; and (xv) review and approval of any other due diligence items requested by Lender in connection with the Guarantor or the Guarantor Property. At any time, Guarantor may elect to deliver to Lender, as collateral security for the DIP Facility, the immediately available cash sum of $3,000,000 (the "**Substitute Cash Collateral**"), as substitute collateral for all of Lender's lien and other interests (as to the DIP Loan only) in the Guarantor Property, in such manner as Lender may reasonably require, at which time Lender shall promptly discharge and release all of its liens and other such interests against the Guarantor Collateral and shall hold the Substitute Cash Collateral in a segregated account as security for the DIP Loan in accordance herewith.

In addition, at Guarantor's option, the Lender will  refinance  the Guarantor Property in the form of a new non-amortizing first lien mortgage loan in the amount of the lesser of (i) $7,000,000 and (ii) fifty percent (50%) of the "as is" appraised value of the Guarantor Property, as determined by an appraisal reasonably acceptable to Lender, on business terms consistent with those set forth herein as to the DIP Loan (i.e., the interest rate, origination/closing fee, etc.) with a maturity date of September 1, 2026 (the "**FTF Loan**") except that Evelyn Carabetta shall be the guarantor of the FTF Loan and Ms. Carabetta shall guarantee the unlimited payment and performance of the FTF Loan. The Lender's commitment to make the FTF Loan is subject to Lender's receipt and reasonable satisfaction with the following information provided, and to be provided, by the Guarantor to Lender promptly to Lender following the date hereof:

- Name of the existing lender and the current loan payoff amount.
- The most recent rent roll, including unit mix, square footage, and lease expiration dates for the Guarantor Property.
- The latest T-12 statement for the Guarantor Property.
- Any appraisals for the Guarantor Property.
- The current occupancy rate of the Guarantor Property.
- Confirmation that there is or there is not, a deferred maintenance or capital improvement work needed at the Guarantor Property.

- A current operating budget or pro forma for the Guarantor Property for the next 12 months.
- Any environmental reports, engineering reports, or Phase I/II studies for the Guarantor Property.
- Confirm that the Guarantor Property is not subject to any affordability restrictions.

The closing of any FTF Loan shall require due diligence acceptable to Lender which shall include but not be limited to, Lender completing, in its sole and absolute satisfaction, a review of the foregoing items, as well as any additional items requested by Lender during its due diligence of the Guarantor, Ms. Carabetta, as the guarantor, and the Guarantor Property. Lender reserves the right to order a background check of the Guarantor and its principal(s), an Accountant's Review of Financial Information that Guarantor may supply to the Lender, and any other reports deemed necessary by Lender in its sole and absolute discretion, which reports shall be paid for by Guarantor.

**Budget; Reporting:**  Lender and Borrower have prepared a budget, based on the budget filed by the Borrower in its separate motion, which budget is attached hereto as Exhibit A and sets forth all line-item and aggregate receipts and operating disbursements on a weekly basis for the period beginning by a week to be determined between Lender and Borrower (but in any event no later than the date of the Interim Financing Order) (the "**DIP Budget**"), and includes, without limitation, a line item for all of the interest only debt service payments due throughout the term of the DIP Facility as estimated by Lender (the "**Interest Reserve Line Item**") and Closing Fee (defined below), the Collateral Monitoring Fee (defined below) and the Broker Fee (defined below). The DIP Budget is in form and substance acceptable to, and approved by, the Lender. The DIP Budget shall be deemed the "**Approved DIP Budget**" for all purposes of the DIP Facility until superseded by an Updated DIP Budget (as defined below) that subsequently is consented to by the Lender.

On or before 5:00 p.m. ET on Thursday of every second week, the Borrower shall deliver (a) a supplement to the DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), covering the subsequent period that commences with the Monday immediately following the date of delivery of the supplemental budget and ending with the Stated Maturity Date (and which, for the avoidance of doubt, cannot modify previous weeks), consistent with the form and level of detail set forth in the DIP Budget and otherwise in form and substance acceptable to the Lender (each such supplemental budget, an "**Updated DIP Budget**"), and (b) a report (the "**Variance Report**") for the two week period preceding the first Monday of such Updated DIP Budget, showing line item variances between actual results and projected results (if applicable) for such period from the

most recent Approved DIP Budget delivered pursuant to clause (a) above, in each case in a form acceptable to the Lender and a written explanation for all line item variances of greater than 10% or $7,500 for the applicable period, and such other financial information as the Lender may reasonable request.

Upon the approval of any such Updated DIP Budget by the Lender in its sole discretion, such Updated DIP Budget shall constitute the then-Approved DIP Budget. To the extent that a proposed Updated DIP Budget is not approved by the Lender, the DIP Budget or last approved Updated DIP Budget shall remain in full force and effect.

As of the second Friday occurring after the entry of the Interim Financing Order and on each second Friday thereafter (each a "**Testing Date**" and, as to each Testing Date, (i) the cumulative period from the date of entry of the Interim Financing Order to such Testing Date and (ii) commencing with the fourth Testing Date after entry of the Interim Financing Order, the four weeks ended prior to such Testing Date, each a "**Testing Period**"), the Borrower shall not permit (x) the amount of aggregate receipts during such Testing Period to be less than 85% of the amount of receipts as set forth in the Approved DIP Budget for such Testing Period or (y) the amount of disbursements (A) in any line item during such Testing Period to be greater than 120% of the amount of disbursements for such line item as set forth in the Approved DIP Budget for such Testing Period (provided, however, that (1) this restriction for professional fees for Debtor's Professionals (as hereinafter defined) must be no more than 110% of the amount set forth in the Approved DIP Budget for such Testing Period; and (2) any excess availability as to the under-budget accrual of professional fees for Debtor's Professionals may be applied, in the Borrower's discretion, to other approved DIP Budget categories) and (B) in the aggregate during such Testing Period to be greater than 115% of the amount of disbursements in the aggregate for such Test Period (collectively, the "**Budget Compliance Covenant**").

| | |
|---|---|
| **Interest Rate:** | 1-month Term SOFR plus 5.00% per annum, with a floor of 12.5% per annum. |
| **Default Rate:** | During the continuance of an Event of Default (as defined in the DIP Documents), all loans, interest, fees and other amounts outstanding will bear interest at a rate equal to the lesser of (i) 18% per annum or (ii) the maximum allowable interest rate under the applicable state and/or federal laws. |
| **Payments; Interest Accrual:** | Accrued interest on the outstanding principal balance of all DIP Loans made under the DIP Facility shall be due and payable monthly, beginning on the |

first (1st) day of the first full calendar month following the advance of the initial DIP Loan and on the first (1st) day of each and every calendar month thereafter throughout the term of the DIP Facility. On the Maturity Date, all principal, interest and all other fees and expenses due under the Interim Financing Order and the other DIP Documents shall be due and payable, in full. Interest (at the Interest Rate or the Default Rate, as applicable) and fees shall be based on a 360-day year and actual days elapsed.

**Fees:** In consideration of making the DIP Facility available to the Borrower, the Borrower shall pay to the Lender the following fees (collectively, the "**Loan Fees**"), which shall be included in the Approved DIP Budget:

(a) A Closing Fee equal to 2.0% of the Maximum Loan Amount or One Hundred Eighty-One Thousand Twelve and 00/100 Dollars ($181,012.00), shall be fully earned and payable on the date of the Initial Advance of the DIP Facility (the "**Closing Fee**").

(b) A Collateral Monitoring Fee in the amount of $10,000 per month until the Maturity Date, paid each Monday which precedes the first day of the subsequent calendar month (the "**Collateral Monitoring Fee**").

**Carve-Out:** "**Carve-Out**" means the sum of:

(a) all unpaid fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code;

(b) to the extent allowed by the Bankruptcy Court at any time (regardless of whether the order allowing such fees is entered before or after the Carve-Out Notice is received): (i) all accrued and unpaid fees and expenses through and including the date of delivery of the Carve-Out Notice (as defined below) in an aggregate amount on a line item basis not exceeding the cumulative amounts for professional fees and expenses reflected in the DIP Budget incurred by persons or firms retained by the Debtor pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "**Debtor's Professionals**"); and (ii) all unpaid fees and expenses incurred by the Debtor's Professionals after the delivery of a Carve-Out Notice, in an aggregate amount not to exceed $50,000; and

(c) in the event of a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, allowed fees and expenses incurred by a trustee and any professional retained by such trustee, in an aggregate amount not to exceed $50,000;

<u>provided</u> that no portion of the Carve-Out or proceeds of the DIP Facility or the Collateral may be used for the payment of the fees and expenses of any person incurred in prosecuting any claims or causes of actions against the Lender, its advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof, and/or any liens of the Lender under the DIP Documents.

For purposes of the foregoing, "**Carve-Out Notice**" shall mean a written notice delivered by the Lender to the Debtor and its counsel, and the Office of the United States Trustee, which notice may be delivered following the earlier of (x) the occurrence and during the continuance of an Event of Default (or other termination event referred to in the Financing Orders) and acceleration of the obligations under the DIP Facility or (y) the Maturity Date.

|  |  |
|---|---|
| **Prepayments:** | The Borrower may, upon at least one (1) business days' notice, prepay in full or in part, the DIP Facility, without premium or penalty. Once repaid, Advances may not be re-borrowed. |
| **Mandatory Prepayments:** | Subject to the rights of the holder of the Existing First Mortgage Financing, the Borrower shall promptly, and in any event, within one (1) business day, prepay the DIP Facility obligations in an amount equal to (a) 100% of net insurance and condemnation proceeds, (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted hereunder and (c) 100% of the net cash proceeds of any sale of all or any material portion of the Debtor's assets. At the election of the Lender in its sole discretion, all or a portion of such mandatory prepayments may be declined and available to the Borrower to be used in accordance with the Approved DIP Budget. |
|  | Subject to the Carve-Out, all optional prepayments and mandatory prepayments (within one (1) business day of receipt thereof) shall be applied as follows: first, to pay accrued and unpaid interest on, and expenses in respect of, the obligations under the DIP Facility, to the extent then due and payable; and second, to repay any principal amounts or other obligations which have been advanced and are outstanding under the DIP Facility. |
| **Cash Management:** | In connection with the Existing DIP Facility, the Debtor has established a Chapter 11 debtor-in-possession account in accordance with the United States Trustee operating guidelines (the "**DIP Account**") and a segregated account to fund payments reserved for Debtor's Professionals under the Approved DIP Budget (the "**Professional Reserve Account**"). Unless otherwise agreed by the Lender, Advances shall be funded by the Lender into the Borrower's DIP Account or Professional Reserve Account in accordance with the Financing Orders. |

**Payment of Taxes:** The Borrower and Guarantor shall each deliver to the Lender, in form and substance reasonably satisfactory to the Lender, evidence of payment of all taxes as such taxes become due and payable.

**Bankruptcy Milestones:** The Borrowers shall achieve the following bankruptcy milestones (each, a "**Bankruptcy Milestone**"):

(a)   no later than August 28, 2025 (the "**DIP Motion Filing Date**"), Debtor shall file a motion to approve the DIP Facility under the terms set forth in this Term Sheet and entry of the Interim Financing Order (the "**DIP Motion**");

(b)   no later than 3 business days after the DIP Motion Filing Date, entry of the Interim Financing Order;

(c)   no later than October 15, 2025, a motion seeking Court approval of one or more sales or other transactions with respect to the Properties (each, a "**Transaction**"), the proceeds of which are sufficient to repay the DIP Facility in full (the "**Transaction Motion**"), which motion shall be allowed by the Bankruptcy Court no later than November 15, 2025; and

(d)   no later than November 26, 2025 (which deadline shall be extended to December 31, 2025 if but only if the Extension Period is exercised), the Transaction(s) shall have closed.

All of the foregoing motions and orders shall be in form and substance reasonably acceptable to the Lender.

**Affirmative Covenants:** In addition to any other covenants of the Borrower or Guarantor set forth herein or in the Financing Orders or in the DIP Documents or the Guarantor DIP Documents, until the payment in full of all DIP Facility obligations and termination of the commitments of the Lender, the Borrower and Guarantor each covenants and agrees with the Lender that it shall:

(a)   provide to Lender (including its counsel) advance copies of all pleadings and/or filings in the Bankruptcy Case to be made by the Debtor prior to filing the same;

(b)   maintain its existence and qualifications to do business in its jurisdiction of incorporation and all other jurisdictions where qualification is required;

(c)      maintain all authorizations, licenses, certifications, and approvals necessary or desirable to conduct its business as presently conducted and in accordance with all applicable law;

(d)      deliver to the Lender the Approved DIP Budget and Variance Reports as and when required herein;

(e)      deliver to Lender Chapter 11 monthly operating reports within 20 days after the last day of each month;

(f)      deliver to the Lender such other information reasonably requested by the Lender from time to time (including information required to be delivered pursuant to the Bankruptcy Case and such other reporting as set forth herein);

(g)      except to the extent consented in writing by Lender, maintain its Properties in the ordinary course of business;

(h)      provide the Lender with prompt (and in any event within two (2) business days) notice of any (A) default, (B) litigation, and (C) any other material event;

(i)      pay all post-petition taxes as and when due;

(j)      comply with all applicable laws in all material respects;

(k)      maintain "all risk" fire and casualty insurance, general liability insurance and such other insurance required by the Lender, in each case, issued by insurers and covering such risks and subject to such deductibles and co-insurance amounts (if any), as are acceptable to the Lender; all such policies to name Lender as additional insured and insured mortgagee and lender loss payee, as applicable; and

(l)      maintain its books and records in the ordinary course of business.

**Negative Covenants:** In addition to any other covenants of the Borrower or Guarantor set forth herein or in the Financing Orders or in the DIP Documents or the Guarantor DIP Documents, until the payment in full of all DIP Facility obligations and termination of the commitments of the Lender, the Borrower and Guarantor each covenants and agrees with the Lender that it shall not, without the prior written consent of the Lender:

(a)      assume or reject any leases (on which the Borrower is lessee) or executory contracts;

(b)    use any cash or the proceeds of any Advances in a manner or for a purpose other than in accordance with the DIP Facility and Approved DIP Budget;

(c)    incur or permit to exist any indebtedness (other than trade debt in the ordinary course of business; provided such trade debt (i) is unsecured, (ii) is not evidenced by a note, (iii) is on commercially reasonable terms and conditions; (iv) is due not more than sixty (60) days past the date incurred and paid on or prior to such date; and (v) does not exceed at any time the outstanding principal amount of $500,000);

(d)    grant or permit to exist any liens on any of its assets other than (i) liens in favor of the Lender, (ii) statutory liens for taxes arising as a matter of law, (iii) the liens securing the Existing First Mortgage Debt and any other valid, enforceable, non-avoidable liens in existence as of the Petition Date, and (iv) the Carve-Out;

(e)    declare or make any dividend or distribution;

(f)    prepay any indebtedness except as expressly set forth herein;

(g)    make any payment on account of any prepetition indebtedness of the Borrower, other than adequate protection interest payments on account of the Existing First Mortgage Financing, to the extent approved in the Financing Orders;

(h)    make any investment or loan to any other person; or

(i)    merge or consolidate with any other person, or sell or dispose of any assets outside of the ordinary course of business.

**Events of Default:**    The DIP Documents will contain events of default (each, an "**Event of Default**") as are customary for debtor-in-possession financings of this type, including without limitation, unless waived by the Lender, a breach of any of the following:

(a)    failure of the Borrower to make any payment of principal, interest, fees, or other amounts as and when due;

(b)    any representation or warranty of the Borrower or Guarantor that was materially incorrect when made;

(c)    failure of the Borrower or the Guarantor to observe or perform any covenants, condition, or agreement hereunder or any documents executed in connection with the DIP Facility;

(d)     any material provision of the DIP Facility shall cease to be in full force and effect, or cease to create a valid and perfected lien;

(e)     any change in ownership or control of the Borrower unless resulting from a motion filed or consented to by the Lender;

(f)     dismissal of the Bankruptcy Case or conversion of the Bankruptcy Case into a case under chapter 7 of the Bankruptcy Code;

(g)     granting of relief from any stay of proceeding (including the automatic stay) so as to allow a third-party to proceed against any material asset of the Borrower, except as the Lender may reasonably approve;

(h)     entry of an order granting any superpriority claim which is senior to or pari passu with the Lender's claims under the DIP Facility without the prior consent of the Lender or as otherwise provided in the Financing Orders (other than any adequate protection claims which may be granted in favor of the holder of the Existing First Mortgage Financing);

(i)     without the prior written consent of the Lender, entry of an order staying, reversing, vacating or otherwise modifying, the DIP Facility, the Interim Financing Order or the Final Financing Order, and such order is not stayed or reversed within two (2) business days after entry thereof;

(j)     payment of, or granting adequate protection with respect to, prepetition debt (other than as contemplated by the Financing Orders) in a manner that requires cash expenditures in excess of $25,000 that is not contemplated by the Approved DIP Budget, unless otherwise agreed by the Lender in writing;

(k)     cessation of liens or superpriority claims granted with respect to the Collateral to be valid, perfected and enforceable in all respects with the priority described herein;

(l)     the appointment of a chapter 11 trustee or a special examiner with enlarged powers unless resulting from a motion filed by or consented to by the Lender;

(m)     the Borrower pursues any Alternative Transaction (as defined below), unless in connection therewith the DIP Facility is indefeasibly paid in full, in cash, and Lender receives payment of all

of its Expenses (defined below) contemplated hereby and by the DIP Documents;

(n) the entry of an order granting automatic stay relief to a party other than the Lender, allowing them to foreclose on any asset worth more than $25,000;

(o) the Borrower becomes adverse to the Lender in any litigation or adversary proceeding;

(p) failure to satisfy any Bankruptcy Milestone;

(q) failure of the Debtor to seek Court authority to apply any non-refundable contract deposit retained by the Debtor under any agreement evidencing a Transaction towards payment of Existing First Mortgage Financing, within 2 business days of the Debtor's or its attorneys receipt thereof; or

(r) if an "Event of Default" shall occur under any of the Guarantor DIP Documents.

**Remedies:** Upon the occurrence and continuance of an Event of Default beyond the applicable grace period set forth below, the Lender shall be entitled to take all or any of the following actions without further order of or application to the Bankruptcy Court (provided that in the case of the enforcement of liens or other remedies with respect to Collateral pursuant to clause (d) below, the Lender shall provide the Debtor, the Guarantor and the Office of the United States Trustee with five (5) business days' prior written notice (the "**Enforcement Notice Period**") and file such notice on the docket in the Chapter 11 Case, during which Enforcement Notice Period any such party must file a pleading in opposition to the Lender's exercise of its rights and remedies and seek an emergency hearing prior to the conclusion of the Enforcement Notice Period, and provided further, that in any hearing following such notice, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the Lender shall be whether, in fact, an Event of Default has occurred and is continuing):

(a) declare the principal of and accrued interest on the outstanding DIP Loans to be immediately due and payable;

(b) terminate the DIP Facility;

(c) implement the Default Rate of interest on all outstanding DIP Loans; and/or

(d)     take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the Lender) permitted under the DIP Documents, the Guarantor DIP Documents, or by applicable law.

Unless during the Enforcement Notice Period, the Bankruptcy Court determines that an Event of Default has not occurred (or that no Event of Default that has occurred is continuing), the Lender shall have relief from the automatic stay without further notice or order and may foreclose on all or any portion of the Collateral or otherwise exercise remedies against the Collateral.

**Conditions to Advances:**

Any commitment of the Lender to provide the DIP Facility, or to provide the Initial Advance, shall be conditioned upon completion (or waiver) of the following conditions precedent and subsequent, in each case, in a manner satisfactory to the Lender, as well as other conditions customary of transactions of this type:

(a)     All necessary consents and approvals to the financing shall have been obtained, including all necessary internal credit approvals by Lender;

(b)     Receipt of the DIP Budget and approval of same by the Lender;

(c)     Receipt of any other information (financial or otherwise) reasonably requested by the Lender in form and substance reasonably satisfactory to the Lender;

(d)     To the extent requested by the Lender, execution and delivery of such documentation (to include financing statements, tax lien, litigation searches, good standing certificates, instruments, insurance, and such other matters as Lender may reasonably request) reasonably satisfactory in form and substance to Lender and its counsel;

(e)     The funding available upon the closing of the DIP Facility on the date the Interim Financing Order is entered shall be sufficient to fund cash needs outlined in the Approved DIP Budget;

(f)     Entry of the Interim Financing Order; and

(g)     Due execution of all of the DIP Loan Documents by the Debtor and/or Guarantor, as applicable and delivery thereof to the Lender and the recording of the mortgages against the Properties and the Guarantor Property (collectively, the "**Mortgages**").

The following conditions precedent shall have been satisfied with respect to each Advance under the DIP Facility:

(a)     No default or Event of Default shall exist or would occur as a result of such borrowing;

(b)     The making of the Advance shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently;

(c)     The Lender shall have received a borrowing request at least two (2) business days prior to the requested date of funding, in form and substance satisfactory to Lender, setting forth the proposed date and amount of such Advance along with instructions for the funding of such amount to Borrower's deposit account; and

(d)     The Financing Orders shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse in any respect to the Lender without the consent of the Lender.

**Expense Reimbursement:**     The Borrower agrees to pay all reasonable and documented out-of-pocket fees and expenses incurred by the Lender in connection with the proposed DIP Facility, including without limitation: legal fees, closing costs, property condition assessments, UCC and other public records searches, recording and filing fees, collateral examination costs and enforcement costs incurred by Lender in connection with the DIP Facility (the "**Expenses**"). The Borrower agrees that it is obligated to pay all Expenses promptly notwithstanding the expiration or termination of any approval of the DIP Facility for so long as any amounts under the DIP Facility remain outstanding.

**Indemnification:**     Borrower shall indemnify the Lender and its affiliates, successors and assigns, and their respective advisors, investment managers, employees, officers, directors, attorneys, consultants, agents, subagents, representatives, subsidiaries and participants in relation to the DIP Facility and the Financing Orders, except to the extent arising solely out of fraud, gross negligence or willful misconduct of the Lender as determined by a court of competent jurisdiction, in a final, non-appealable order.

**Governing Law:**     The DIP Facility will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any suit, claim, or other action to enforce the terms of the DIP Documents shall be brought exclusively in the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise

jurisdiction, then in any state or federal court of competent jurisdiction located in New York County, New York, and shall waive any right to trial by jury.

**Entire Agreement:** The DIP Facility described in this Term Sheet, the Financing Orders and any other documents and agreements which may be executed in connection with the DIP Facility, constitutes the entire agreement between the parties with respect to the subject matter hereof. To the extent there is any inconsistency between the terms of this Term Sheet and the terms of the Financing Orders, the terms of the Financing Orders shall govern.

**Exclusivity;
Break-Up Fee, etc.:** Following execution of this Term Sheet and until such time that the Lender has received payment in full of its Closing Fee pursuant to the Interim Financing Order, neither Borrower, Guarantor nor any of their respective affiliates, principals, equity-holders, directors, officers or representatives shall, directly or indirectly, (a) solicit or encourage any inquiries, discussions or proposals regarding, (b) continue, propose or enter into negotiations or discussions with respect to, or (c) enter into any agreement or other understanding providing for, in each case, any Alternative Transaction (as defined below); nor shall any of such persons or entities provide any information to any other person or entity for the purpose of making, evaluating or determining whether to make or pursue, any inquiries or proposals with respect to, any Alternative Transaction. For the purposes hereof, "**Alternative Transaction**" means any substitution for or addition to the DIP Facility or other financing with respect to any Property prior to the entry of the closing of the DIP Facility and the payment of the Closing Fee but does not mean the Debtor's entry into a joint venture agreement or similar agreement with a third party with respect to all or a portion of the Properties. If any of the restrictions set forth in this Section are breached or violated, contemporaneously with the closing of any Alternative Transaction, Lender shall be entitled to a break-up fee equal to Seventy-Five Thousand Dollars ($75,000.00). For the avoidance of doubt, the Break-Up Fee will not be due and payable if the DIP Facility closes and the Closing Fee is paid.

**[Remainder of this Page is Intentionally Left Blank;
Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties hereto have executed and agree to be bound by the terms set forth in this Term Sheet or caused the same to be executed by their respective duly authorized officers as of the day and year first above written.

**LENDER:**

**FAIRBRIDGE CREDIT LLC,**
a Delaware limited liability company

By: _____
    Name:    Steven J. Wissak
    Title:     Managing Member

**BORROWER:**

**WATERS EDGE LIMITED PARTNERSHIP,**
a Massachusetts limited partnership

By: _____
    Name:    Evelyn Carabetta
    Title:     Authorized Signatory

**GUARANTOR:**

**FIRST TOWER FUNDING, LLC,** a
Massachusetts limited liability company

By: _____
    Name:    Evelyn Carabetta
    Title:     Authorized Signatory

# EXHIBIT 2

# DIP BUDGET

Water's Edge Limited Partnership
Chapter 11, Case No. 24-12455

WELP 4th Revised Extended Budget Sept 1 through Nov 30, 2025 v4

Week Ending dates — start: 9/1, 9/8, 9/15, 9/22, 9/29, 10/6, 10/13, 10/20, 10/27, 11/3, 11/10, 11/17, 11/24 (all 2025); end: 9/7, 9/14, 9/21, 9/28, 10/5, 10/12, 10/19, 10/26, 11/2, 11/9, 11/16, 11/23, 11/30 (all 2025). Total 13 weeks: 9/1/2025–11/30/2025.

| ($000) / Extended Budget Week # | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | Total 13 weeks | Post Closing Est. Amounts |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | | |
| Tenant Rent | 92.6 | 56.0 | 14.8 | 12.5 | 92.6 | 56.0 | 14.8 | 6.3 | 6.3 | 92.6 | 56.0 | 14.8 | 12.5 | 527.7 | |
| Tenant Parking | | 2.5 | | | | 2.5 | | | | | 2.5 | | | 7.5 | |
| DIP Loan (see Below) | | | | | | | | | | | | | | 0.0 | |
| **Total Cash Sources** | 92.6 | 58.5 | 14.8 | 12.5 | 92.6 | 58.5 | 14.8 | 6.3 | 6.3 | 92.6 | 58.5 | 14.8 | 12.5 | 535.2 | |
| **Cash Disbursements** | | | | | | | | | | | | | | | |
| Management Co. | 20.0 | 5.0 | 25.0 | 5.0 | 20.0 | 5.0 | 25.0 | 5.0 | 20.0 | 5.0 | 25.0 | 5.0 | 20.0 | 185.0 | 25.0 |
| Insurance | | 44.6 | | | | 44.6 | | | | | | | | 89.2 | 0.0 |
| Real Estate Tax | | | | | | | | 0.0 | 155.0 | | | | | 155.0 | 0.0 |
| Water/Sewer Service | | | | | 20.0 | | | | 20.0 | | | | | 40.0 | 25.0 |
| Electricity Service | | | | 33.2 | | | | 33.2 | | | | 33.2 | | 99.6 | 50.0 |
| Gas Service | | | | 58.4 | | | | 58.4 | | | | 58.4 | | 175.2 | 50.0 |
| Fuel | | 0.8 | | | | 0.8 | | | | | 0.8 | | | 2.4 | 0.0 |
| Cable/Internet | | | 1.1 | | | | 1.1 | | | | 1.1 | | | 3.3 | 1.0 |
| Telephone | | 1.0 | | | | 1.0 | | | | 1.0 | | | | 3.0 | 1.0 |
| Trash | | 18.0 | | | | 18.0 | | | | 18.0 | | | | 54.0 | 18.0 |
| Pest Control | | 1.7 | | | | 1.7 | | | | 1.7 | | | | 5.1 | 0.0 |
| Cleaning Service | 3.1 | | | | 3.1 | | | | 3.1 | | | | | 9.3 | 0.0 |
| Elevator Service | 8.3 | | | | 8.3 | | | | 8.3 | | | | | 24.9 | 0.0 |
| Fire Alarm/Electrical Service/Henson | | | | 17.3 | | | | 17.3 | | | | 17.3 | | 51.9 | 0.0 |
| Sprinkler/Plumbing Service/Manniff | | | | 5.4 | | | | 5.4 | | | | 5.4 | | 16.2 | 0.0 |
| HVAC/Heating and Air Cond. Maintenance | | | | 2.2 | | | | 2.2 | | | | 2.2 | | 6.6 | 0.0 |
| General Maintenance & Repair Service | | | | 40.0 | | | | 40.0 | | | | 40.0 | | 120.0 | 0.0 |
| Hardware, Paint & Other Materials | | | | 3.4 | | | | 3.4 | | | | 3.4 | | 10.2 | 0.0 |
| Office Supplies/Copy Paper | | | | 0.3 | | | | 0.3 | | | | 0.3 | | 0.9 | 0.0 |
| Travel | | | 0.5 | | | | 0.5 | | | | 0.5 | | | 1.5 | 0.0 |
| Permits/Fees | 4.0 | | | | | 4.0 | | | | 4.0 | | | | 12.0 | 0.0 |
| Contingency | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 97.5 | 0.0 |
| Senior Loan Note Interest | | | | 67.7 | | | | | 67.7 | | | | 67.7 | 203.1 | 0.0 |
| DIP Loan Interest | 52.7 | | | | | 61.3 | | | | 67.9 | | | 75.8 | 257.8 | 19.7 |
| DIP Loan Fee | 200.0 | | | | | | | | | | | | | 200.0 | 0.0 |
| DIP Loan Legal | 80.0 | | | | | | | | | | | | | 80.0 | 50.0 |
| Collateral Monitor | | | | | 10.0 | | | | 10.0 | | | | 10.0 | 30.0 | 0.0 |
| UST Fees | | | | | | | | 14.5 | | | | | | 14.5 | 9.9 |
| **Total Cash Disbursements** | 375.6 | 34.0 | 78.7 | 217.7 | 141.5 | 27.9 | 99.1 | 165.6 | 370.8 | 27.9 | 54.5 | 59.5 | 295.3 | 1,948.2 | 249.6 |
| **Net Cash Flow** | (283.0) | 24.5 | (63.9) | (205.2) | (48.9) | 30.6 | (84.3) | (159.3) | (364.5) | 64.7 | 4.0 | (44.7) | (282.8) | (1,413.0) | |
| Beginning Cash Position | 25.0 | 25.0 | 49.5 | 25.0 | 25.0 | 25.0 | 55.6 | 25.0 | 25.0 | 25.0 | 89.7 | 93.7 | 49.0 | | |
| **Professional Fees** | | | | | | | | | | | | | | | |
| General Counsel - MK | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 390.0 | 100.0 |
| Special Counsel - BR | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 260.0 | 100.0 |
| Committee Counsel | | | | | | | | | | | | | | | 0.0 |
| Financial Advisor - V&L | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 84.5 | 25.0 |
| Tax Advisor - GGG | | | | 10.0 | | | | 10.0 | | | | 10.0 | | 30.0 | 25.0 |
| Insurance Counsel - Cohen, Rios, & Wholly | | | | 7.5 | | | | 7.5 | | | | 7.5 | | 22.5 | 25.0 |
| Tax Abatement Counsel - Pullman & Comley | | | | 7.5 | | | | 7.5 | | | | 7.5 | | 22.5 | 25.0 |
| Russo & Frye | | | | 5.0 | | | | 5.0 | | | | 5.0 | | 15.0 | 25.0 |
| Appraisal | | | | | | | | | | | | | | 0.0 | 25.0 |
| OPERATIONS EXCESS (DEFICIT) BEFORE DIP FUNDING | (258.0) | 49.5 | (14.4) | (180.2) | (23.9) | 55.6 | (28.7) | (134.3) | (339.5) | 89.7 | 93.7 | 49.0 | (233.8) | | 350.0 |
| OPERATIONS FUNDING REQUIREMENT (EXCESS) | 283.0 | (24.5) | 39.4 | 205.2 | 48.9 | (30.6) | 53.7 | 159.3 | 364.5 | (64.7) | (68.7) | (24.0) | 258.8 | | |
| OPERATIONS DIP FUNDING DRAW | 283.0 | 0.0 | 39.4 | 205.2 | 48.9 | 0.0 | 53.7 | 159.3 | 364.5 | 0.0 | 0.0 | 0.0 | 258.8 | 1,412.8 | |
| PRO FEE ESCROW FUNDING DRAW | 160.0 | | 113.0 | | 143.0 | | 113.0 | | 113.0 | | 143.0 | | 113.0 | 898.0 | |
| New DIP Loan Beginning Balance | 5,915.5 | 6,372.9 | 6,388.3 | 6,556.3 | 6,777.4 | 6,985.8 | 7,002.8 | 7,186.5 | 7,363.3 | 7,888.6 | 7,907.8 | 8,040.0 | 8,059.6 | | |
| New DIP Loan Funding | 443.0 | 0.0 | 152.4 | 205.2 | 191.9 | 0.0 | 166.7 | 159.3 | 507.5 | 0.0 | 113.0 | 0.0 | 371.8 | 2,310.8 | |
| New DIP Loan Interest (12.50%) | 14.4 | 15.5 | 15.5 | 15.9 | 16.5 | 17.0 | 17.0 | 17.5 | 17.9 | 19.2 | 19.2 | 19.5 | 19.6 | 224.7 | |
| New DIP Loan Payment | | | | | | | | | | | | | | | |
| New DIP Loan Ending Balance | 6,372.9 | 6,388.3 | 6,556.3 | 6,777.4 | 6,985.8 | 7,002.8 | 7,186.5 | 7,363.3 | 7,888.6 | 7,907.8 | 8,040.0 | 8,059.6 | 8,451.0 | | 8,451.0 |
| Ending Cash Position | 25.0 | 49.5 | 25.0 | 25.0 | 25.0 | 55.6 | 25.0 | 25.0 | 25.0 | 89.7 | 93.7 | 49.0 | 25.0 | | |
| Grand Total | | | | | | | | | | | | | | | 9,050.6 |