**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | |
| WATER'S EDGE LIMITED PARTNERSHIP, | Chapter 11 |
| Debtor. | Case No. 24-12445-CJP |

**EASTERN ACQUISITIONS, LLC'S OBJECTION TO DEBTOR'S MOTION FOR APPROVAL OF (A) THE SALE OF SUBSTANTIALLY ALL OF ITS ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (B) WAIVER OF COUNTEROFFER PROCEDURES; (C) GRANT OF CERTAIN STALKING HORSE OFFER PROTECTIONS TO PROPOSED PURCHASER; (D) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (E) RELATED RELIEF**

Eastern Acquisitions, LLC (the "**Eastern**"), by its undersigned counsel, hereby files this objection (the "**Objection**") to *Debtor's Motion For Approval of (A) The Sale of Substantially All of its Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (B) Waiver of Counteroffer Procedures; (C) Grant of Certain Stalking Horse Offer Protections to Proposed Purchaser; (D) The Assumption and Assignment Of Executory Contracts and Unexpired Leases; and (E) Related Relief* [ECF No. 440] (the "**Sale Motion**"). In support hereof, Eastern respectfully states:[1]

## I.   PRELIMINARY STATEMENT

The Debtor seeks, among other relief, approval the sale of substantially all of its assets to Helge Capital, Inc. ("**Helge**") and stalking horse protections to Helge in the form of a break-up fee and expense reimbursement. Attached hereto as <u>Exhibit A</u> is the purchase and sale agreement from E-T Ocean Ave LLC, a joint venture comprised of Eastern and Taurus Investment Holdings

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

("**Taurus**"), which represents a binding, higher and better bid in the amount of $43.5 million, which bid is $1 million higher than the Helge offer sought to be approved in the Sale Motion. Accordingly, it is inappropriate to approve the sale or award any stalking horse protections. In light of the higher and better bid from Eastern and Taurus, the Debtor's estate will not receive any incremental value if such stalking horse protections are granted.

## II.   OBJECTION

a.   The Court Should Not Approve the Sale to Helge Because a Higher and Better Bid Exists.

Through E-T Ocean Ave LLC, Eastern and Taurus hereby submit a binding, higher and better bid that would yield an additional $1 million in value to the Debtor's estate and its creditors. The purpose of any section 363 sale process is to maximize value. *See In re Food Barn Stores, Inc., 107 F.3d at 564-65* (recognizing the paramount goal of any proposed sale of property of estate is to maximize value). Approving the Sale Motion and the proposed Private Sale to Helge, in light of higher and better bid from Eastern and Taurus, would deprive the Debtor's estate of that incremental value.

b.   The Court Should Not Approve Stalking Horse Protections Because They Serve No Purpose.

As set forth in the Sale Motion, the Debtor seeks approval of a break-up fee and expense reimbursement for Helge. Those protections are inappropriate and contrary to the purpose of stalking horse incentives. Established case law, including *In re O'Brien Environmental Energy, Inc.,* 181 F.3d 527 (3d Cir. 1999), holds that stalking horse protections may be approved only when they confer a demonstrable benefit to the estate, such as establishing a bidding floor or incentivizing an initial bid. Expanding on this principle, the Third Circuit in *In re Reliant Energy Channelview LP,* 594 F.3d 200 (3d Cir. 2010), denied a $15 million break-up fee, holding that

such fees must be evaluated under section 503(b) and are not automatically justified; rather, they must be shown to preserve estate value.

Here, those purposes are absent. There is already active bidding.  The higher and better bid from Eastern and Taurus renders any stalking horse protection unnecessary and wasteful.  Notably, their bid does not require any stalking horse protection and remains subject to higher and better offers.

    c.   The Proper Course Is to Allow Further Bidding and Maximize Value to the Debtor's Estate.

Eastern and Taurus are not seeking any stalking horse protection and seek the opportunity to have their binding, higher and better bid approved by the Court, unless other higher and better offers are received.  The Court should not deprive the Debtor's estate of value by approving an inferior offer or granting unnecessary fees.

### III.    CONCLUSION

For the foregoing reasons, Eastern respectfully requests that the Court:

1.     Deny approval of the sale to Helge as currently proposed;

2.     Deny the Debtor's request for any stalking horse protections; and

3.     Grant such other and further relief to Eastern as the Court deems just and proper.

Dated:  October 23, 2025

**GREENBERG TRAURIG, LLP**

*/s/ Charlie Liu*
T. Charlie Liu, Esq. (BBO # 693338)
Jeffrey M. Wolf, Esq. (BBO # 630590)
One International Place, Suite 2000
Boston, Massachusetts 02110
Tel:  (617) 310-6000
Email:  Charlie.Liu@gtlaw.com
       Jeffrey.Wolf@gtlaw.com

- and -

Brian E. Greer, Esq. (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Tel:  (212) 801-9200
Email: GreerB@gtlaw.com

*Counsel for Eastern Acquisitions, LLC*

## EXHIBIT A

Purchase and Sale Agreement

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is made and entered into this 23rd day of October, 2025 (the "Effective Date") by and between Water's Edge Limited Partnership, a Massachusetts limited partnership, with its principal office located at 394 Ocean Avenue, Revere, Massachusetts 02151 (the "Seller") E-T Ocean Ave LLC, a Delaware limited liability company, with an address of c/o Eastern Real Estate LLC, 1 Marina Park Drive Suite 310, Boston MA 02210 (the "Buyer").

WHEREAS, on December 5, 2025 (the "Petition Date"), Seller filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101, *et. seq.* (the "Bankruptcy Code"), Case No. 24-12445-CJP, (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court");

WHEREAS, the Seller is the owner of the land located at and generally known as 364, 370, and 388 Ocean Avenue, Revere, MA 02151, as described in that certain Quitclaim Deed recorded in the Suffolk County District Registry of Deeds in Book 11875 at Page 340, and as Document Number 394765, on Certificate of Title Number 98598 (excepting therefrom the parcel described as Parcel R3), and in that certain Quitclaim Deed recorded in the Suffolk County District Registry of Deeds in Book 14128, Page 324 and as Document Number 429814, on Certificate of Title Number 101316 and other improvements thereon as more particularly described on Exhibit A attached hereto (the "Land"); and

WHEREAS, Seller desires to sell and Buyer desires to purchase the Property and Personal Property (as defined below) pursuant to the terms, provisions and conditions herein; and

WHEREAS, the Property and Personal Property (as defined below) will be sold pursuant to the terms of this Agreement, subject to entry of an order of the Bankruptcy Court approving and authorizing such sale under Section 363 of the Bankruptcy Code pursuant to a Sale Approval Order (as defined below).

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    PURCHASE AND SALE OF PROPERTY; EXCLUDED ASSETS.

1.1    Seller agrees to sell and Buyer agrees to purchase (a) the Land and all rights appurtenant thereto, together with (i) the buildings known for purposes herein as Building 1 at 364 Ocean Avenue ("Building 1"), Building 2 at 370 Ocean Avenue ("Building 2"), and Building 5 at 388 Ocean Avenue ("Building 5"); (ii) all improvements and fixtures owned by Seller and located on the Land ("Improvements"); (iii) all right, title and interest of Seller, if any, in and to all the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances on the Land or appertaining thereto; and (iv) all right, title and interest of Seller, if any, in and to all strips and

gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such Land, (all of the foregoing, collectively with the Land, the "Real Property"), and (b) the equipment, furnishings, furniture and other tangible personal property (the "Personal Property") owned by Seller and now located on or about the Land, pursuant to the terms of this Agreement (c) Seller's interest as lessor in all leases of the Land or buildings referenced above  (collectively, the "**Leases**"); (d) all intangible personal property used in connection with or necessary to the ownership and operation of the Property, including any  website, transferable permits, licenses, certificates and consents granted or issued by any governmental or quasi-governmental agency (collectively, the "**Intangible Interests**"); (e) all assignable contracts and agreements for the operation and maintenance of the Property, if any, which Buyer requests Seller to assign to Buyer (collectively the "**Contracts**"); (hereinafter, the Real property, Personal Property, Leases, Intangible Interests and Contracts are sometimes collectively referred to as the "**Property**").

1.2    Seller and Buyer acknowledge and agree that the  assets of Seller listed below will be retained by Seller  (collectively, the "Excluded Assets") and shall not be sold, transferred or assigned to Buyer in connection with the purchase of the Property and Personal Property:

(a)    all of Seller's cash and cash equivalents;

(b)    Seller's right to own and use the name "Water's Edge" and "Water's Edge Limited Partnership";

(c)    all of Seller's tax rights, refunds, benefits, deposits and claims for and rights to abatement of taxes related to all periods prior to the Closing;

(d)    all of Seller's rights, claims and benefits in, to and under contracts, agreements, leases and licenses of Seller (other than the rights and benefits under the Assumed Contracts during all periods following the Closing);

(e)    all insurance policies of Seller and all of Seller's rights, benefits, prepayments and claims thereunder, including rights to prepaid amounts and proceeds of such policies;

(f)    all deposits, prepaid expenses, claims of refunds and rights to offset of Seller related to the Excluded Assets; and

(g)    all claims of Seller against third parties related to ownership or operation of the Property and the Personal Property during all periods prior to the Closing.

(h)    All employees and any liabilities with respect thereto.

2.    <u>PURCHASE PRICE AND DEPOSIT; DEFAULT</u>.

2.1    The purchase price shall be FORTY-THREE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($43,500,000.00) (the "Purchase Price"), subject to adjustments and prorations set forth herein.

2.2    In addition to the Purchase Price, Buyer shall pay to Seller an additional payment at the time and in the amount calculated in accordance with the terms provided in Exhibit C (the "<u>Additional Payment</u>"). The rights and obligations associated with the Additional Payment shall survive Closing and recording of the deed.

2.2     Within two (2) business days from the filing of the motion to obtain the Court approval of the Sale Approval Order, Buyer shall deposit with the Seller's counsel, Murphy & King, P.C. (the "Escrow Agent"), an initial deposit in the amount of Two Million and No/100 Dollars ($2,000,000.00) (the "Deposit"). The Deposit shall be deposited by Escrow Agent into a non-interest-bearing attorney's IOLTA, and shall be held by Escrow Agent subject to the terms of this Agreement and shall be duly accounted for at the Closing (as that term is hereinafter defined). The Deposit shall be non-refundable except as set forth in Section 14.7 below , or in the event of a failure of a Closing condition or a Seller default that remains uncured after the passage of any applicable cure period set forth in this Agreement.

2.3     The parties hereby agree that the Escrow Agent is employed as escrow agent hereunder in a ministerial capacity only, and shall act in accordance with this Agreement or only upon the joint written instructions of the parties in interest or a judicial order of a court of competent jurisdiction, and shall not be liable to any party for any loss or damage resulting therefrom, except for loss or damage resulting from the bad faith or willful misconduct of the Escrow Agent. If there is any dispute among the parties in interest as to whether the Escrow Agent shall disburse any funds, documents, or instruments held hereunder, the Escrow Agent shall either (a) hold such items until receipt of an authorization in writing signed by Buyer and Seller or an order of a court of competent jurisdiction ordering disposition of the Deposit, or (b) retain counsel and tender such items into court in connection with a proceeding to determine the rights and obligations of such persons. Buyer and Seller shall jointly and severally indemnify and hold the Escrow Agent harmless from and against any and all claims, liability, loss, cost and expense (including reasonable attorneys' fees and court costs) arising from the performance of the Escrow Agent hereunder, except for any such claim, action, or proceeding resulting in a final determination that the Escrow Agent breached its obligations through bad faith or willful misconduct. If such costs or expenses are incurred by the Escrow Agent, the Escrow Agent shall be entitled to reimburse itself out of any funds held hereunder for its reasonable costs and expenses. So long as any monies are held or invested in accordance with the instructions of the parties in interest, the Escrow Agent shall not be responsible for any loss or delay occasioned by the closure or insolvency of the institution with which any funds are invested). The Escrow Agent is counsel to Seller and, despite the role as Escrow Agent hereunder, Murphy & King, P.C. may continue to act as counsel to Seller hereafter.

2.4     If the sale of the Property as contemplated hereunder is consummated, then the Deposit shall be paid to Seller at Closing and credited against the Purchase Price. If the sale of the Property is not consummated due to Seller's failure to fulfill any of its obligations under this Agreement or due to any breach of any of Seller's representations and warranties hereunder (hereinafter a "Default"), then Buyer may elect, as Buyer's sole and exclusive remedy, either (1) to terminate this Agreement and receive a refund of the Deposit and in the event of such a termination neither party shall have any further rights or obligations hereunder except for those provisions that are expressly provided to survive termination of this Agreement, (2) waive such default and consummate the transactions contemplated hereby in accordance with the terms of this Agreement without any adjustment of the Purchase Price, or (3) enforce specific performance of the Seller's obligations under this Agreement. Buyer shall not have any other rights or remedies hereunder as a result of any Default by Seller prior to Closing, and Buyer hereby waives any other

3

such remedy as a result of a Default hereunder by Seller.  If the sale is not consummated due to Buyer's default hereunder, then, Seller, as its sole and exclusive remedies at law and in equity, shall have the right to terminate this Agreement by giving written notice thereof to Buyer, whereupon Escrow Agent shall deliver the Deposit, to Seller, free of any claims by Buyer, as liquidated damages, and neither party hereto shall have any further rights or obligations under this Agreement except as specifically provided otherwise in this Agreement, and Buyer shall promptly deliver to Seller, at no cost to Seller, copies of all third-party plans and reports commissioned by Buyer as part of its review of the Property but without any representation or warranty as to accuracy or completeness or Seller's ability to rely upon the same, .  Buyer shall pay for all costs, including Seller's reasonable attorneys' fees which are incurred due to Buyer's default. The Parties have agreed that Seller's actual damages in the event of a failure to consummate this sale due to Buyer's default prior to Closing, would be extremely difficult or impracticable to determine.  The Parties have agreed that, considering all the circumstances existing on the date of this Agreement, the amount of the Deposit is a reasonable estimate of the damages that Seller would incur in such event. In the event Buyer or any party related to or affiliated with Buyer is asserting any claims or right to the Property that would otherwise delay or prevent Seller from having clear, indefeasible and marketable title to the Property, then notwithstanding anything in this Section 2.4 to the contrary, in the event of Buyer's default or a termination of this Agreement, Seller shall have all remedies available at law or in equity.   The terms of this Section are expressly intended to survive termination of this Agreement.

3.    TITLE.

3.1    Good and clear record and marketable title to the Property shall be conveyed to Buyer at Closing in fee simple by a Release Deed, free and clear of any and all liens and encumbrances as specified in the Sale Approval Order, but subject to all Permitted Exceptions (as defined in Section 3.2).

3.2    The term "Permitted Exceptions", as used herein, shall mean (i) the lien of real estate taxes not yet due and payable as of the Closing Date (including, so-called "betterment assessments" established following the effective date of this Agreement); (ii) ) any title exception created directly by any act or omission of Buyer or its representatives, agents, employees or invitees; (iii) provisions of any ordinance, municipal regulation, or public or private law, rule or regulation existing at Closing; (iv) existing rights and obligations in party walls which are not the subject of written agreement; (v) subject to Section 12.1(d) and (e) below, any state of facts, easements or encroachments that an accurate survey, title examination, or personal inspection of the Property might disclose; (vi) the exceptions listed on the title commitment issued by Fidelity National Title Insurance Company (the "Title Company") dated May 27, 2025, Commitment No. MAF25-0231KC (the "Fidelity Title Commitment"), a copy of which is attached as Exhibit D; (vii) matters shown on the Feldman Survey dated September 17, 2025, a copy of which is attached as Exhibit E (the "Feldman Survey"); (viii) any contract, agreement, lease and/or license that is listed on Exhibit F of this Agreement, as same may be amended from time to time (the "Contracts"); and (ix) the rights and obligations under the leases between Seller and tenants occupying the Property, as listed on Exhibit G, as same may be amended from time to time (the "Leases").

4.    ACCESS ONLY; AS-IS, WHERE-IS.

4.1    From and after the date of this Agreement, Seller agrees to permit the Buyer and Buyer's employees, agents and contractors reasonable access, during normal business hours, after reasonable notice given to the Seller (given at least 24 hours in advance), to the Property. Said access shall be exercised only in the presence of Seller or Seller's agent, and with Seller's prior consent.  Under no such circumstance shall the Buyer or any agent of the Buyer be allowed to make any sort of alteration to the Property during Buyer's access. Buyer's access to the Property, in accordance with the terms herein, shall be used solely for Buyer's planning purposes in the purchase of the Property as contemplated by this Agreement and Buyer expressly agrees that said access shall not in any way grant to Buyer any inspection rights, property rights to the Buyer, or any right to terminate this Agreement for any reason whatsoever.

(a)    Buyer agrees that all access to the Property by Buyer and Buyer's employees, agents and contractors shall be at Buyer's sole risk and expense, and that any entry to and activity at the Property shall be in compliance with the terms hereof.  Before entry onto the Property, Buyer shall assure that all third party engineers, surveyors, contractors, consultants and other applicable third parties maintain appropriate licenses and personal injury and property damage insurance and applicable workman's compensation insurance, in amounts satisfactory to Seller, and at Seller's request, shall provide copies of such insurance certificates to Seller prior to entry.  Such insurance shall name Seller and Seller's mortgagee as additional insureds.  In all events, Buyer shall take all reasonable steps to minimize interference with tenants or occupants of the Property and the operation of the Property during any entry onto the Property by Buyer, its consultants, employees, contractors or others.  The provisions of this section shall survive the Closing of the transactions contemplated by this Agreement and any expiration or termination of this Agreement.

(b)    Buyer agrees to promptly repair any physical damage to the Property on account of access by Buyer or by Buyer's consultants, employees, contractors or others pursuant to the terms hereof.  Buyer shall indemnify, defend and hold Seller, and Seller's respective members, managers, partners, general partners, limited partners, officers, directors, shareholders, trustees, beneficiaries, beneficial owners, agents, employees, legal representatives, tenants, occupants successors and assigns as well as Seller's mortgagee (collectively the "Seller Parties") harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, reasonable attorney's fees) to the extent incurred by Seller or the Seller Parties on account of or in connection with Buyer's access by Buyer or Buyer's consultants, employees or contractors, onto the Property. The provisions of this section shall survive the Closing of the transactions contemplated by this Agreement and any expiration or termination of this Agreement.

4.2    Any documents or information provided by the Seller prior to, on, or after the date of this Agreement have been or will be delivered to the Buyer as an accommodation to the Buyer without representation or warranty as to accuracy or completeness. Buyer understands that certain

of the materials and other documents or information provided hereunder may have been provided by others to the Seller and may not have been prepared by or verified by the Seller. Buyer acknowledges that such documents and information are being provided for information only and Buyer shall not rely on such documents and information, but shall have instead conducted its own independent investigation of the Property. Buyer shall not disclose the contents of the documents provided by Seller to any person other than (a) to those persons (i) who are responsible for determining the feasibility of Buyer's acquisition of the Property and (ii) who have agreed to preserve the confidentiality of such information as required hereby or (b) to persons as required by law (collectively, "Permitted Outside Parties"). The provisions of this section shall survive the Closing of the transactions contemplated by this Agreement and any expiration or termination of this Agreement.

      4.3     Except with respect to Seller's representations and warranties expressly set forth in Section 9.1 of this Agreement, it is understood and agreed that Seller specifically disclaims, and has not made and is not now making any other warranties, representations or guaranties of any kind or character, express or implied, oral or written, past, present or future, with respect to the Property or the Personal Property, including without limitation, the suitability of the Property for Buyer's intended use. Buyer has not relied upon and will not rely upon, either directly or indirectly, any statement, representation or warranty of Seller or any of its respective agents and acknowledges that no such representations have been made. Buyer represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and, other than the representations and warranties expressly set forth in Section 9.1 of this Agreement, it is relying solely on its own expertise and that of Buyer's consultants in purchasing the Property. Upon Closing, Buyer acknowledges that adverse matters, including, but not limited to, adverse physical and environmental conditions, may not have been revealed by Buyer's investigations. Buyer acknowledges and agrees that, upon Closing, Seller shall sell and convey to Buyer and Buyer shall accept the Property and the Personal Property "As Is, Where Is", with all faults. Upon Closing, Buyer shall assume the risk that adverse matters, including adverse physical or construction defects or adverse environmental, health or safety conditions, may not have been revealed by Buyer's investigations. Buyer further acknowledges and agrees that (i) there are no oral agreements, warranties or representations collateral to or affecting the Property or the Personal Property by Seller, any agent of Seller or any third party and (ii) that the representations and warranties of Seller and claims for breach or violation thereof shall not survive the Closing of the transactions contemplated by this Agreement, except to the extent expressly set forth herein. Seller is not liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property or the Personal Property furnished by any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth or referred to in this Agreement. Buyer acknowledges that the Purchase Price reflects the "As Is" nature of this sale and any faults, liabilities, defects or other adverse matters that may be associated with the Property or Personal Property. Buyer has fully reviewed the disclaimers and waivers set forth in this Agreement with its counsel and understands the significance and effect thereof. The provisions of this Section shall survive termination of this Agreement and Closing of the transactions contemplated by this Agreement.

4.4 If this Agreement terminates for any reason, Buyer shall promptly return and/or deliver to Seller the following (collectively, the "Property Documents"): all Property information and any other additional property reports or materials delivered by Seller to Buyer and all copies thereof. Buyer's obligation to return and/or deliver the Property Documents to Seller shall survive the termination of this Agreement.

4.5 Effective upon Closing, Except as set forth below, Buyer, for itself and its agents, employees and other persons or entities related to or affiliated with Buyer, hereby irrevocably and unconditionally releases Seller, its members, managers, general partners, limited partners, stockholders, directors, agents, employees, accountants, consultants, attorneys, officers and any other person or entity related to or affiliated with Seller, from any and all claims, suits, actions, proceedings, obligations, damages, losses, liabilities, fines, penalties, costs and expenses (including legal fees and expenses) resulting from, related to or incident to the conditions of, at, under or about the Property and the Personal Property, whether or not known to Buyer, its agents, employees or other persons or entities related to or affiliated with Buyer, or indicated by any investigation, or arising before or after Closing, anticipated or unanticipated, foreseen or unforeseen, or above ground or below ground, including without limitation, matters arising under any federal, state or local environmental, health or safety law, ordinance, rule or regulation. The releases contained in this Agreement include claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist, which, if known by Buyer, would materially affect Buyer's release of Seller. Buyer specifically waives the provisions of any law of any state, territory or jurisdiction the import of which is to provide that a general release does not extend to claims which a party does not know or suspect to exist in such party's favor at the time of executing the release, which if known by such party may have materially affected such party's decision to give the release. The foregoing release shall not in any way preclude Buyer from raising any defense that may be available to it in any litigation or other adversarial proceeding or action commenced after the Closing by any party other than Seller, including, without limitation that it was not the owner of the Property at the time that the relevant cause(s) of action occurred. Further, the foregoing release shall not apply to any indemnity of Seller related to real estate brokers that explicitly survives the Closing hereunder or to any breach of any representation or warranty by Seller set for herein. The provisions of this Section shall survive termination of this Agreement and Closing of the transactions contemplated by this Agreement.

5. <u>CLOSING; BUSINESS DAYS</u>.

The Deed is to be delivered and the Purchase Price to be paid (the "Closing") at 10:00 a.m. on or before the date that is on the later of (i) December 1, 2025, or (ii) the date that is forty-five (45) days after the Bankruptcy Court approves the Buyer as the winning bidder under the terms of the Sale Motion, unless mutually extended by the terms of this Agreement or by Seller and Buyer in writing (the "Closing Date"). The Closing shall take place by means of a customary escrow closing through Escrow Agent or the Title Company or BUYER's attorney that will issue Buyer's title insurance policy (the "Closing Title Company"). It is agreed that, subject to all terms and conditions of this Agreement, time is of the essence of this Agreement for all purposes hereof including, without limitation, with respect to the Closing date set forth herein. Except as otherwise expressly provided in this Agreement, Buyer and Seller shall bear closing costs and

expenses and the parties shall make all closing adjustments in accordance with customary Massachusetts conveyancing practice, and each party shall be responsible for its own legal fees and expenses. If the Closing would occur on a Saturday, Sunday or legal Massachusetts holiday, then the Closing shall be the immediately following business day.

5.1    At the Closing, Seller shall deliver to Buyer the following:

(i)    A Release Deed, in proper statutory form for recording so as to convey the Property in fee simple to Buyer, or to the nominee designated by Buyer pursuant to Section 8.7 hereof, by written notice to Seller at least three (3) days before the Closing;

(ii)    A certified copy of the Sale Approval Order;

(iii)    A closing settlement statement;

(iv)    Affidavit that Seller is not a foreign person under IRC §1445;

(v)    An executed counterpart of an Assumption and Assignment Agreement in form mutually acceptable to the parties with respect to the Leases.

(vi)    An executed counterpart of an Assumption and Assignment Agreement in the form of Exhibit H with respect to the Assumed Contracts;

(vi)    An executed Bill of Sale in the form of Exhibit I attached hereto (the "Bill of Sale") executed by Seller, vesting in Buyer, "as is, where is" and without warranty or recourse, Seller's right, title and interest in and to the Personal Property; and

(vii)    Any and all other reasonable and customary documents, instruments, and agreements necessary or appropriate in the reasonable opinion of Buyer's attorney to transfer and convey the Property and all interest therein to Buyer in accordance with this Agreement or as may be reasonably required by the Title Company or BUYER's lender, if any, in accordance with this Agreement. Such other documents, instruments and agreements shall be furnished to Seller's attorney at least three (3) days prior to Closing.

5.2    At the Closing, Buyer shall deliver to Seller the following:

(i)    A closing settlement statement;

(ii)    To the extent that BUYER's nominee is an entity, certificates of legal existence, limited liability company resolutions, corporate votes and/or trustees' certificates or other authority confirming the legal existence,

8

good standing and authority of Buyer's nominee to perform its obligations hereunder;

(iii)    The balance of the Purchase Price via wire transfer of immediately available funds after application of the Deposit previously tendered, plus or minus applicable prorations and adjustments as provided herein, into Escrow Agent's escrow account;

(iv)    An executed counterpart of an Assumption and Assignment Agreement in the form of Exhibit H with respect to the Assumed Contracts; and

(v)    The Bill of Sale in the form of Exhibit I, executed by Buyer;

(vi)    Other documentation provided for herein or reasonably requested by Seller or the Title Company to effect the sale of the Property and the other obligations of the Parties as contemplated herein which are consistent with the terms hereof.

To the extent that a form of any document listed in Section 5.2 or 5.3 above, to be delivered hereunder, is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to the Buyer and the Seller.

    5.3    Buyer shall pay the cost of recording the Deed, all costs of owner's title insurance policy. Seller shall pay all state documentary stamps due in connection with the transfer of the Property. The parties shall adjust any final utility readings as may be applicable. Any escrow charges or the like charged by the Title Company, if any, shall be split equally between the parties.

    5.4    Real property taxes and assessments for the then current fiscal year; water, sewer and utility charges (to the extent not paid by tenants of the Property); rent and other income, fees and assessments; and annual permits and/or inspection fees (calculated on the basis of the period covered), shall all be prorated as of 12:01 a.m. Eastern Time on the date of Closing on the basis of a 365-day year. If any information is unavailable at the Closing that prevents Buyer and Seller from finalizing adjustments and prorations pursuant to this Agreement, then Buyer and Seller agree to allocate such items on a fair and equitable basis at the Closing, and then as soon as such information is available, final adjustments shall promptly be made. Payments in connection with the final adjustments shall be due within ten (10) days of written notice. Notwithstanding the foregoing, all such rights and obligations shall survive the Closing for sixty (60) days.

    5.5    If the amount of real estate taxes or other governmental charges and assessments for the then current fiscal year are not known at the time of the Closing, taxes and any other applicable items shall be apportioned on the basis of the taxes or other amounts assessed for the preceding fiscal year or other applicable payment period or based on a reasonably anticipated estimate of the then current fiscal year or other applicable payment period, with a reapportionment as soon as the new tax rate and valuation or actual amounts to be paid can be ascertained. The

terms of this Section 5.6 shall survive the Closing of the transactions contemplated by this Agreement.

5.6     Buyer shall take all steps necessary to effectuate the transfer of all utilities to its name as of the Closing Date, and where necessary, post deposits with the utility companies. Seller shall ensure that all utility meters are read as close to the Closing Date as is reasonably feasible, and utility charges shall be equitably apportioned between Seller and Buyer for the period between the date of the reading and the Closing. Seller shall be entitled to recover any and all deposits held by any utility company as of the Closing Date.

5.7     Security deposits and prepaid rents of tenants (other than those which are marketable securities, letters of credit, or other non-cash items, all of which shall be transferred to Buyer) shall be transferred by Seller by crediting to Buyer the amount of the security deposits and prepaid rents held under the Leases. There shall be no proration as to those security deposits so delivered. Seller shall have no obligation to deliver (or prorate) any security deposits properly applied prior to the Closing Date. Non-cash security deposits shall be assigned and delivered to Buyer at Closing, with any income earned thereon through the Closing Date credited to Seller, less such portion as which the tenant would be entitled pursuant to its lease or by law. If the consent or authorization of the issuer of any such letter of credit is required, Seller shall cooperate with Buyer in obtaining such consent subsequent to the Closing. Notwithstanding anything herein to the contrary, no proration shall be made for rents delinquent as of the Closing Date (the "Delinquent Rents"). Buyer shall make a good faith attempt (but Buyer shall not be required to institute suit or collection procedures) to collect the Delinquent Rents. Seller waives any and all rights to bring suit against tenants to collect Delinquent Rents. Amounts collected by Buyer from any tenant showing Delinquent Rents shall be applied first to Delinquent Rents owed by such tenant and then to current rents. Any such amounts applicable to Delinquent Rents received by Buyer shall be forwarded to Seller within five (5) business days.

6.     CONDITION; RISK OF LOSS.

6.1     The Property and the Personal Property are to be conveyed in "AS IS" condition and subject to the rights of tenants occupying Building 5 under the Leases, with Buildings 1 and 2 free of all occupants. Prior to Closing, Seller shall bear all risk of loss to the Property and all liabilities arising from the Property except as otherwise set forth in Section 4 hereinabove.

6.2     Subject to the provisions of the Sale Order, if the Property shall have been damaged by fire or casualty following the date of execution of this Agreement, then the Seller shall either:

(a)     pay over or assign to the Buyer, on delivery of the deed, all amounts recovered or recoverable under such insurance on account of such damage, less any amounts reasonably expended by the Seller for any partial restoration, or

(b)     if a holder of a mortgage on the Property shall not permit the insurance proceeds or a part thereof to be used to restore the Property to their former condition or to be so paid over or assigned, give to the Buyer a credit against the purchase price, on delivery of the

deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the Seller for any partial restoration.

(c)     Notwithstanding the above, if the Property incurs damage by fire, vandalism, or any other casualty whether or not insured against after the date of this Agreement and such cost of the repair of such loss or damage to the Property will, in Buyer's good faith, exceed $500,000.00 and such damage is not repaired prior to Closing to its condition prior to such fire, vandalism, or any other casualty, BUYER may, at the BUYER's option, elect to terminate this Agreement and receive a full refund of the Deposit by notice given to Seller within five (5) business days following written notice from Seller of such casualty (but in no event later than the Closing).

6.3     In the event of a material taking of the Property by eminent domain under applicable law, which permanently and materially impairs the current use of the Property or access thereto, Buyer shall have the option to terminate this Agreement and receive a return of the Deposit, or to proceed to Closing without deduction.  Seller shall provide any notices that it receives with respect to any taking promptly to Buyer.

7.     BROKERAGE COMMISSION.

7.1     Seller shall be solely responsible to Newmark (the "Broker") for a real estate sales commission at Closing in accordance with a separate agreement between Seller and Broker. Broker may share its commission with any other licensed broker involved in this transaction, but the payment of the commission by Seller to Broker shall fully satisfy any obligations of Seller to pay a commission hereunder.  Under no circumstances shall Seller owe a commission or other compensation directly to any other broker, agent or person.  Any cooperating broker shall not be an affiliate, subsidiary or related in any way to Buyer.  Other than as stated above in this Section, Seller and Buyer each represent and warrant to the other that no real estate brokerage commission is payable to any person or entity in connection with the transaction contemplated hereby, and each agrees to and does hereby indemnify and hold the other harmless against the payments of any commission to any other person or entity claiming by, through or under Seller or Buyer, as applicable.  This indemnification shall extend to any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees and litigation costs) arising as a result of such claims and shall survive the Closing.

8.     GENERAL PROVISIONS.

8.1     The terms and conditions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

8.2     Any notice required or permitted hereunder shall be deemed to have been received either (a) when delivered by hand and the party giving such notice has received a signed receipt thereof, (b) e-mail, or (c) one (1) day following the date deposited with Federal Express or other recognized overnight courier, addressed as follows (or addressed in such other manner as the party being notified shall have requested by written notice to the other party) for:

| | |
|---|---|
| If to the Buyer: | E-T Ocean Ave LLC<br>c/o Eastern Real Estate LLC<br>1 Marina Park Drive, suite 310<br>Boston MA 02210<br>Attn: Jeffrey T. Banta<br>tbanta@eastern-re.com |
| | And. |
| | c/o Taurus Investment<br>Two International Place Floor 27<br>Boston, MA  02110<br>Attn: Nick Clark<br>nclark@tiholdings.com |
| With copies to: | Raymond Murphy (rmurphy@eastern-re.com)<br>Michael Brodigan (mbrodigan@brodiganlaw.com) |
| If to the Seller: | Water's Edge Limited Partnership<br>394 Ocean Avenue<br>Revere, MA 02151<br>Attn: Evelyn M. Carabetta<br>Email: emc112799@gmail.com |
| With a copy to: | Kathleen R. Cruickshank, Esquire<br>kcruickshank@murphyking.com<br>Robert E. Richards, Esquire<br>Rrichards@murphyking.com<br>Brianna E. Burns, Esquire<br>bburns@murphyking.com<br>Murphy & King, P.C.<br>28 State Street<br>Boston, MA 02109 |

Notice given by legal counsel to a party shall be deemed to have been given by such party.

8.3     Whenever used herein, unless expressly provided otherwise, the term "days" shall mean consecutive calendar days, except that if the expiration of any time period measured in days occurs on a Saturday, Sunday, legal holiday or other day when federal offices are closed in Boston, MA, such expiration shall automatically be extended to the next business day.

8.4     This Agreement constitutes the entire agreement between the parties concerning the Property and the Personal Property and supersedes all prior agreements or undertakings.

8.5    This Agreement may not be modified except by the written agreement of the parties.  The Buyer and Seller agree to authorize their respective attorneys, if any, and by executing this Agreement do so authorize their attorneys to execute or otherwise communicate on their behalf any and all extensions in connection with this Agreement, including but not limited to extensions of periods of time and/or extensions for the date of Closing.

8.6    In the event any one or more of the provisions contained in this Agreement are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had not been contained herein. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.  The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party by the same or any other such term or provision in the future.

8.7    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, and legal representatives.  Except as set forth below, this Agreement may not be assigned by the Buyer to any person, firm, corporation or other entity, without prior written consent and approval of Seller, which shall not be unreasonably withheld and in the case of an assignment by Buyer to an unaffiliated thirty-party, such approval by Seller shall be in the sole discretion of Seller.  Notwithstanding anything set forth herein, Buyer shall not be entitled to assign this Agreement or to nominate any other person or entity to take title to the Property, except that Buyer may nominate or assign this Agreement to a corporation, limited partnership, limited liability company or other entity to take title to the Property provided that Buyer controls such assignee or nominee, and upon assumption of all the obligations and liabilities of Buyer hereunder by such nominee, the Buyer listed in the first paragraph hereof shall have no further obligations or liabilities hereunder (except as to the provisions of this Agreement that are expressly provided to survive the Closing of the transactions contemplated by this Agreement or any expiration or termination of this Agreement, as to which such original Buyer shall have joint and several liability with the assignee Buyer).  At Seller's election, assignment of this Agreement to any other person or entity or nomination of any other person or entity, other than as set forth above, to take title to the Property shall be void, ab initio, unless Seller's written authorization has been previously granted.

8.8    Any paragraph headings or captions contained in this Agreement shall be for convenience of reference only and shall not affect the construction or interpretation of any provisions of this Agreement. Words such as "herein," "hereof" and "hereunder" when used in reference to this Agreement, refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.  The word "including" shall not be restrictive and shall be interpreted as if followed by the words "without limitation."

8.9    This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and the laws of the Commonwealth of Massachusetts without regard to its conflicts of laws provisions.  The parties hereto hereby (a) consent to the exclusive jurisdiction of the Bankruptcy Court in connection with any controversy related to this Agreement; (b) waive any

argument that venue in any such forum is not convenient; (c) agree that the exclusive venue for any litigation initiated by the Seller or Buyer in connection with this Agreement shall be in the Bankruptcy Court; and (d) agree that the Bankruptcy Court may issue a final judgment as to any such dispute and that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Seller and Buyer waive any right to trial by jury in any action at law or in equity or in any other proceeding based on or pertaining to this Agreement, or any other document.

8.10   The individuals executing this Agreement represent and warrant that they have full authority and/or have been duly authorized by their respective parties to do so on behalf of such parties.

8.11   The parties waive the formal requirements for tender of payment and deed to establish a breach or default of this Agreement. The parties agree that all time is of the essence.

8.12   Except as required by applicable law or in connection with any legal proceeding brought to enforce Buyer's rights herein, Buyer agrees to keep confidential all information related to the Agreement and the transaction contemplated herein; provided however that  Buyer may disclose, meet with, or discuss the potential transaction with employees of Buyer, legal counsel, accountants, banks, probate courts and other consultants to and contractors for Buyer for purposes incidental to this agreement.

9.   WARRANTIES AND REPRESENTATIONS BY SELLER.

9.1   Seller hereby warrants and represents to Buyer, knowing and intending that Buyer is relying hereon in entering into this Agreement and consummating the transactions contemplated hereby that:

(a)   Subject to entry of the Sale Approval Order (as hereafter defined), Seller has all necessary right, power, capacity and authority to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder. This Agreement has been duly executed and delivered by the Seller and, subject to entry of the Sale Approval Order, is a valid and binding obligation of the Seller enforceable against the Seller in accordance with its terms.

(b)   Seller is an entity duly organized and validly existing under the laws of the jurisdiction of its formation and has the power and authority to operate its properties and to carry on its business as it is now being conducted.

(c)   The Seller will, upon the entry of the Sale Approval Order and the consummation of the transactions contemplated hereby, transfer all right, title and interest in and to the Property to the Buyer, free and clear of any and all encumbrances as provided in the Sale Approval Order, but subject to the Permitted Exceptions .

(d)   Except for Newmark, no person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Seller in connection with the

14

transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller.

(e)     Seller is not a "foreign person," as defined under Internal Revenue Code Section 1445.

(f)     To the best of Seller's knowledge, other than the Sale Approval Order, no consent, approval or authorization of any court, regulatory authority, governmental body, or any other entity or person not a party to this Agreement is required for the consummation of the transactions described in this Agreement by Seller.

(g)     Seller has no employees at the Property.

9.2     The warranties and representations by Seller contained in this Agreement (and claims for breach or violation thereof) shall not survive from and after Closing of the transactions contemplated by this Agreement. The acceptance and recording of the Deed by Buyer or its nominee shall be deemed to be full performance and discharge of every covenant, agreement and obligation of Seller contained in this Agreement, but the foregoing shall not apply to the brokerage indemnity that explicitly survives the Closing hereunder. The provisions of this Section 9.2 shall survive termination of this Agreement and the Closing of the transactions contemplated by this Agreement.

10.     <u>WARRANTIES AND REPRESENTATIONS BY BUYER</u>.

10.1     Buyer hereby warrants and represents to Seller, knowing and intending that Seller is relying hereon in entering into this Agreement and consummating the transactions contemplated hereby, that:

(a)     Buyer is, and at Closing, any nominee of Buyer that is an entity shall be, a duly and validly organized and existing entity, in good standing and governed by the laws of its state or Commonwealth of formation. Buyer has, and any nominee of Buyer shall have, full power and authority to enter into and perform this Agreement and all documents, instruments and contracts entered into or to be entered into by it pursuant to this Agreement and to carry out the transactions contemplated hereby. This Agreement is, and all documents that are to be executed by Buyer or its nominee and delivered to Seller at the Closing will be, duly authorized, executed and delivered by Buyer or its nominee, and all consents required under organizational documents of Buyer's nominee, by law or otherwise have been obtained. This Agreement is, and all documents that are to be executed by Buyer or Buyer's nominee and delivered to Seller at the Closing, will be the legal, valid and binding obligations of Buyer or Buyer's nominee, as applicable, enforceable in accordance with their terms and will not violate any provisions of any contract, judicial order or any matter to which Buyer or its nominee is a party or to or by which Buyer or its nominee is subject. Neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement is subject to any requirement that Buyer or its nominee obtain any consent, approval or authorization of, or make any declaration or filing with, any governmental authority or third party.

(b)     No consent, approval or waiver of any third party is required for the consummation by Buyer or its nominee of the transactions contemplated by this Agreement. There are no general assignments for the benefit of creditors, or voluntary or involuntary bankruptcy proceedings, or other proceedings under any debtor relief laws, contemplated by or pending or to Buyer's actual knowledge threatened against Buyer or its nominee.

(c)     There is no agreement to which Buyer is a party or to Buyer's knowledge binding on Buyer which is in conflict with this Agreement.  To Buyer's knowledge, there is no action or proceeding pending or threatened against Buyer that challenges or impairs Buyer's ability to execute or perform its obligations under this Agreement.

(d)     Buyer is not, and will not be, a person with whom Seller is restricted from doing business with under the Anti-Terrorism Laws, including persons and entities named on the Office of Foreign Asset Control Specially Designated Nationals and Blocked Persons List.

At the Closing, and as a condition thereof, without limitation of any other obligation of Buyer contained in this Agreement, Buyer shall warrant and represent to Seller in writing on the Closing Date that all representations and warranties made by Buyer or its nominee in this Agreement continue to be true and correct in all material respects as of the Closing Date as if they were made on the Closing Date.

11.     COVENANTS OF SELLER.

11.1     Between the date hereof and the Closing, Seller agrees that:

(a)     it will maintain the Property, or cause the Property to be maintained, in the same condition as it is on the Effective Date (reasonable wear and tear excepted) and in a manner consistent with Seller's maintenance of the Property since the Petition Date, subject to the terms of Section 6.1 of this Agreement;

(b)     it will promptly give notice to Buyer of every threatened or actual litigation whether or not covered by insurance against or relating to the Property (including, without limitation, the sale thereof to Buyer) or any portion thereof between the Effective Date and the Closing;

(c)     Seller will operate the Property in the ordinary course of business consistent with its practice since the Petition Date.

12.     CONDITIONS TO BUYER'S OBLIGATIONS.

12.1     Without limitation of any other conditions to Buyer's obligation to close set forth in this Agreement, the obligations of Buyer under this Agreement are subject to the satisfaction at the time of Closing of each of the following conditions (any one of which may be waived in writing in whole or in part by Buyer at or prior to Closing):

(a)    All of the representations by Seller set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and as of Closing;

(b)    Seller shall have performed, observed and complied with all covenants and obligations required by this Agreement to be performed by Seller at or prior to Closing;

(c)    Possession of the Property, in accordance with the terms of this Agreement is to be delivered at the Closing, the Property to be then in the same condition as it is at the Effective Date (reasonable wear and tear excepted) and in accordance with the terms of Section 6.1 of this Agreement subject, however, to Section 6.2 and Section 6.3 which shall govern certain changes in the condition of the Property described therein;

(d)    Buyer shall have obtained a commitment for title insurance, including ALTA coverage, from Fidelity Title Insurance Company or other national title insurance company, in form and substance satisfactory to Buyer in its sole discretion, insuring that, based on the Sales Approval Order, Buyer will vested with good clear record and marketable title in the Property free and clear of any encumbrances other than the Permitted Exceptions and any other encumbrance approved by Buyer;

(e)    Buyer shall have obtained an updated ALTA Survey in form and substance satisfactory to Buyer in its sole discretion that does not disclose any defects, encroachments or other encumbrances that are not disclosed by the Feldman Survey or which areotherwise approved by Buyer;

(f)    Seller shall have satisfied all requirements set forth in Schedule B Part 1 of Buyer's title insurance commitment;

(g)    Other that with respect to casualties or losses under section 6.1 above there shall be no material adverse change in the condition of the Property between the date of this Agreement or Closing, such as but not limited to, a significant  release of hazardous materials.

(h)    No injunction shall have been issued by a governmental authority or other legal proceeding which would prohibit the transaction;

(i)    Delivery of all required Closing items by Seller; and

(j)    The Sale Approval Order (hereinafter defined) shall have been entered by the Bankruptcy Court and no court of competent jurisdiction shall have entered an order staying such Sale Approval Order pending appeal.

If at any time at or prior to Closing, Buyer determines that one or more of the foregoing conditions has not been satisfied or will not be satisfied by Closing, Buyer shall have the right to terminate this Agreement by written notice to Seller whereupon the Escrow Agent shall refund the Deposit to Buyer and, in the event of such a termination, neither party shall have any further

rights or obligations hereunder, except for those provisions that are expressly provided to survive termination of this Agreement.

13.    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER.

13.1    The obligations of Seller with respect to actions to be taken by Seller at the Closing are subject to the satisfaction, or the written waiver by Seller, of each of the following conditions:

(a)    Buyer's representations and warranties contained herein shall be true and correct in all material respects as of the date of this Agreement and the Closing Date;

(b)    Buyer shall have performed its obligations hereunder in all material respects and the Purchase Price and all deliveries to be made at Closing by Buyer shall have been tendered; and

(c)    The Sale Approval Order (hereinafter defined) shall have been entered by the Bankruptcy Court and no court of competent jurisdiction shall have entered an order staying such Sale Approval Order pending appeal.

14.    BANKRUPTCY PROVISIONS.

14.1    The obligations of Seller and Buyer are conditioned upon the approval by the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") under all applicable bankruptcy laws and rules, including all applicable bidding and objection procedures, of an Order approving consummation of the transactions contemplated hereby by Buyer and Seller, certified by the clerk of the Bankruptcy Court as a true and correct copy of such order, reasonably satisfactory in form and substance to Buyer, Seller and their respective counsel, entered after a hearing conducted on adequate notice given in the Bankruptcy Case (the "Sale Approval Order").

14.2    The Sale Approval Order shall provide for the following: (i) the sale shall be free and clear of all liens, claims, interests, and encumbrances existing as of the date of entry of the Sale Approval Order, including without limitation all litigation and tenant claims (except for Permitted Exceptions), but subject to the occupancy rights of tenants of Building 5; (ii) authorizing the Seller to pay any taxes existing as of or prior to the date specified for Closing (including but not limited to any transfer taxes and stamp taxes arising from the sale of the premises); (iii) providing that Buyer is a good faith Buyer entitled to the protections of Section 363(m) of the Bankruptcy Code; (iv) providing that the purchase price for the premises is fair and reasonable and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law; and (v) providing that notwithstanding Fed. R. Bankr. P. 6004(h), the Sale Approval Order shall not be stayed for fourteen days after entry and shall be effective immediately upon entry.

14.3    The Buyer shall have the right to, in Buyer's sole discretion; designate those contracts, agreements, leases and/or licenses of the Seller which are to be Assumed Contracts,

pursuant to the terms of this Section. An initial list of the contracts, agreements, leases and/or licenses that are to be Assumed Contracts is set forth in Exhibits F and G hereto. At least seven (7) days prior to the hearing for approval of the Sale Approval Order, Buyer may by notice to the Seller and without any additional consideration therefor, designate additional contracts, agreements, leases and/or licenses to be assumed and assigned or to designate executory contracts and agreements which will not be assumed and assigned notwithstanding their prior inclusion in Exhibits F and G or prior designation by the Buyer. In the Sale Motion, the Seller shall seek an order of the Court approving the assumption and assignment of the contracts, agreements, leases and/or licenses that are to be assumed by the Seller and assigned to the Buyer listed on Exhibits F and G, as amended, if at all. The Sale Order shall provide that the assumption and assignment of the Assumed Contracts shall be free and clear of all Encumbrances, except for obligations of Buyer under Section 365 of the Bankruptcy Code. Buyer and/or Seller may file amended, supplemental, or additional pleadings, if required to address additions or deletions of contracts, agreements, leases and/or licenses to Exhibits F and G made pursuant to this Section. "Assumed Contract" shall mean any contract, agreement, lease and/or license that (i) is listed on Exhibits F and G of this Agreement, as same may be amended from time to time in accordance with this Section; (ii) is subject to an order entered by the Bankruptcy Court that authorizes the Seller to assume and assign the contract, agreement, lease and/or license to Buyer free and clear of Encumbrances; and (iii) is actually assumed by Seller and assigned to Buyer.

14.4    The Bankruptcy Court approval process allows a party in interest to file an objection to the sale or a qualifying counteroffer. Promptly after execution of this Agreement, Seller shall file with the Bankruptcy Court an appropriate Motion and Notice of Intended Sale, in accordance with 11 U.S.C. §363 and the Local Rules of the Bankruptcy Court (the "Sale Motion"). BUYER shall be provided with copies of all pleadings pertinent to the sale. In the Sale Motion, the Seller shall request entry of an order waiving the counteroffer procedures with respect to the Agreement and make its best efforts to obtain such a waiver.

14.5    Intentionally Omitted

14.6    Intentionally Omitted

14.7    In the event that Buyer is not the approved Buyer under the Sale Approval Order, either Party may terminate this Agreement, whereupon the Escrow Agent shall refund the Deposit to Buyer and, in the event of such a termination, neither party shall have any further rights or obligations hereunder, except those provisions that are expressly provided to survive termination of this Agreement.

14.8    Access to Information; Maintenance of Records:

(a)    Following the Closing, for a period of the later of (i) three (3) years after the Closing Date and (ii) the date of entry of an order of the Bankruptcy Court closing the Bankruptcy Case, or if converted to a case under Chapter 7 of the Bankruptcy Code, an order of the Bankruptcy Court closing such case, each party and its representatives shall have reasonable access to all of the books and records compiled with respect to the period prior to the Closing

19

Date relating to the business of Seller or the Property, including all information pertaining to the Assumed Contracts, all employee records or other personnel and medical records required by law, legal process or subpoena, in the possession of the other party to the extent that such access may reasonably be required by such party in connection with the Assumed Contracts, or other matters relating to or affected by the operation of the business of Seller and the Property.

(b)     Such access shall be afforded by the party in possession of such books and records upon receipt of reasonable advance notice and during normal business hours; provided, however, that: (i) any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party; (ii) no party shall be required to take any action which would constitute a waiver of the attorney-client privilege; (iii) no party shall be required to take any action which would reveal confidential or proprietary information; and (iv) no party shall be required to supply the other party with any information which such party is under a legal obligation not to supply. The applicable party exercising this right of access shall be solely responsible for any costs or expenses incurred by it hereunder.

(c)     If the party in possession of such books and records shall desire to dispose of any such books and records prior to the expiration of such period, such party shall, prior to such disposition, give the other party a reasonable opportunity at such other party's expense, to segregate and remove such books and records as such other party may select.

15.     MISCELLANEOUS.

15.1     Seller's Liability:  Notwithstanding anything set forth herein, Seller's liability for its obligations hereunder is limited to the interest of Seller in the Property. No partner, officer, member, manager, general partner, limited partner, trustee, beneficiary, stockholder, director, employee, agent, attorney, accountant, consultant, or representative of Seller shall have any personal liability in connection with this Agreement or the transaction contemplated hereby and in no event shall Seller be liable for consequential or indirect damages.

15.2     Waiver of Conditions:  Notwithstanding any provision of this Agreement, either party may at its option waive any provision that is a condition to its performance hereunder and close the transaction.  In the event a condition to Closing has not been satisfied by a party at the time of Closing (or such earlier date as is provided herein), the other party may either (i) waive the condition and proceed to Closing, or (ii) provided the other party is not in default hereunder, terminate this Agreement by giving notice to the first party on or before the Closing Date.

15.3     Attorney's Fees:  In the event it becomes necessary for either Party hereto to file a suit or other action to enforce this Agreement or the provisions contained herein, then the Party prevailing in such action shall be entitled to recover, in addition to all other remedies and charges, reasonable attorney fees and costs incurred in such suit or action.

15.4     Recording:  It shall be a default hereunder by Buyer, entitling Seller to enforce its rights under this Agreement, including but not limited to the rights set forth in Section 2.4, if Buyer records or files of record this Agreement or a notice thereof in any land records in Massachusetts.

15.5    <u>Confidentiality</u>:  Buyer agrees that all information and material obtained by Buyer relating to the transaction contemplated herein, the Property and this Agreement including, without limitation, any information obtained from or in connection with the Seller's confidential records, tenant leases and tenant relationships including under the Leases (herein collectively "**Confidential Material**") are proprietary and confidential, and Buyer agrees to keep and maintain same as confidential and not to use or disclose same or permit such Confidential Materials to be used or disclosed to any third parties except in accordance with the terms of this Agreement.  Buyer shall not disclose or permit to be disclosed any Confidential Materials to any third parties other than to Buyer's respective principals, agents, consultants, lenders and transaction participants and investors and to counsel engaged to implement this transaction, and then only on the condition that Buyer instructs such third parties to keep the Confidential Material confidential in accordance with the terms hereof.  In no event shall Buyer advertise or permit the advertising of the fact or terms of the sale contemplated herein prior to Closing.  In the event it is Buyer's reasonable belief that Buyer is required under applicable law or any other governmental entity, regulation, requirement, order or directive (such laws, regulations, requirements, orders and directives collectively referred to as a "**Directives**") to disclose any information which Buyer is otherwise required to keep confidential, Buyer shall first (at least ten (10) days before making any such disclosure, or such shorter period as may be required by the Directives) notify Seller in writing as to the nature of the disclosure that Buyer reasonably believes it is required to make, which notice shall include any Directives and copies of all information that Buyer intends to disclose.  Buyer acknowledges that the confidentiality provisions set forth herein will likely be beneficial to Buyer and Seller to avoid any potential adverse results upon Buyer's ability to operate the Property after the Closing Date or upon Seller's continued ability to operate the Property to the extent Buyer fails to perform.  The provisions of this Section shall survive termination of this Agreement and the transactions contemplated hereby.

15.6    <u>Construction of Agreement</u>:  This Agreement, which may be executed in multiple counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the Parties, is binding upon and inures to the benefit of the Parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and except as specifically provided herein, may be canceled, modified or amended only by a written instrument executed by both Seller and Buyer.  Delivery of an executed pdf counterpart of this Agreement by email (or executed by DocuSign or similar software) shall be equally as effective as delivery of any original executed counterpart.  Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one (1) document.  If two or more persons are named herein as Buyer, their obligations hereunder shall be joint and several.  The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this Agreement or to be used in determining the intent of the Parties to it. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and agree that the normal rule of construction - to the effect that any ambiguities are to be resolved against the drafting party - shall not be employed in the interpretation of this Agreement or any exhibits or amendments thereto.

21

15.7    <u>Title Standards</u>: Any dispute as to any title issue or conveyancing practice remaining unresolved at the scheduled time for performance under this Agreement shall be resolved in accordance with applicable Standards or Practices of the Massachusetts Real Estate Bar Association, to the extent possible.

.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal on the Effective Date.

**SELLER:**

Water's Edge Limited Partnership

By: _____

**BUYER:**

E-T Ocean Ave LLC

By: _____
Daniel J. Doherty, III
Authorized Signatory

**EXHIBIT A**

PROPERTY DESCRIPTION

Three parcels of land situated in Revere, Suffolk County, Commonwealth of Massachusetts and being shown as Parcels R1, R2 and 5C on a plan entitled "Plan of Land in Revere, Mass., Scale: 1" = 60', July 14, 1987, Norwood Engineering Co., Inc., Civil Engineers, Land Surveyors, 1410 Providence Pike, Norwood, Mass.", which plan is recorded with the Suffolk County Registry of Deeds in Book 14128, Page 316, and which parcels are more particularly described as follows:

PARCEL R1:

Beginning at a point at the northeasterly corner of said Parcel R1 and running

S 09° 28' 46" W by the westerly side line of Ocean Avenue as shown on said plan, three hundred twenty-four and 06/100 (324.06) feet; thence turning and running

N 80° 31' 10" W by land now or formerly of Schena as shown on said plan, sixty-five (65) feet; thence turning and running

S 09° 28' 47" W by land now or formerly of Schena as shown on said plan, one hundred twenty-two and 59/100 (122.59) feet; thence turning and running

N 84° 19' 40" W by the northerly side line of Beach Street as shown on said plan, eighty-two and 06/100 (82.06) feet; thence turning and running

N 06° 28' 37" W by land now or formerly of the Commonwealth of Massachusetts, Massachusetts Bay Transportation Authority as shown on said plan, fifty-three and 62/100 (53.62) feet; thence continuing

in a general northerly direction along the arc of a curve to the right with a radius of three thousand two hundred forty-eight and 67/100 (3,248.67) feet by land now or formerly of the Commonwealth of Massachusetts, Massachusetts Bay Transportation Authority as shown on said plan, one hundred seventy-five and 86/100 (175.86) feet to a point; thence continuing

in a general northerly direction along the arc of a curve to the right with a radius of two thousand nine hundred sixty-eight and 70/100 (2,968.70) feet by land now or formerly of the Commonwealth of Massachusetts, Massachusetts Bay Transportation Authority as shown on said plan, two hundred fifty-six and 51/100 (256.51) feet; thence turning and running

S 75° 31' 14" E by Parcel R2 as shown on said plan, two hundred fifty-two and 52/100 (252.52) feet to the point of beginning.

Containing 86,128 square feet according to said plan.

Parcel R1 is comprised of Parcel A and Parcel B as shown on said plan. Parcel A is the Registered Land shown as L.C. Case No. 40442 on said plan and is shown on a plan dated

February 15, 1980, filed as Land Court Plan 40442-A, which plan is filed with Certificate of Title No. 95617, and shown thereon as Lots 1 and 2.

PARCEL R2:

Beginning at a point at the northeasterly corner of said Parcel R2 and running

S 12° 52' 16" W by the westerly side line of Ocean Avenue as shown on said plan, one hundred fifty-four and 19/100 (154.19) feet to a point; thence running

S 09° 28' 46" W by the westerly side line of Ocean Avenue as shown on said plan, seventy-six and 67/100 (76.67) feet; thence turning and running

N 75° 31' 14" W by Parcel R1 as shown on said plan, two hundred fifty-two and 52/100 (252.52) feet; thence turning and running

in a general northerly direction along the arc of a curve to the right with a radius of two thousand nine hundred sixty-eight and 70/100 (2,968.70) feet by land now or formerly of the Commonwealth of Massachusetts, Massachusetts Bay Transportation Authority as shown on said plan, eighty-nine and 50/100 (89.50) feet to a point; thence continuing

in a general northerly direction along the arc of a curve to the right with a radius of four thousand nine hundred sixty-eight and 70/100 (4,968.70) feet by land now or formerly of the Commonwealth of Massachusetts, Massachusetts Bay Transportation Authority as shown on said plan, seventy and 92/100 (70.92) feet; thence turning and running

N 89° 28' 16" E by Parcel R3 as shown on said plan, two hundred eighty-three and 08/100 (283.08) feet to the point of beginning.

Containing 51,512 square feet according to said plan.

PARCEL 5C:

Beginning at a point at the northeasterly corner of said Parcel 5C and running

S 14° 27' 06" W by the westerly sideline of Ocean Avenue as shown on said plan, one hundred ninety-nine and 78/100 (199.78) feet; thence turning and running

N 75° 32' 54" W by Parcel 4C as shown on said plan, three hundred twenty-four and 32/100 (324.32) feet; thence turning and running

in a general northerly direction along the arc of a curve to the right with a radius of three thousand two hundred forty-eight and 67/100 (3,248.67) feet by land now or formerly of the Commonwealth of Massachusetts, Massachusetts Bay Transportation Authority as shown on said plan, two hundred eighty-five and 28/100 (285.28) feet; thence turning and running

S 60° 32' 54" E by Parcel 6C as shown on said plan, three hundred twenty-nine and 79/100 (329.79) feet to the point of beginning.

Containing 78,654 square feet according to said plan.

A portion of Parcel 5C is the registered land shown as Land Court Case No. 19605 on said plan and being shown as an unnumbered parcel on Plan No. 19605-A, which plan is filed with Certificate of Title No. 48462.

Said premises are subject to easements, encumbrances, and restrictions of record.

For title, see deeds from Carabetta Enterprises, Inc., dated September 5, 1985, recorded in Book 11875, Page 340 and filed as Document No. 394765, creating Certificate of Title No. 98598; and dated October 5, 1987, recorded in Book 14128, Page 324, and filed as Document No. 429814, creating Certificate of Title No. 101316.

**EXHIBIT B**

<u>PERSONAL PROPERTY</u>

**EXHIBIT C**

ADDITIONAL PAYMENT TERMS

The Seller and Buyer shall enter into a contractual earnout agreement for the Seller (the "Contract"), and not a membership interest in the ownership structure of the Buyer, whereby only upon the actual disposition of all of the Property by Buyer's entity to a third party arm's length sale, Seller shall receive 10% of the net proceeds received by the Buyer entity after a realization of a 25% internal rate of return ("IRR") and a multiple on Buyer's invested capital of 2.5x, all as reasonably determined by Buyer's accounting firm. The earnout agreement shall become null and void twenty-one (21) years after the Closing Date herein. The terms of the Contract are to be further agreed upon mutually by the Seller and Buyer in a formal earnout agreement to be signed at Closing.

**EXHIBIT D**

<u>TITLE COMMITMENT</u>

**EXHIBIT E**

<u>SURVEY</u>

**EXHIBIT F**

<u>CONTRACTS</u>

**EXHIBIT G**

<u>LEASES</u>

1) Thiago Santiago Ambrosio and Caroline Sposito Ambrosio – Unit 202
2) Vladamir Balla and Florinda Balla – Unit 203
3) Sanae Zerhouni and Ehab Hassan – Unit 206
4) Xhuljana Mance and Eqerem Mance – Unit 207
5) Hocine Benzohra and Fatima Mekamene – Unit 208
6) Pinki Muslim and Rahmatullah Fatehzada – Unit 209
7) Spartak Myrto, Dorald Myrto, Bajram Myrto, and Raimonda Myrto – Unit 210
8) Mohammad Qasim Butt and Amina Butt – Unit 213
9) Manisha Ducasse and Elise Michelle Ngo Mbock – Unit 214
10) Jose Sorto – Unit 301
11) Julian Quintero and Sandra Arias – Unit 302
12) Bryce Sims – Unit 303
13) Oscar Florez-Realpe – Unit 306
14) Alpana Banerjee – Unit 307
15) Calvin Tuan Do and Trang T. Mai – Unit 308
16) Edgar Arenas, Guadaloupe Nivarro, Alberto Ortiz (aka Albert Madina) – Unit 309
17) Silvia Elias and Elena Martinez – Unit 310
18) Aissato Ba and Alioune Badara Fall – Unit 313
19) Diego Contreraz and Taya Laurimer – Unit 314
20) Marlene LaBella and Marlene Matus – Unit 315
21) Hesein Mehic and Suada Mehic – Unit 401
22) Muhamma Ahmed Taibah – Unit 402
23) Giovanna Queiroz Silva Campos and Gislene Soares De Queiroz E Siva – Unit 403

24) Miloud Hraiba and Rabia Elouardi – Unit 406

25) Yvan Nathanael Ngongang  and Katherine Pierre-Valdez – Unit 407

26) Greta Sfeci – Unit 408

27) Felix Balda Mujica and Nestor Perez Balda – Unit 409

28) Eqerm Mance, Bashkim Mance, and Marsuel Mance – Unit 410

29) Demis Abata and Alemtsehay Girma – Unit 413

30) Mohamed Hamacha and Mounira Medjahdi – Unit 414

31) Utonneil Martin, Esaree Martin, and Hueken Martin – Unit 415

32) Karim Slami – Unit 501

33) Suriya Khan and MD Mijanur Rahman – Unit 502

34) Carlos Arteaga, Claudia Munoz, and Mateo Arteaga – Unit 503

35) Antonio Soares-Smolinski – Unit 506

36) Stephanie Gil Cano and Kevin Medina – Unit 509

37) Amr Mohamed – Unit 510

38) Jessica Bezerra Enes and Benjamin Hafizovic – Unit 514

39) Marcos Espinosa and Erica Ellena Garcia – Unit 515

40) Darlene Raymond, Thoskanie C. Jean Franc, and Panosky Jean-Louis – Unit 602

41) Zaineb Elouafi and Shivendra Thapa – Unit 603

42) Paul Bowers and Glenna Bowers – Unit 606

43) Gina Mirela Mustata – Unit 609

44) Lahcen Ifkirne and Meriem Abounaim – Unit 610

45) Josephine Muthemba and John Gitau – Unit 613

46) Sayeed Fazir Massom and Claritza Yamilet Ramos – Unit 615

47) Fei Ren and Hoaofeng Xu – Unit 701

48) David Ravalli – Unit 702

49) Felix Soto and Maritza Londono – Unit 703

50) Michael Sean Harris – Unit 706

51) Alexander Zvonok and Halina Zvonok – Unit 710

52) Paulo Vieira and Maria E. Carrasco-Vieira – Unit 713

53) Nancy Mourtada, Michael Mullaney, and Cecilia Corsino – Unit 714

54) Andres Felipe Ochoa Serna and Yury Vanesa Giron Tapiero – Unit 802

55) Dianne Lamonica – Unit 804

56) Mary Connolly – Unit 805

57) Diaz – Unit 810

58) Ted Mistretta and Rosemarie Shields – Unit 811

59) Bensalah Atochy and Mariam El Fadili – Unit 812

60) Armela Sinjari, Thanas Sinjari, and Kristel Sinjari – Unit 813

61) Mauricio Medina and Lina Restrepo – Unit 814

62) Catalina Arango – Unit 901

63) Ricardo Luis Vazquez-Barrera and Rosa Rodas Garcia – Unit 902

64) Jorge Sorto – Unit 904
65) Haifeng Weng – Unit 905
66) Rafael Gomez and Dany Gomez – Unit 911
67) Lunecee Eligene – Unit 912
68) Erica Elaine Diaz – Unit 914
69) Diana Gonzalez – Unit 1002
70) David Hirtle and Kathleen Nolan – Unit 1004
71) Mohamed Zyade and Rachida Fergaoui – Unit 1005
72) Mehman Abdulsalmov – Unit 1011
73) Zine Eddine Boulegroune and Lucia Boulegroune – Unit 1012
74) Noreddine Harchaoui and Zouhir Benzizoune – Unit 1013
75) Liliana Maria Roldan and Diana Marcella Tobon Vasquez – Unit 1014
76) Ilhan Ozcan – Unit 1102
77) Nicholas Sklodowska-Johnson and Joshua Sklodowska-Johnson – Unit 1113
78) Yashraj Swarnkar and Aditya Malviya – Unit 1114
79) Jorge Soto – Unit 1201
80) Thales Cesa – Unit 1204
81) Yvgeniy Pavlukhin and Alfina A. Karagulova – Unit 1212
82) Eduardo De Oliveira and Antonio Soares – Unit 1213
83) Chelsea Bishop and Timothy Wilkinson – Unit 1214
84) Minoo Gharagozly – Unit 1215
85) Laura Soto and Daniel Velez Vanegas – Unit 1313
86) Gabriel De Almeida and Fabiano Latham – Unit 1314
87) Maria Rezende – Unit 1402
88) Reda Moussaid, Jihane Moussaid, and Mohammed Moussaid – Unit 1413
89) Aleksy Hernandez and Sindy Andasol – Unit 1414
90) El Mehdi Charani – Unit 1513
91) Uppercut – C101
92) A&K Plumbing – C102 and C103

# EXHIBIT H

## ASSUMPTION AND ASSIGNMENT AGREEMENT

ASSUMPTION AND ASSIGNMENT AGREEMENT, dated as of _____, 2025, Water's Edge Limited Partnership, a Massachusetts limited partnership ("**Seller**") and _____ a _____("**Buyer**").

WHEREAS, Seller and Buyer have entered into that Purchase and Sale Agreement, dated as of _____, 2025 (the "**Purchase Agreement**"), pursuant to which Seller has agreed to sell, and Buyer has agreed to purchase, the Property and the Personal Property (capitalized terms used but not otherwise defined herein shall have the same meaning as set forth in the Purchase Agreement); and

WHEREAS, the Purchase Agreement provides, among other matters, for Seller to assume and assign to Buyer all of Seller's rights and obligations, under the Assumed Contracts for all periods after the Closing Date, as such rights and obligations are described in the Purchase Agreement and the Sale Approval Order dated as of _____, 2025 (the "**Sale Approval Order**"); and

WHEREAS, the Purchase Agreement and the Sale Approval Order provide, among other matters, for Buyer to assume, satisfy, perform and/or pay the Assumed Contracts as provided in the Purchase Agreement and the Sale Approval Order and to pay any and all cure amounts related thereto.

NOW, THEREFORE, in consideration of the recitals, the agreements and obligations contained herein and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree, effective as of the date hereof, as follows:

1.      Assignment by Seller. Seller hereby assumes and assigns to Buyer all of Seller's rights and obligations in, to and under the Assumed Contracts listed on Exhibit A annexed hereto and made a part hereof for all periods after the Closing Date, in each case, pursuant to the terms of the Purchase Agreement and the Sale Approval Order or as otherwise ordered by the Bankruptcy

Court.

2.    <u>Assumption by Buyer</u>.  Buyer hereby assumes and agrees to pay, perform and discharge all obligations under the Assigned Contracts for all periods after the Closing Date, pursuant to the terms of the Purchase Agreement and the Sale Approval Order, including, without limitation, payment in cash at Closing of any and all cure amounts due in respect of any Assumed Contracts for all periods on or prior to the Closing Date, as provided in the Purchase Agreement and the Sale Approval Order or as otherwise ordered by the Bankruptcy Court.

3.    <u>Agreement</u>.  This Agreement shall not be deemed to supersede any of the provisions of the Purchase Agreement and shall be subject to the terms of the Sale Approval Order. To the extent that any term or condition of this Agreement is construed to conflict with any term or condition of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control and supersede those of this Agreement.

4.    <u>Successors and Assigns</u>.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.    <u>Further Actions</u>.  The parties agree, on behalf of themselves and their respective successors and assigns, to execute and deliver, or cause to be executed and delivered, and to do or make or cause to be done or made all further instruments, supplemental, confirmatory or otherwise, as may be required by the other in order to effectuate the foregoing.

6.    <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with the laws (other than conflicts of law rules) of the Commonwealth of Massachusetts and the Bankruptcy Code.  The Bankruptcy Court shall have exclusive jurisdiction over all matters related to this Agreement.

7.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which may be executed and delivered electronically, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.    <u>Time</u>.  Time is of the essence with respect to this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Assumption and Assignment Agreement as of the date first above written.

[Signatures follow on next page]

**SELLER**:

Water's Edge Limited Partnership,

By: _____ its General Partner

By:_

          Name: _____

          Title: _____

**BUYER**:

_____

By: _____

Name: _____

## EXHIBIT A

*ASSUMED CONTRACTS*

# EXHIBIT I

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS that Water's Edge Limited Partnership, a Massachusetts limited partnership ("Seller"), for good and valuable consideration paid to it at or prior to the delivery of this instrument, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, grant, bargain, convey, confirm, assign, transfer and deliver to _____ a _____ ("Buyer") and its successors and assigns forever, all of Seller's right, title and interest in and to the Personal Property, as defined in that certain Purchase and Sale Agreement, dated as of _____, 2025 (the "Agreement"), between Seller and Buyer, pursuant to the terms of the Agreement, the Sale Approval Order and the Bankruptcy Code.  Capitalized terms used but not otherwise defined herein shall have same meanings as set forth in the Agreement.

*[Signature Follows on Next Page]*

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of the ___ day of _____, 2025.

Water's Edge Limited Partnership,

By: _____, its General Partner


By:_____
Name: _____

## <u>CERTIFICATE OF SERVICE</u>

I, T. Charlie Liu, counsel to Eastern Acquisitions, LLC in connection with the above-captioned bankruptcy proceeding, hereby certify that a true and correct copy of the foregoing *Eastern Acquisitions, LLC's Objection to Debtor's Motion For Approval of (A) The Sale of Substantially All of its Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (B) Waiver of Counteroffer Procedures; (C) Grant of Certain Stalking Horse Offer Protections to Proposed Purchaser; (D) The Assumption and Assignment Of Executory Contracts and Unexpired Leases; and (E) Related Relief* has been served upon the parties listed on the Court's CM/ECF transmission list in these cases via CM/ECF on October 23, 2025.



/s/ Charlie Liu
T. Charlie Liu, Esq.