UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br>WATER'S EDGE LIMITED PARTNERSHIP,<br><br>    Debtor,<br><br>WATER'S EDGE LIMITED PARTNERSHIP<br>and EVELYN M. CARABETTA,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF REVERE, MA, PAUL CAPIZZI,<br>MICHAEL WELLS, BRIAN ARRIGO,<br>PATRICK KEEFE, LOUIS CAVAGNARO,<br>MATTEO FABIANO, RICHARD VISCAY,<br>D'AMBROSIO, LLP, and GENNARO<br>D'AMBROSIO,<br><br>    Defendants. | )<br>)<br>)<br>)<br>) Chapter 11<br>) No: 24-12445-CJP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AMENDED OBJECTION TO CLAIM,
COUNTERCLAIMS, AND PENDENT CLAIMS**

<div style="margin-left:45%">

WATER'S EDGE LIMITED PARTNERSHIP
and EVELYN M. CARABETTA,

By their attorneys,

William C. Nystrom (BBO No. 559656)
Christine M. Kingston (BBO No. 682962)
Sean P. Kelly (BBO No. 704226)
Alden Piper (BBO No. 713549)
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, MA 02210
(617) 778-9100
wnystrom@nbparis.com
ckingston@nbparis.com
skelly@nbparis.com
apiper@nbparis.com

</div>

Dated: May 15, 2026

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................1

PARTIES ........................................................................................................................................3

JURISDICTION AND VENUE ......................................................................................................5

FACTS ............................................................................................................................................6

 *The Carabetta Companies Are Borne Out of Poverty and Grow Into a Family Legacy* ...........6

 *Water's Edge Takes Revere Beach from "Honkytonk to highrise"* ............................................6

 *Water's Edge Becomes a Coveted Place to Live and Exists in Harmony with the City for Decades* ......................................................................................................................................8

 *Ms. Carabetta Proudly Carries on the Family's Business* ........................................................8

 *The Old Boys' Club* ....................................................................................................................9

 *City Officials Harbor Personal Animus Towards the Carabetta Companies and Ms. Carabetta* ..........................................................................................................................12

 *The June 21, 2022 Fire at 370 Ocean Avenue* ........................................................................13

 *Defendants Hatch Their Plan to Ruin WELP* ..........................................................................13

  *i. Revere Obstructs WELP's Efforts to Repair 370* ......................................................14

  *ii. Revere Drags WELP to Court* ....................................................................................15

  *iii. The City Weaponizes Chapter 40U* ............................................................................17

 *Defendants Politicize the Emergency* .....................................................................................22

 *The Housing Court Excoriates Revere for its Daily Fines* ......................................................24

 *On November 17, 2022, when a Pipe Burst in 364 Ocean Avenue Causing Water Damage, the City Again Seized the Opportunity to Pummel Water's Edge* ...........................................26

 *The City's Condemnation Order Against 364 Ocean Avenue is Struck Down in Housing Court* ..........................................................................................................................32

 *A Whistleblower Reveals Shocking Fraud Committed Against WELP* ...................................33

i

*As a Result of the City's Relentless Unlawful Actions, WELP Cannot Refinance its Properties and is Forced to File for Bankruptcy* ............................................................40

*WELP is Forced Into Bankruptcy* ......................................................................................44

*The City Ignores the Housing Court's Orders and Seeks Repayment of all Invalidated Fines in the Bankruptcy* .............................................................................................................45

*During These Events, City Officials Launched a Vicious Defamation Campaign Against WELP and Ms. Carabetta* .......................................................................................................47

*Ms. Carabetta Has Been Injured as a Result of Defendants' Action* ...................................48

*Plaintiffs Have Timely Brought Suit* ...................................................................................49

*Defendants Are Not Immune from Suit* ..............................................................................49

CAUSES OF ACTION ................................................................................................................50

COUNT I (Disallowance of the Entirety of the City's Claim) ...............................................50

COUNT II (Declaratory Judgment) ......................................................................................50

COUNT III (Violation of 42 U.S.C. § 1983, Substantive Due Process)..................................52

COUNT IV (Violation of 42 U.S.C. § 1983, Equal Protection) .............................................54

COUNT V (Conspiracy to Violate Rights Pursuant to 42 U.S.C. § 1983) .............................55

COUNT VI (Fraud)................................................................................................................57

COUNT VII (Aiding and Abetting Fraud)..............................................................................61

COUNT VIII (Common Law Civil Conspiracy) .....................................................................63

COUNT IX (M.G.L. c. 93A) ..................................................................................................66

COUNT X (Defamation) ........................................................................................................67

COUNT XI (Intentional Interference with an Advantageous Business Relationship) ............68

COUNT XII (Malicious Prosecution).....................................................................................69

COUNT XIII (Abuse of Process) ...........................................................................................70

PRAYERS FOR RELIEF..........................................................................................................71

**<u>INTRODUCTION</u>**

With this action, Plaintiffs object to the claim filed by the City of Revere, and seek redress for the related misconduct directed at them by the City, its officials, and its outside counsel—the same conduct that the Massachusetts Housing Court found "reeks of bad faith" and the City's own former lawyer described as "unethical," "excessive," and "punitive." As detailed below, Defendants' campaign against the Water's Edge apartments in Revere was marked by forgery, animus, gross violations of City rules and ordinances, and unbridled greed, power, and corruption. Due to this gross misconduct, Plaintiffs lost ownership of a landmark Revere development and their legacy, suffered over $100 million in damages, professional ruin, and personal humiliation. It should not have ended this way.

Families, sunbathers, and thrill-seekers flocked to Revere Beach in the late 1800s when it became the nation's first public ocean beach, to enjoy its seaside restaurants, rollercoasters, and the crescent-shaped sandy coastline. But by the 1980s, Revere Beach had declined considerably. In stepped Joseph Carabetta and the Carabetta family. Working hand-in-hand with city officials, Joseph transformed a parking lot into a modern, six-building residential complex with 630 waterfront units on the edge of the Atlantic Ocean. The development—Water's Edge—ushered in "the long dreamed of transformation of Revere Beach." And though the flying horses, arcades, and ballrooms are long gone, Water's Edge sits as a landmark amidst the gleaming luxury apartment buildings and oceanfront restaurants that followed in its wake.

By 2022, Evelyn M. Carabetta, Joseph's daughter, owned and managed the Water's Edge complex. Behind City doors, a cohort of City officials—the old boys' club—openly expressed personal animus towards the Carabettas and Water's Edge. When two of the Water's Edge apartment buildings suffered damages through no fault of the Carabettas, these City officials and

1

their outside law firm, D'Ambrosio, LLP, found an opportunity to exact revenge against the family they hated, to strip the family of Water's Edge, and to grossly enrich and benefit themselves. Each defendant had their own unique but overlapping personal interests in this plot: D'Ambrosio racked up massive attorneys' fees by charging taxpayers for this personal fight against the Carabettas; Brian Arrigo, then-mayor, scored political points and a cushy state job by defaming the family in the media under the guise of being tough on landlords; and others like the City's head lawyer, Paul Capizzi, stayed in the good graces of Gennaro D'Ambrosio, who is connected to high-ranking Massachusetts politicians, by furthering the plot.

Defendants' campaign against Plaintiffs was relentless and at times verged into criminal misconduct. Defendants obstructed Plaintiffs from obtaining the necessary permits to bring the buildings back into good repair. They assessed $30,000 *per day* fines against Plaintiffs, in blatant violation of the City's rules that no property owner be assessed more than $490 per day. They sabotaged Plaintiffs' attempts to fight the illegal fines by making the administrative appeal process impossible. They dragged Plaintiffs repeatedly into court, burying Plaintiffs in legal bills and stripping them of the time and resources to fight back. They sabotaged Plaintiffs' attempt to refinance the Properties to unlock the necessary cash flow to maintain them. They blatantly violated court orders and viciously defamed the Carabettas in the local media. And to top it off, when a senior City employee refused to sign off on the $30,000 per day fines, City officials *forged* her signature to ensure the complete financial ruin of Water's Edge.

Indeed, Defendants' conduct was so out of bounds and so obviously motivated by personal animus that a Massachusetts judge declared that it "reeks of bad faith," was "spectacularly stunning," and "does not seem to comport" with any legitimate municipal goals. The judge noted the City's "pertinacious pursuit of Water's Edge" led to a "stunning dereliction of [the City's] legal

2

duty." The judge further noted that she had "adjudicated hundreds of Sanitary Code enforcement cases over the course of the past six years. . . . This Court has also overseen cases from virtually every municipality under this Court's jurisdiction. … This is the first time that the Court has observed a municipality ignoring" an express requirement under the Sanitary Code.

In 2024 and 2025, Defendants' vicious plan succeeded. Due to Defendants' relentless campaign, the Carabettas could not refinance the Properties, Water's Edge was forced into bankruptcy, and the Properties were sold at auction for less than what Joseph paid for the run-down parcel in the 1980s. Tragically, Joseph passed away in March 2025, when it was becoming clear that a reorganization in this Court was likely not feasible and family ownership of Water's Edge would be lost. As a result of Defendants' actions, the Carabetta family has lost Water's Edge; has suffered significant financial loss, reputational harm, and loss of a precious legacy and piece of history as a result thereof; and, Ms. Carabetta has been humiliated and suffered serious emotional distress. Plaintiffs file this action to recover their monetary damages and to shine a light into the corruption and cronyism that has infected Revere.

## **PARTIES**

1.      Plaintiff Water's Edge Limited Partnership ("WELP") is a limited partnership organized under the laws of Massachusetts, with its principal place of business located at 394 Ocean Avenue, Revere, Massachusetts.

2.      Plaintiff Evelyn M. "Kiki" Carabetta ("Ms. Carabetta") is an individual who resides in Meriden, Connecticut. Ms. Carabetta is the sole (99%) limited partner of WELP and is the sole owner of WELP's 1% general partner.

3.      Defendant City of Revere, Massachusetts ("Revere" or the "City") is a municipality in Suffolk County, with its administrative offices located at 281 Broadway, Revere, Massachusetts.

4.      Defendant Paul Capizzi is an individual who resides in Revere, Massachusetts. Capizzi is, and during all relevant events has been, the City Solicitor for Revere.

5.      Defendant Michael Wells is an individual who resides in Revere, Massachusetts. Wells is, and during all relevant events has been, the Director of Municipal Inspections & Health Agent for Revere.

6.      Defendant Brian Arrigo is an individual who resides in Acton, Massachusetts. Arrigo was the Mayor of Revere from 2016 to 2023.

7.      Defendant Patrick Keefe Jr. is an individual who resides in Revere, Massachusetts. Keefe was the Acting Mayor of Revere beginning in April 2023 when Arrigo resigned, and was later elected Mayor in late 2023, a position he holds to date.

8.      Defendant Richard Viscay is an individual who resides in Revere, Massachusetts. Viscay is, and during all relevant events was, the Chief Financial Officer, Auditor, and Budget Director for Revere.

9.      Defendant Louis Cavagnaro Jr. is an individual who resides in Revere, Massachusetts. Cavagnaro is, and during all relevant events was, the Building Commissioner for Revere.

10.      Defendant Matteo Fabiano is an individual who resides in Peabody, Massachusetts. Fabiano is, and during all relevant events was, an Electrical Inspector for Revere.

11.      Defendant D'Ambrosio, LLP (the "D'Ambrosio Firm") is a law firm formed as a professional limited liability partnership in Massachusetts. Its principal place of business is located at 185 Devonshire Street, 2nd Floor, Boston, Massachusetts. During all relevant events, the D'Ambrosio Firm purported to serve as outside counsel for Revere, although also served in other non-legal roles such as consultant and strategist.

4

12.     Defendant Gennaro D'Ambrosio, a/k/a Gerry D'Ambrosio, is an individual who resides in Beverly, Massachusetts. He is a licensed attorney in Massachusetts and the Founder and Managing Partner of the D'Ambrosio Firm.

### JURISDICTION & VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

14.     This proceeding arises under title 11 of the United States Code, 11 U.S.C. §§ 101-1530 (the "Bankruptcy Code"), and is commenced pursuant to Bankruptcy Code sections 502(b) and 1142(a), and Rules 3007, 7001, and 7008 of the Federal Rules of Bankruptcy Procedure.

15.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (C), and (O), such that the Court may enter a final order and judgment consistent with Article III of the United States Constitution. Plaintiffs consent to any such entry by this Court.

16.     By way of this action, WELP amends its objection to the City of Revere's claim (and Ms. Carabetta joins in that amended objection), asserts counterclaims, and asserts (with Ms. Carabetta) claims arising out of and inextricably intertwined with their objection and counterclaims.

17.     The City of Revere, through the D'Ambrosio Firm, filed its Proof of Claim on February 14, 2025 [Claim 38-1]. WELP filed its Objection to the City's claim on September 23, 2025 [ECF No. 412]. WELP references and incorporates herein that Objection, and through this action seeks to resolve its Objection and related claims.

18.     The Modified Plan, as confirmed by this Court, preserves the right to bring these counterclaims and claims against the Defendants. *See* ECF No. 539, ¶ 5.7; *see also* ECF No. 555.

19.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

20.    This Court has personal jurisdiction over Revere and the individual Defendants, as they each have sufficient minimum contacts in the forum. The City has also consented to the jurisdiction of this Court, including by appearing and filing a claim in this case.

## FACTS

### *The Carabetta Companies Are Borne Out of Poverty and Grow into a Family Legacy*

21.    Joseph F. Carabetta ("Joseph") was the founding principal of the family company, the Carabetta Companies.[1]

22.    The Carabetta Companies specialize in the acquisition, development, construction, and management of high quality, affordable housing nationwide.

23.    Joseph was a self-made man, rising from selling newspapers and shining shoes in Meriden, Connecticut to building the Carabetta Companies into a prominent family-run real estate firm that has built more than 40,000 apartment buildings on the East Coast, manages 10,000 of them, and has been recognized and honored by local non-profit organizations and the U.S. Department of Housing and Urban Development.

24.    Three generations of Carabettas have worked for the family company, including Joseph's children and grandchildren.

### *Water's Edge Takes Revere Beach from "Honkytonk to highrise"*

25.    In the 1980s, Joseph purchased land on Ocean Avenue on Revere Beach to develop a 630-unit condominium and apartment complex. At the time, a carnival had been operating there.

26.    This was a watershed moment for Revere Beach. While now dotted with gleaming luxury apartment buildings and upscale restaurants, it was not so when the Carabettas arrived. In

---

[1] Carabetta Enterprises, Inc. was formed in 1960 and Carabetta Management Co. in 1983, both in Connecticut. Although separate entities, the companies (and their many subsidiaries and affiliated companies) are referred to together herein as the "Carabetta Companies" for ease of reference.

fact, the Carabettas' development of this property was credited as *the* precipitating event for Revere Beach's turn-around.

27.    In a newspaper article describing the groundbreaking of the land on July 15, 1985, the development of Water's Edge was described as a "new dawn for the city" and one that "will change the face of Revere Beach and with it, the attitude of city residents who for years have turned their backs on its potential." *Honkytonk to highrise: Beach groundbreaking set*, DAILY EVENING ITEM, Jul. 15, 1985, at 11.

28.    The Mayor of Revere at the time, George V. Colella, praised Joseph's "vision," "determination," and "tenacity" in spearheading the development. *Id*.

29.    Sadly ironic given the rest of the events described herein, the development of Water's Edge was the result of a remarkable and "joint" effort between Joseph and Revere officials, turning "the dream of the revitalization of Revere Beach into a reality." *Id*.

30.    Indeed, Mayor Colella viewed this period for Revere Beach as "the most exciting time in its history," commenting that the city was "having a tremendous development explosion that is going to produce the greatest change in the history of the city." Anthony J. Yudis, *Revere Beach: A new look*, THE BOSTON GLOBE, Dec. 22, 1985, at A33.

31.    Once developed, the Water's Edge complex consisted of six buildings. Buildings three and four were sold on completion for individually-owned condominium units. Building six, 394 Ocean Avenue, is owned by a non-debtor entity that is itself owned and controlled by Ms. Carabetta; it is not a party to these proceedings. WELP retained buildings one, two, and five—i.e., 364 Ocean Avenue ("364"); 370 Ocean Avenue ("370"); and 388 Ocean Avenue ("388") (collectively, "Water's Edge" or the "Properties").

***Water's Edge Becomes a Coveted Place to live***
***and Exists in Harmony with the City for Decades***

32.     Water's Edge, as its name denotes, is located on coveted waterfront property on Revere Beach. The apartment buildings have "long been landmarks on the beachfront and sit near the MBTA Blue Line's Wonderland and Revere Beach stations." *Revere Beach Apartment Complex Sells for $45M Following Bankruptcy and Fire, BBJ Reports*, BOSTON REAL ESTATE TIMES (Feb. 25, 2026), https://bostonrealestatetimes.com/revere-beach-apartment-complex-sells-for-45m-following-bankruptcy-and-fire-bbj-reports/.

33.     364, 370, and 388 Ocean Avenue were designed by a Worcester-based architectural firm. The towers—stepped-back, balconied high-rise buildings—take advantage of the oceanfront property to offer sea views with patio or terrace access for many units.

34.     The three towers are between thirteen and sixteen stories tall and contain 303 apartment units.

35.     They are conveniently located: a stone's throw from the Atlantic Ocean, a mere five miles from Boston, and near the MBTA Blue Line's Wonderland and Revere Beach stations.

36.     Water's Edge offered one- and two-bedroom apartments with onsite parking at competitive rates, providing access to beachfront housing for a community of working-class citizens.

***Ms. Carabetta Proudly Carries on the Family's Business***

37.     Ms. Carabetta is the daughter of Joseph.

38.     Ms. Carabetta is a Director and co-owner of Carabetta Enterprises, Inc. and, for more than 20 years, has been the Director of Property Management for the Carabetta Companies' Massachusetts properties, which included Water's Edge.

8

39.     Commercial real estate development is a notoriously male-dominated industry. Women hold only 9% of senior positions. *2025 Benchmark Study Report: Workplace Data and Trends in Commercial Real Estate*, COMMERCIAL REAL ESTATE WOMEN (CREW) NETWORK, 2025, at 2, 17.

40.     Nevertheless, Ms. Carabetta persevered to become a major force in property development and management in New England.

### *The Old Boys' Club*

41.     After the symbiotic relationship between Joseph and City officials that paved the way for the initial development of Water's Edge, there was an unfortunate changing of the guard in Revere. An old boys' club began operating behind City doors—and Ms. Carabetta was not the first woman to suffer.

42.     City officials are sworn to uphold the law, to act impartially, and to treat citizens with respect and dignity. Indeed, Arrigo touted in his fourth State of the City address in March 2022 his development of "a modern, efficient and honest city government that, put simply, improves lives."  Nothing could be further from the truth.

43.     Instead, the old boys' club operated by way of intimidation, threats, misogyny, greed, misuse of power, and personal grudges—much like a modern-day mob. It was fueled by the misuse of City money and authority. Upon information and belief, each Defendant had their own unique but interconnected role: some were motivated by money; others by indebtedness to their cronies; others by political gain and public attention; and each seemingly with the goal of wresting control of the valuable buildings and land from the Carabettas.

44.     The D'Ambrosio Firm bills the City hundreds of thousands in legal fees to purportedly serve as "outside counsel" despite that the City has its own lawyers on staff. Gerry

9

D'Ambrosio runs the firm and enjoys close relationships with many high-ranking state officials and businesspeople. He has his thumbprints all over City business.

46.  D'Ambrosio and his firm did not operate like outside counsel. Rather, D'Ambrosio, upon information and belief and as described further herein, was making politically- and personally-motivated decisions for the City that benefited himself, his firm, and his clients. As purported outside counsel, the D'Ambrosio Firm had no appropriate role in making these business decisions for the City.

46.  Capizzi has been the City Solicitor for Revere since 2004 and is a personal friend of D'Ambrosio. As City Solicitor, Capizzi wields tremendous power in deciding how the City interprets and enforces laws and ordinances, how it deals with private landowners, and who it sues and for what reasons (legitimate or otherwise), among other things. Further, Capizzi rubber stamps the D'Ambrosio Firm's legal bills for payment out of the City's coffers. Upon information and belief, Capizzi endorsed and furthered his friend D'Ambrosio's personally-motivated decisions that had no good faith legal bases.

47.  Viscay, the Chief Financial Officer for Revere, has a duty to act as a check and guardrail for the spending of City money. Upon information and belief, he, too, is a close friend of and indebted personally to D'Ambrosio, and likewise carried out D'Ambrosio's orders.

48.  Upon information and belief, Wells was handpicked by City officials to be Director of Municipal Inspections and was indebted to them for appointing and keeping him in this role, and brandished his powers improperly at their behest.

49.  Cavagnaro, the Building Commissioner, wielded tremendous power in deciding how and when to issue certain permits to Water's Edge. In addition, he repeatedly offered court testimony in legal proceedings against Water's Edge. Fabiano, as Electrical Inspector, likewise

10

controlled how and when necessary electrical work for Water's Edge was approved. Upon information and belief, they, too, worked together with the other Defendants as part of the plot to wrest control of the buildings from the Plaintiffs.

50. Arrigo is the former Mayor of Revere. Upon information and belief, in Water's Edge, Arrigo saw an opportunity to score political points with the media and voters as a tough-on-landlords politician. After carrying on this political stunt for over a year, he ascended to Commissioner of the Massachusetts Department of Conservation and Recreation.

51. Keefe, who took over for Arrigo, has followed his playbook, also scoring political points by defaming Plaintiffs to the media.

52. Upon information and belief, the fact that Water's Edge was managed and owned by a woman, Ms. Carabetta, was a driving factor in Defendants' wrongful conduct.

53. Gender-based discrimination by Defendants has been pervasive. Capizzi has been accused by at least three female employees of gender-based discrimination or harassment. The names of Arrigo, D'Ambrosio, Wells, Viscay, and Keefe are intertwined in those stories.

54. Amy O'Hara ("Ms. O'Hara") and Michelle Mangino ("Ms. Mangino"), captains in the Revere Police Department, filed suit against Revere, Capizzi, and others in June 2023. They alleged that Arrigo appointed a male police chief without considering any other applicants; that the police chief engaged in discriminatory conduct towards them; and when Capizzi obtained a confidential report about the events, which included their unredacted personal information and interview recordings, he improperly disseminated it to the police's union representative, ensuring it would be read widely by Ms. O'Hara and Ms. Mangino's peers.

55. Cheryl Leon-McCormick ("Ms. McCormick"), an Assistant City Solicitor for Revere before Capizzi terminated her, filed suit in May 2024, alleging a long campaign of

11

gender-based harassment and discrimination by Capizzi—including berating, yelling, retaliation, and intimidation. As noted below, she also alleged that Capizzi and others conspired to forge her signature to add certain municipal fines against WELP to its tax bill, to which she had objected.

56.    In the wake of these events, Revere City Councilor Anthony Cogliandro filed a motion asking Keefe to request an external investigation into gender harassment allegations against Capizzi.

57.    Cogliandro reported that he was threatened in response because it could make the City look bad. Cogliandro further stated that "there would not be support from the administration on this motion"—presumably, a reference to Keefe. And even worse, Cogliandro "was later … threatened by a city employee claiming they would release information that would be detrimental to himself and his fellow councilors." Adam Swift, *Council requests external investigation of city solicitor*, THE REVERE JOURNAL, Dec. 6, 2023, at 3.

### *City Officials Harbor Personal Animus Towards the Carabetta Companies and Ms. Carabetta*

58.    Various Revere officials over the years internally expressed personal animus towards Joseph, the Carabetta Companies, and Ms. Carabetta, often referring to them by derogatory names.

59.    The City had previously targeted Water's Edge before, by fining WELP and taking WELP to court over issues that could have been dealt with in good faith between it and the City.

60.    Upon information and belief, Defendants were actively trying to push WELP to sell or otherwise lose its very valuable Revere Properties. But they were not successful—until a June 2022 fire at 370 and the events that followed.

12

*The June 21, 2022 Fire at 370 Ocean Avenue*

61.     On June 21, 2022, a fire occurred on the eleventh-floor balcony of 370. The fire was caused by the careless disposal of smoking material by a tenant outside on the balcony of 370, through no fault of Plaintiffs. The fire was not life-threatening nor detrimental to the fundamental safety or soundness of the building.

62.     The fire was solely tenant-caused. Revere never found nor suggested that the fire had any connection to any negligence of WELP or management.

63.     In response to a fire that was contained to an outdoor balcony, the Revere Fire Department hosed down about twelve floors of the building, causing substantial water damage throughout 370.

64.     On July 5, 2022, the Revere Board of Health voted to condemn 370 due to the water damage caused by firefighting efforts. As a result of that order, WELP was required to relocate all tenants and secure the building.

*Defendants Hatch Their Plan to Ruin WELP*

65.     With the fire and related condemnation, Defendants saw an opportunity to target WELP with the ultimate goal of wresting the buildings and land from it. Defendants used a multi-pronged approach. First, they obstructed WELP's efforts to make necessary repairs to the property. Second, at the same time, they filed a lawsuit seeking to appoint a receiver despite WELP's efforts to repair the property, causing WELP to further deplete time and resources to defend the suit. Third, while WELP was making repairs and under court supervision, they began issuing unprecedented $30,000 per day fines that they knew WELP could not process and pay.

66.     As detailed in *Cheryl A. Leon-McCormick v. City of Revere and Paul Capizzi*, C.A. No. 1:24-CV-11480-IT (D. Mass.) (the "McCormick Complaint"), the City side-lined their code

13

enforcement officer, Ms. McCormick, and stripped her of her powers to implement the City's rules and regulations with respect to Water's Edge. In her place, the City installed D'Ambrosio, a private attorney, and his law firm, at taxpayers' expense. With Ms. McCormick out of the way, D'Ambrosio was free to orchestrate the take-down of Water's Edge unrestrained by the City's rules, regulations, and protections in place for property owners.

### i. *Revere Obstructs WELP's Efforts to Repair 370*

67.     WELP hired an electrician, Ryan Kelly ("Kelly") of Kelly Electric, to begin work on restoring electricity to 370 after the fire and water damage. Kelly had deemed it safe to restore power to the common areas.

68.     This was crucial in the summer heat and humidity. To prevent mold from accumulating after the massive water intrusion in the high-rise building, it was necessary to run blowing fans and other equipment as soon as possible. A shutdown of power would also mean a shutdown of all air conditioning and cooling systems.

69.     Upon information and belief, shortly after the repair work began at 370, Fabiano, the City's Electrical Inspector who works under Cavagnaro, called Kelly and ordered him to shut off all power to the entire building, which included common areas and other areas that had not suffered any water damage. WELP and its representatives begged the City to allow it to turn the power back on to run air conditioners in the building, but the City refused for no reason.

70.     Fabiano refused to grant (again for no legitimate reason) permission to restore power in the common areas until July 11, 2022. But by then the damage had been done. The fire had occurred on June 21, 2022, and each 100-degree day with blazing heat and high humidity turned the inside of the building into a swamp-like calamity, vastly increasing the damage.

71. And although there is no permitting requirement when a property owner is doing *emergency* water damage remediation, Revere effectively required this. It slow-walked WELP's emergency remediation by requiring that Cavagnaro review and sign off on the work.

72. Because of the City's tactics, the mold remediation took three weeks to complete and cost WELP hundreds of thousands of dollars, far more than if electricity had been running in the common areas during this time, as Kelly had deemed was entirely safe and necessary.

73. Defendants further interfered with WELP's efforts to repair 370 in myriad other ways. They slow-walked WELP's permit requests, denied permits, issued only "conditional" permits, made demands and imposed conditions not required by applicable code provisions, and at times allowed WELP to submit permit applications and submissions by email one day, but then arbitrarily insisted that WELP use an online permit portal the next.

74. There was no legitimate reason for City officials to obstruct WELP's good faith efforts to repair 370. After all, tenants had been displaced and the City should have been motivated to work with WELP to get them home as soon as possible. But this was a key part of Defendants' scheme. Not only could they paint WELP as a slumlord to the media, by obstructing WELP's repair efforts, they could execute on the other prongs of their scheme.

### ii. Revere Drags WELP to Court

75. While actively obstructing WELP's ability to repair 370, Defendants launched their second prong of attack. The D'Ambrosio Firm on behalf of the City filed a complaint (the "Complaint") in the Eastern Housing Court (the "Housing Court") on July 14, 2022, seeking to appoint a receiver for 370.

15

76.     This could not possibly have been done with a good faith purpose—the fire had just occurred less than a month before and WELP had not had sufficient time to bring the building back into good repair before the City took this drastic step.

77.     Indeed, the Complaint filed by the D'Ambrosio Firm makes clear that it was filed for premeditated revenge: it focuses not on the fire and water damage that allegedly was the cause for the lawsuit, but on years of prior dealings between the City and the Carabettas—issues which had already been resolved by way of ordinary course agreements between them. Indeed, the Complaint duplicitously cited purported issues dating back to 2017 that the D'Ambrosio Firm knew full well had been resolved with finality and in writing by and between the City and WELP years before the fire. Thus, the D'Ambrosio Firm wrongfully sought to use the pretense of these alleged prior issues to seek a receivership over 370.

78.     Receiverships can and often do have devastating consequences, as expenses incurred by the receiver can become super-liens on a property and, if not paid by an owner, can permit a receiver to foreclose on the super-lien and take over the property. Receiverships also destroy property values and eliminate financing opportunities.

79.     Even if a receiver is never appointed, just the mere filing and pendency of a receivership proceeding often drives down tenant occupancy, causes reputational harm to the building's owner, and dampens the building's value, as the perception is that the building is not being properly managed and/or is in trouble financially. It appears this was Defendants' goal.

80.     In addition to suffering all of this harm, in response to this filing, WELP was also forced to pay its attorneys and deplete considerable resources to defend the lawsuit, which continued for three years into late 2024.

16

81.     The Housing Court never appointed a receiver at any time, rejecting the City's requests. Instead, the Court allowed WELP to make repairs at 370, which happened with court oversight and approval.

### iii. The City Weaponizes Chapter 40U

82.     Despite that WELP was making necessary repairs at 370 to the satisfaction of the Housing Court, Revere launched its third prong of attack against WELP. Its weapon of choice was Massachusetts General Laws Chapter 40U ("Chapter 40U").

83.     Chapter 40U, passed in 2010, allows municipalities to issue fines to property owners for violations of housing and sanitary requirements. It also allows municipalities to add unpaid fines to property owners' tax bills and then if unpaid place liens on their properties, which can have devastating financial consequences. There is a significant difference between an unpaid fine versus a secured debt in the form of a property lien, which can affect an owner's standing with its mortgagee, among other things.

84.     The law requires municipalities to establish their own schedule of fines, but with two limitations. First, fines under Chapter 40U cannot exceed $500. Second, "all [] fines shall be uniform for the same offense committed in the same zone or district, if any."

85.     Chapter 40U gives property owners the right, within twenty-one days of the fine, to either pay the fine or request a hearing to appeal the fine before a hearing officer designated by the municipality. If the hearing officer upholds the fine, the property owner can appeal the municipal hearing officer's decision in court.

86.     Any fines that remain unpaid or that are not subject to an appeal are added to the property owner's real estate tax bill and can ultimately become a lien on the property if the tax bill is not paid.

17

87.     Revere adopted Chapter 40U, effective April 2015.

88.     Shortly thereafter, Revere developed internal rules, policies, and procedures to implement and execute its Chapter 40U program. These written rules, policies, and procedures (the "40U Rules") were created in part by the D'Ambrosio Firm. They were intended for use and reference by those involved in the Chapter 40U program, including D'Ambrosio Firm attorneys, the City Solicitor's Office, and City officials involved in building inspections.

89.     Upon information and belief, the 40U Rules were disseminated widely to City officials, including the Mayor's Office and City Councilors, and in public forums for transparency purposes.

90.     Upon information and belief, Revere had never intentionally deviated from its 40U Rules *until* the events described herein involving Water's Edge.

91.     Upon information and belief, Revere's 40U Rules mandated that, no matter the number of violations present at a property, the City could only assess a maximum of $490 in fines to a property owner *per day*.[2] For example, if Revere found that a property had ten violations on any given day, it could only assess $490 total for all violations—not $490 per violation, per day.

92.     This was reflected on Revere's public website in November 2021, which stated: "Tickets of properties in violation of city and state codes will be issued fines of *up to a maximum of $490 per day*" (emphasis added).[3]

93.     Despite WELP's urgent and good faith efforts to get 370 back into good repair on a compressed timeline, which included spending millions of Plaintiffs' own money, and all while

---

[2] Revere added a $10 administrative fee to each fine, thus taking the total to the maximum $500 under Chapter 40U.

[3] https://www.revere.org/departments/health.

under Housing Court supervision and while the building was unoccupied by tenants, Revere began issuing daily municipal fines against WELP, purportedly under Chapter 40U.

94.     It was not a proper or good faith use of Chapter 40U to fine a property owner in response to an *emergency* situation, much less one that was not caused by the owner. In addition, this came at a time when 370 was unoccupied by tenants and being actively repaired. Further, many of the alleged violations were under local ordinances inapplicable to vacant buildings, and for alleged violations that WELP had already corrected.

95.     Even worse, in blatant violation of the 40U Rules that limited fines to $490 per day *and* in violation of Chapter 40U's requirement that fines for the same offense be uniform across different properties in the same zone or district, City officials began issuing against WELP (and only WELP) ***$30,000 per day*** fines beginning on July 27, 2022.

96.     Revere concocted the arbitrary amount of $30,000 per day by purporting to find over 60 violations per day and ticking $490 *per violation*, contrary to its 40U Rules.

97.     Revere continued with the fines against WELP for periods of time spanning over two years, between July 27, 2022, and July 10, 2024.

98.     The purported violations were so numerous that WELP and its lawyers were never able to compile a total number. Only the City knew the exact number at any given time.

99.     Even with the aid of its attorneys, WELP could not possibly timely receive, process, review, and file appeals relative to every individual daily fine (***over 60 per day***) within the required 21-day period. Fines were delivered to an active job site at 370, where WELP was focused on repairing the building.

100.    WELP's attorneys understandably requested to appeal the fines together (via one consolidated appeal). However, and making it more difficult for WELP to appeal the fines, the

19

D'Ambrosio Firm on behalf of the City responded that WELP would have to appeal each and every fine individually. This effectively took away WELP's appellate rights under Chapter 40U. Even a property owner with unlimited resources could not keep up with that amount of procedural red tape.

101.    The D'Ambrosio Firm enriched itself through this process by actively engaging in the Chapter 40U process against WELP, including defending WELP's administrative (and later court) appeal of the fines on behalf of the City.

102.    Each fine that WELP failed to pay or appeal (or appealed unsuccessfully) could be added to the City's real estate tax bill for 370 and then accumulate interest at exceptionally high rates.

103.    Further showing its bad faith, the City was issuing these daily fines while WELP was in the process of complying with court orders to remediate the property. As the Hon. Irene Bagdoian of the Housing Court, the judge presiding over the 370 case, stated at a hearing on November 8, 2022, the State Sanitary Code requires compliance, "not compliance and punishment."

104.    Judge Bagdoian queried whether Revere's imposition of the $30,000 daily fines amounted to Revere "flexing some muscle" or was "an action to supersede th[e] Court's jurisdiction over this case" after the judge declined to appoint a receiver over 370.

105.    According to the Massachusetts Fire Incident Reporting System, there have been thousands of structure fires in Revere between 2015 and 2022, totaling tens of millions of dollars' worth of damages. Upon information and belief, Revere had never before used Chapter 40U to punish a similarly situated owner by issuing fines in the amount of $30,000 per day. Rather, any property owner fined under the program was subjected only to $490 per day fines, at most.

106. Further deviating from its normal procedure, Capizzi sidelined Ms. McCormick, who typically oversaw the Chapter 40U program at this time, from involvement at Water's Edge. As detailed below, this was purposeful—Ms. McCormick vehemently disagreed with the unprecedented $30,000 per day fines and Capizzi knew it. In Ms. McCormick's place, Capizzi let D'Ambrosio and his firm run the program with respect to 370 specifically.

107. Upon information and belief, the City had never before used Chapter 40U as a weapon in this manner. As just one example, a fire occurred at an apartment building at 912 Winthrop Avenue on July 23, 2022, and the City condemned the building. To WELP's knowledge, however, the City never assessed any Chapter 40U fines on the property (much less at $30,000 per day). Nor did it seek a receivership on the property, despite that the attendant circumstances were the same or similar as 370 (for example, the age and condition of the buildings). Rather, upon information and belief, the owners of that building were given a lengthy grace period to bring the building back into good repair.

108. This disparate treatment of WELP was a perverse scheme by Defendants. The sole focus following the fire should have been the timely repairs of 370 to permit tenants to go back to their homes, and this could and should have been a joint effort between Plaintiffs and City officials.

109. But Defendants saw in the fire an opportunity to drive out someone they did not like—Ms. Carabetta and her family business—and to apply pressure to WELP like a vise, to force them out of Revere Beach forever and even possibly have a back door to sell the property at much lower value to their buyer of choice.

110. Upon information and belief, D'Ambrosio and the D'Ambrosio Firm, with Capizzi, formulated the plan to impose the unprecedented and illegal $30,000 per day fines on WELP, and drafted the initial paperwork. Wells signed each notice of violation.

21

111.   D'Ambrosio's involvement in the plan came at a time when, upon information and belief, his firm's lucrative involvement in code work for the City was facing the threat of being curtailed by the City. By formulating the scheme for $30,000 per day fines, he could ensure continued involvement in the City's code work because he knew his firm would deal with the administrative appeals and litigation resulting from the fines.

112.   In a later attempt to hide the fact that it had selectively targeted Water's Edge and violated its own 40U Rules, *Revere changed the language on its public website*. The website now states: "Tickets of properties in violation of city and state codes may be issued fines of up to a maximum of $490 *per day, per violation*" (emphasis added). Of course, this was not the rule nor what the website said when Revere issued the $30,000 per day fines to WELP. Revere made this change to its website sometime between June 27 and July 19, 2025.

113.   Chapter 40U was a revenue-generating program for the City, sometimes generating up to or over $1,000,000 each year. Most of the money from the program was placed in a revolving fund. Upon information and belief, the D'Ambrosio Firm's bills relating to the program were paid directly out of the fund as "Legal and Administrative Expenses," per the Revere FY24 Budget. Thus, the D'Ambrosio Firm had a clear financial incentive in driving up Chapter 40U fines at Water's Edge, by billing for its involvement with the property and then collecting payment directly from any fines paid by Plaintiffs.

### *Defendants Politicize the Emergency*

114.   Defendants also realized they could use the emergency situation at 370—which they actively worsened—to score political points with the local media and Revere residents by appearing to be tough on landlords and demonizing the Carabettas and WELP.

22

115.    On July 14, 2022, the same day that the City sought a receiver for 370, and upon information and belief, D'Ambrosio, Capizzi, and/or then-Mayor Arrigo and others contacted the media to gather at 370.

116.    There, Arrigo "spoke at a well-attended press conference held across the street from the building. Virtually every Boston TV news station, along with WBZ-AM Radio, was present, with some reporters doing live on-site reports." Arrigo painted the conditions inside 370 as "deplorable" and stated "[t]he decision to go to court and impose receivership is one that we made after years of dissatisfaction with the Carabetta family and Carabetta Properties. And that dissatisfaction has only been exacerbated by their inability to step up to the plate for our residents." Cary Shuman, *Mayor Arrigo files emergency request for receivership of 370 Ocean Avenue*, THE REVERE JOURNAL, Jul. 20, 2022, at 1, 14.

117.    Upon information and belief, the act of holding a press conference at a property in this manner was unprecedented. As described further below, this press conference and other efforts to vilify WELP and the Carabetta family in the media chilled WELP's efforts to refinance the property. No financial institution wanted to be associated with the City's vicious campaign against WELP and Ms. Carabetta.

118.    Capizzi and D'Ambrosio also used the emergency to get their names in the press. Capizzi was quoted in the Revere Journal in August 2022 bragging about a decision of the Housing Court regarding 370, claiming a "big victory for the City" and crediting "our legal strategy [that] worked 100 percent." He also used the opportunity to promote his friend D'Ambrosio, stating "Attorney D'Ambrosio provided great legal service to get us to where we are right now … I don't think there was any other way we could get to this point."

23

*__The Housing Court Excoriates Revere for its Daily Fines__*

119.    Defendants' scheme was so relentless that WELP had no choice but to seek relief in the courts, causing WELP to incur even greater financial loss as a result of having to pay its attorneys.

120.    On October 12, 2022, WELP filed a complaint for injunctive relief against Revere in the Housing Court seeking to preclude the further imposition of Chapter 40U fines at 370 and to invalidate the prior fines.

121.    Defendants' bad faith was immediately obvious to the presiding judge, Judge Bagdoian. At a hearing on November 8, 2022, Judge Bagdoian admonished Revere for its imposition of $30,000 in daily fines, stating in part:

> It is spectacularly stunning to me that any municipality would fine an owner that is in Court and continue to fine that owner any amount of money at all without seeking the Court's permission to do so. Spectacularly interesting. And it reeks of bad faith. … [T]his business of continuing to act in a way that -- that actually causes harm to the owner with no purpose of bringing this property into compliance, but rather to prevent the property owner from having the funds to bring it into compliance, again, is a stunning action that does not seem to comport with the actual aim of compliance, which is what a municipality is supposed to be doing, causing homeowners, causing owners to comply with [the] Sanitary Code for the purpose of ensuring health and safety in the community. Health and safety. Not some spectacular show that involves WBZ showing up in my courtroom for political reasons, perhaps.

122.    In the meantime, since WELP had to exhaust an administrative appeal of the fines before the Housing Court judge would consider invalidating them, WELP did its best to administratively appeal all the Chapter 40U fines, although it was impossible to appeal every individual fine given the City's 60-per day scheme.

123.    WELP's administrative appeal was heard by Revere's designated Chapter 40U hearing officer, Robert Marra ("Marra"). Marra was also part of Revere's old boys' club, described as Capizzi's "friend and colleague" by a Revere insider. He had been Assistant City Solicitor, City

24

Solicitor, and then Chief of Staff to Arrigo (serving as Chief of Staff to Arrigo, who had been openly defaming WELP, at the same time as serving as hearing officer).

124. Indeed, when the City Council voted for the external investigation of Capizzi after the allegations of harassment and gender discrimination from three City employees, Marra predictably made sure to oppose the motion for his friend. Marra's excuse was that an investigation would exceed the councilors' authority, which made no sense given that they had merely *requested* an *external* investigation.

125. Predictably, Marra, the biased hearing officer, rejected WELP's appeal and upheld all the Chapter 40U fines on May 16, 2023. However, and notably, even Marra had to note his reservations about how the City was proceeding:

> Although I have reservations about the procedures the City of Revere utilized in issuing fines on a daily basis, and further question the punitive nature of cumulative fines after condemnation of the building, I find no aspect of Chapter 40U that prohibits or restrains the City of Revere's aggressive effort to force the landlord to correct the egregious conditions at Water's Edge that posed health and safety issues for its residents. I concur with the City of Revere's assertion, as contained in its memorandum, that this review is limited to whether the violations occurred and whether the cited property owner is the entity responsible for the violations.

126. Marra's analysis is also notable in that he ignores (a) Chapter 40U's requirement that fines be *uniform* across different properties, and (b) the City's 40U Rules that capped fines at $490 per day. Marra necessarily was or should have been aware that the City's fines violated both.

127. WELP turned back to the Housing Court for relief, which had no trouble finding *all* of the Chapter 40U fines that the City had issued invalid. On May 13, 2024, the Housing Court issued an order (the "Revocation Order") **granting WELP's motion to invalidate all the Chapter 40U fines**, again noting Revere's bad faith: "the fines assessed by the City of Revere to this date may have been assessed for purely punitive purposes not reasonably calculated to comport with the gravity of the circumstances."

128. To be clear, Judge Bagdoian did not merely suspend or stay the fines; she unequivocally revoked and rescinded them. At a hearing on May 13, reading her Order into the record, she stated: "this Court **hereby rescinds, revokes, and invalidates** all fines imposed by the City of Revere connected to code violations" (emphasis added).

129. Later, and as detailed below, Revere *ignored* this binding Revocation Order, acting as if it did not exist or that the Housing Court had no jurisdiction or authority over it. Rather, Revere and its officials continued to hound WELP over the Chapter 40U fines that had been invalidated in total by the Court, even asserting to this Court that they were still due and owing in a filing signed under the pains and penalties of perjury.

### *On November 17, 2022, when a Pipe Burst in 364 Ocean Avenue Causing Water Damage, the City Again Seized the Opportunity to Pummel Water's Edge*

130. Amidst all of the above events, another unfortunate event struck Water's Edge, which Defendants happily leveraged to further bury WELP.

131. On November 17, 2022, a water pipe in the wall of the seventh floor of 364, the adjacent connected building to 370, leaked. Water migrated to the first-floor utility room, causing water damage to the alarm system.

132. The very next day, the Revere Fire Department issued an Order of Notice, purportedly requiring Water's Edge to retain a fire watch detail in the building 24 hours a day, 7 days a week, 365 days a year at its expense until the fire alarm system was replaced *and* "updated."

133. The order for this fire watch detail was issued purportedly under the Massachusetts Comprehensive Fire Safety Code, 527 CMR 1.0, *et seq*. At the time, Revere had no ordinance permitting a fire watch requirement. The state fire code did not permit Revere to impose a constant, lengthy fire watch in order for WELP to repair, replace, or modernize its fire alarm systems per Revere's whims.

26

134.    Revere officials also effectively forced WELP to retain the Revere Fire Department to provide the required detail rather than hiring someone else to do it, even though there is no authority that permitted Revere to do so. Not coincidentally, by supplying these details, the Revere Fire Department generates hundreds of thousands of dollars in revenue for itself.[4]

135.    The fire watch detail provided by the Revere Fire Department at 364 was a massive overkill; the firefighters were not performing any trained services to actually prevent a fire but were clocking in and clocking out, largely sitting idle at the property, to allow the fire watch fees to accrue to their benefit. On some occasions, firefighters even slept on cots in the building's lobby and security area.

136.    The fees assessed by the Revere Fire Department for the ongoing fire watch detail were also exorbitant, arbitrary and capricious, and not uniform. For example, each invoice tacked on a 10% "Admin Fee."

137.    Despite Water's Edge's ongoing efforts to repair 364, including hiring a registered design professional, Fitzemeyer & Tocci Associates, Inc., Defendants had no interest in working with WELP but again sought to punish and harass it.

138.    For example, a contractor was able to bring back functionality of 364's fire alarm panel to substantially the same condition as before the incident, but the City refused to remove its fire watch detail. Rather, it required full modernization of the system that would take many months to accomplish, even assuming the City cooperated by providing the necessary permits to do so. The City made this "modernization" demand despite severe supply-chain issues following the

---

[4] Although Revere purports to allow a property owner to obtain a private fire watch detail, this requires submitting a fire safety plan to the Revere Fire Department for approval. Thus, in reality, the fire department can effectively force an owner to use it for the fire watch by refusing to approve (or slow-walking approval of) private plans.

27

COVID-19 shut-downs, further prolonging the time Water's Edge had to pay for the fire watch detail.

139.    The fact that the fire watch detail continued into 2024 was not an appropriate application of the state fire code or any other potential source of authority for a fire watch; any emergency situation had clearly been abated by that time.

140.    Further harassing WELP, in November 2023, the City filed suit in the Housing Court to appoint a receiver for 364—which would allow at least temporary City takeover of the building (with the possible aim of *permanent* takeover by way of foreclosure by the receiver). As with 370, the receivership Complaint used the pretense of alleged prior issues dating back to 2017 to seek a receivership, which had been resolved.

141.    Like with 370, the Housing Court refused to appoint a receiver. The Court noted that it would provide WELP (with the knowledge and capabilities to do so as 40-year owners of the property) with the opportunity to bring the building back into good repair, such opportunity having been denied by the City.

142.    In the meantime, while WELP paid many of the fire watch fees (despite the illegality of them), it could no longer keep up given how exorbitant and ongoing they were.

143.    Then came another salvo. Shockingly, on August 29, 2024—twenty-one (21) months after the pipe burst at 364, while WELP was working to repair the building according to the City's dictates and while under Housing Court supervision, and totally out of the blue—Revere condemned 364.

144.    The D'Ambrosio Firm represented the City in the condemnation proceedings, again getting paid off the back of WELP.

28

145.    Unsurprisingly, the vilification of WELP and the Carabetta family was at the forefront of these proceedings. Speaking before the Board of Health, D'Ambrosio Firm attorney Paul Tellier asserted that "Water's Edge has made numerous misrepresentations and false promises over the years. They've schemed, they have deceived . . . The conditions that [sic] the property harm and threaten the tenants in the public. It is unthinkable that in the current housing crisis, Water's Edge would allow this abominable situation to occur."

146.    Ironically, Revere condemned 364 *over the strenuous objections of tenants*. According to a news report of the hearing on the condemnation, "[a] group of current residents at Water's Edge attended the hearing. Some said several of the problems cited by the City, such as mold and trash, do not exist. … Water's Edge resident Sylvia Smith … [stated] [t]wo years ago, they inspected and they never came back … They don't live there. They don't know. Shame on all of you for trying to put us out in the street at the end of summer." *See* Barbara Taormina, *Water's Edge tenants push back on City's ruling to condemn Ocean Ave. high-rise*, REVERE ADVOCATE (Sep. 5, 2024), https://advocatenews.net/revere/news/waters-edge-tenants-push-back-on-citys-ruling-to-condemn-ocean-ave-high-rise/.

147.    Despite that the State Sanitary Code requires an inspection report signed under the pains and penalties of perjury before a building is condemned—given the serious consequences of condemnation—Revere did not even attempt to comply with this requirement. Rather, egregiously, it appeared to rely on 2017 and 2022 orders to correct.

148.    In September 2024, because of the condemnation, the tenants remaining at 364 had to vacate the building and either moved into 388 or into hotels, all at WELP's expense.

149.    The condemnation was heavily covered by the local media, as Defendants intended. Keefe gave a statement to the press stating, in part: "After two years of attempts to work with this

29

property owner to make the necessary improvements and ensure the safety of this building, it has become very clear that they have no intention to do so. Enough is enough. The City of Revere will not allow negligent property owners to put the health and safety of Revere residents at risk. Waters Edge Limited Partnership has created an unimaginably difficult situation for their tenants, and displayed a total disregard for their wellbeing and dignity." These statements were false.

150.    Upon information and belief, the sudden and unnecessary condemnation of 364 was done in part to force WELP to pay the outstanding fire watch fees to the fire department. Of course, this is not a legitimate reason to condemn a building.

151.    A July 25, 2024 letter from the D'Ambrosio Firm to WELP's counsel confirms this. It demanded that WELP pay over $276,000 in alleged fire watch invoices within one week, *or else*. Specifically, the letter threatened that, if payment was not received, the fire department will "cease to provide a fire watch detail." And it further threatened that the City will "move forward with condemnation proceedings" if payment is not received *or* if WELP does not retain its own fire watch detail within one week. The City made good on this threat.

152.    This letter admitted the quiet part out loud: Revere was not imposing the fire watch detail on 364 for the safety of the tenants or any other legitimate reason, but to ensure that it could enrich its own fire department. Otherwise, it would not threaten to remove the fire watch.

153.    To extract payment of the illegal fire watch fees, the City recorded a Statement of Claim in the Suffolk County Registry of Deeds on October 8, 2024, claiming a lien on 364 in the amount of $417,032 for the fire watch fees, relying on M.G.L. c. 148, §§ 4-5.

154.    This purported lien, and all of the underlying fire watch fees, however, are invalid and void. First, as mentioned, the City purportedly relied on the state fire code (not M.G.L. c. 148)

when issuing its November 18, 2022 Order of Notice. Nothing in the state fire code permitted Revere to impose the fire watch under these circumstances.

155. Second, though the City later relied on M.G.L. c. 148 to justify the fire watch, the fees, and its purported lien, it did not comply with M.G.L. c. 148, § 5 at all. For example, the Order of Notice was not served in the manner required under § 5 (and in fact, the portion of the Order attesting to service was left blank). As another example, the Order purportedly required an *immediate* fire watch at WELP's expense, but § 5 only permits entry after giving the owner a 24-hour period to abate the condition at issue. Further, § 5 does not permit a fire watch to be imposed to require *updating* or modernization of a fire alarm system (compared to repair to functionality) as here; it only permits a fire watch during such period of "existence of conditions *likely to cause fire*" until such conditions are remedied (emphasis added). These are just representative examples, as the City did not comply with § 5 in myriad other ways.

156. Because the City failed to comply with the requirements of § 5, and there is no other source of law under which it could impose the fire watch fees or a lien on 364, *the entirety* of the alleged fire watch fees assessed to 364, and the purported lien in the amount of $417,032, are invalid.

157. The fire watch fees were another example of disparate treatment directed only at WELP. Upon information and belief, the City had chosen not to impose, or continue imposing, fire watches at other buildings under the same or similar circumstances.

158. In addition, like with 370, the City used Chapter 40U as a weapon at 364. It is currently claiming $28,500 in Chapter 40U fines owing on 364. Like with the 370 fines, these Chapter 40U fines against 364 do not comply with Chapter 40U or with the City's 40U Rules.

***The City's Condemnation Order Against***
***364 Ocean Avenue is Struck Down in Housing Court***

159.    Water's Edge was again forced to defend itself against the City's unlawful actions in court: on September 4, 2024, Water's Edge filed a complaint in the Housing Court, seeking an injunction against the August 2024 condemnation order for 364.

160.    On November 12, 2024, Judge Bagdoian granted WELP's request and declared the City's condemnation of 364 to be void and unenforceable. She enjoined the City from taking further action to enforce the condemnation.

161.    This decision was not just based on some mere legal misstep by the City. Rather, Judge Bagdoian again noted the City's continuing, bad faith harassment of WELP:

> [T]he City has both been over-eager and sloppy in its pertinacious pursuit of Water's Edge.  The over-eagerness is demonstrated by the inexplicably urgent timing of this condemnation proceeding, which occurred two years after the never-updated Order to Correct, but coincidentally amid a hearing on the appointment of a Receiver. The sloppiness is demonstrated by, inter alia, irregularities in the Order to Correct including no language indicating that the conditions rendered the Property 'unfit for human habitation,' the lack of any re-inspections after the initial Order to Correct (thus giving the false impression that Water's Edge failed to do anything to attempt to correct the cited violations) and the failure of the Board of Health to notify Water's Edge of its 'right to inspect and copy the board of health's file concerning the matter to be heard.' This Court also questions the timing of any required written Finding issued by the Board of Health deeming the Property unfit for human habitation, and the timing of the required Condemnation Order.

162.    Judge Bagdoian found that the City's condemnation was invalid not only because the City did not conduct mandatory re-inspections of 364, but also because it failed to monitor and note all corrections and further violations over the course of two years, which "indicates a stunning dereliction of legal duty."

163.    Further damning, Judge Bagdoian noted that she has "adjudicated hundreds of Sanitary Code enforcement cases over the course of the past six years. … This Court has also

32

overseen cases from virtually every municipality under this Court's jurisdiction. … This is the first time that the Court has observed a municipality ignoring the Code's explicit requirement to conduct periodic reinspections."

164. However, despite this legal victory, the intended damage had already been done. The very public condemnation of 370 and later 364 had severely restricted WELP's cash flow and destroyed Plaintiffs' reputation and standing, among other things.

### *A Whistleblower Reveals Shocking Fraud Committed Against WELP*

165. Hidden from WELP, Revere and City officials furthered their campaign of harassment against WELP by, in part, a cunning and unscrupulous method: silencing an internal whistleblower and *forging her signature* in an attempt to add the illegal Chapter 40U fines to the City's real estate tax bill for 370 for the 2023 fiscal year.

166. As noted above, Ms. McCormick was, at the time of relevant events, an Assistant City Solicitor for Revere. She had worked for the City Solicitor's office since 2007, starting as a paralegal, putting herself through law school in the evenings, and passing the Massachusetts bar exam in 2013.

167. On May 1, 2024, Ms. McCormick laid bare the shocking facts in a lawsuit filed against the City and Capizzi, later removed to federal court.

168. In the McCormick Complaint, Ms. McCormick described how she was appointed to manage Revere's Chapter 40U program. But by 2022, Capizzi began interfering in it, for no above-board purpose.

169. With respect to the Chapter 40U fines levied against 370, Ms. McCormick reported that she had objected internally to the imposition of the daily $30,000 fines, deeming them "improper" assessments.

170.    Indeed, she "previously expressed her concern to [] Capizzi—on many occasions—that the fines were excessive and punitive, and that the City had never before assessed fines against any other property in the City at $30,000.00 per day as [] Capizzi had authorized against 370 Ocean Ave. [] Ms. McCormick continued to express her concern to [] Capizzi and [] Wells regarding the issuance of the excessive fines." *Cheryl Leon-McCormick v. City of Revere, et al.*, Case No. 1:24-cv-11480-IT (D. Mass.), ECF No. 10, ¶ 106.

171.    Capizzi, Wells, and D'Ambrosio (among others) still insisted on the grossly improper fines against 370 over Ms. McCormick's concerns and objections. And they wanted her to take the fall when the illegal fines were added to the City's tax bill for the property.

172.    Ms. McCormick had been working on a document called the Chapter 40U Certification to Fiscal Year 2023 Tax Bill (the "Certification").

173.    Upon information and belief, Revere's 40U Rules required City officials to certify each and every Chapter 40U fine assessed at any property city-wide in order for them to be added to the City's tax bill for each property. This was an important part of the process because, once added to the tax bill, a lien would be placed on each property if the tax bill was not timely paid. The 40U Certification essentially required a guaranty by those personally involved in the 40U process that the fines were accurate and proper under Chapter 40U and the City's rules. The certification was prepared, signed, and submitted to the City's Assessor, Dana Brangiforte, each fiscal year for all Chapter 40U fines assessed by the City.

174.    According to Ms. McCormick, "Wells knew that [] McCormick refused to sign the [FY23 Chapter 40U] certification because it included [the] unreasonable and unethical fines that were assessed against 370 … by [the D'Ambrosio Firm] and [] Capizzi." *Id.*, ¶ 105.

34

175.    This was no obstacle to Capizzi, Wells, and others: they simply *forged Ms. McCormick's signature on the Certification.*

176.    According to Ms. McCormick, despite the fact that she told Wells she would not sign the Certification if it contained the illegal fines against 370, Wells "intentionally obtained her electronic signature from his assistant, Colleen Argenzio, without [] McCormick's permission or knowledge" and "Wells intentionally affixed [] McCormick's electronic signature to the tax bill and submitted the tax certification to [] Brangiforte, [] Viscay, [] Capizzi, and others." *Id.*, ¶¶ 107-08.

177.    Ms. McCormick learned of the forgery on December 7, 2022. She immediately instructed Wells to withdraw the fraudulent Certification (dated December 8, 2022). *Id.*, ¶¶ 104, 109.

178.    Further, on "December 10, 2022, [she] wrote to Mayor Arrigo and Linda DeMaio, the Mayor's Executive Assistant, to request a confidential meeting to discuss both the procedural issue relevant to the Certification and Michael Wells' act of forging her signature." *Id.*, ¶ 110.

179.    Wells did not withdraw the Certification. Nor did Arrigo honor her request for a confidential meeting or have any apparent concern about an act of forgery on an official City document that would illegally pad the City's coffers and grievously and illegally harm a City taxpayer. Rather, Arrigo took Ms. McCormick's request for a *confidential* meeting and turned it into an opportunity for City officials to strongarm Ms. McCormick into compliance.

180.    Ms. McCormick reports that "[i]nstead of … a confidential meeting" with Arrigo, she was confronted by (among others) Wells, Capizzi, Arrigo, Viscay, D'Ambrosio, Cavagnaro, and another attorney from the D'Ambrosio Firm, Attorney Anthony Brunco. Capizzi and Viscay

35

specifically "attempted to pressure" her to certify the Chapter 40U fines on 370 "despite the outstanding procedural and ethical violations that needed to be addressed." *Id*., ¶¶ 111-12.

181. Ms. McCormick refused to accede to the bullying and insisted that the forged Certification "was unethical and inaccurate and had to be amended by removing the fines for 370 [] totaling $205,000, before she would sign it." She drafted and signed an amended FY23 certification, "specifically excluding the fines that were egregiously assessed against 370," and submitted the amended certification to Wells. *Id*., ¶¶ 114, 117.

182. Throughout 2023, Ms. McCormick continued to report the forgery to Capizzi and other City officials, but "[n]othing was done about it." She even provided hard copies of the forged Certification to Revere's Human Resources Director, Lina Trimelli, but still nothing was done. *Id.*, ¶¶ 118-119.

183. The City ultimately authorized this 40U Certification with the illegal fines against WELP specifically, and the fines were added to WELP's tax bill. This was despite the knowledge of Wells, Capizzi, Viscay, Arrigo, D'Ambrosio, the D'Ambrosio Firm, and Cavagnaro that the Certification both contained unethical and improper fines against WELP *and* that the original iteration had been forged.

184. Wells and the D'Ambrosio Firm had active involvement in the iteration of the 40U Certification that was ultimately used. Ms. McCormick had amended her certification to verify and certify that Chapter 40U fines for that fiscal year—*expressly excluding those assessed to 370*—had gone through "all required processes and protocols." In other words, those assessed to 370 had *not* gone through the required processes and protocols, as she made obvious. She verified and certified only $974,500 in 40U fines city-wide:

I, Cheryl A. McCormick, in my capacity as Assistant Solicitor for the City of Revere, Municipal Inspections Department, hereby certify and confirm to the City Assessor and the Collector of Taxes, the amount of $974,500.00, *excluding parcel #8-160-161-1B (370 Ocean Ave)*, to be added to the fiscal year 2023 tax bills, and therefore have properly proceeded through all required processes and protocols.

Signed this 14th day of December 2022.

_____
Cheryl A. McCormick
Assistant Solicitor
Municipal Inspections Department

185.     Because Ms. McCormick's amended certification expressly excluded 370, by certification dated December 19, 2022, Attorney Brunco of the D'Ambrosio Firm purported to certify the 370 fines:

I, Anthony Brunco, in my capacity as outside code enforcement counsel for the City of Revere Department of Municipal Inspections, hereby certify and confirm to the City Assessor and the Collector of Taxes that the $205,000.00 amount sought to be added to fiscal year 2023 tax bill, with respect to parcel 8-160-161-1B (370 Ocean Avenue), has gone through all required processes and protocols.

Signed this 19th day of December, 2022.

_____
Anthony Brunco, Esq.
D'Ambrosio, LLP.
185 Devonshire Street, 10th Floor
Boston, MA 02110
T. (617) 720-5657
E. abrunco@dambrosiollo.com

186.     Of course, this certification was false. The fines against 370 had not "gone through all required processes and protocols." The City and its officials had egregiously violated the required processes and protocols in place—the 40U Rules—with respect to 370, and 370 only.

187.     Moreover, Attorney Brunco and his boss D'Ambrosio were both present at the meeting where Ms. McCormick was pressured to certify the $205,000 amount and both knew her

37

signature had initially been forged. Despite this knowledge, Attorney Brunco willingly signed a false certification in lieu of the City relying upon a forgery of Ms. McCormick's name.

188.    Wells in turn also provided a certification, dated December 14, 2022, asking that $1,179,500 in Chapter 40U fines city-wide be added to property owners' respective tax bills:

### AMENDED CERTIFICATION
### FY2023

I, Michael Wells, in my capacity as Health Agent/ Director of Municipal Inspections for the City of Revere, hereby certify that the lien amounts identified in the attached report and issued for violations of the state sanitary code and the City's municipal ordinances were issued in accordance with the procedures set forth in M.G.L. c. 40U. To date, the liens included for the properties listed in the attached report have not been paid nor legally appealed. Therefore, pursuant to M.G.L. c. 40U, and M.G.L. c. 40 § 42B the outstanding tickets became liens, and I hereby request the unpaid amount of $1,179,500.00 be committed to the fiscal year 2023 tax bills pursuant to M.G.L. c. 40U § 12 in accordance with the amounts per property as listed on the attached report.

Signed this 14th day of December 2022.

Michael Wells
Health Agent
Director of Municipal Inspections

189.    The $1,179,500 figure represented (a) the $974,500 in city-wide Chapter 40U fines excluding 370 that Ms. McCormick certified, plus (b) the $205,000 specific to 370. Wells knew that the $205,000 specific to 370 should not be added because the required processes and protocols were not followed, but signed this certification anyway.

190.    Putting aside the above egregious misconduct, this Amended Certification should never have been accepted by the City's Assessor and Collector of Taxes such that the $205,000

was added to WELP's tax bill. It would have been immediately obvious to these officials that there was some substantial issue or dispute over the validity of the $205,000 assessed to 370, since the City's own attorney would not confirm and certify those amounts and expressly excluded them from her portion of the certification. Given that Ms. McCormick was in charge of the City's Chapter 40U program at the time, an outside certification by the D'Ambrosio Firm also should never have been accepted in lieu of one from her.

191.    By adding the $205,000 to WELP's tax bill, the City knew WELP would be forced to pay it to try to avoid financial ruin. The City adds interest at an annual rate of 14 percent for any tax bill not paid within 30 days after the tax is issued, beginning from the day after it was due. If by June 30 of the fiscal year the taxes remain unpaid, the City places a tax lien on the deed to the property, by recording an instrument of taking with the Suffolk County Registry of Deeds and thus creating a tax title. The placement of this lien on a property allows the City to begin the foreclosure process, if it so chooses. It also increases the accruing interest rate on the unpaid taxes to 16 percent. And having liens of this type imposed on WELP's property would further eliminate any realistic chance that a lender (perhaps other than a "loan to own" or other non-market lender, at exorbitant yields) would seriously consider making loans to WELP.

192.    By assessing WELP fines under Chapter 40U and adding them to WELP's tax bill, Defendants were massively enriched. Indeed, if WELP appealed the Chapter 40U fines, the D'Ambrosio Firm would be paid their fees to defend the City in the administrative appeal proceedings and then any ensuing litigation. If WELP paid the fines after they were added to its tax bill, the City would receive the amounts allegedly owing plus interest at 14 percent. If WELP paid after a tax taking, then the City would add interest at a rate of 16 percent.  And if WELP does

not pay at all, the D'Ambrosio Firm again gets fees to prosecute a foreclosure on the tax title for the City.

193. Thus, with the threat of a lien on the property if the tax bill was not paid, the $205,000 in illegal fines had to be and were paid to the City. In other words, by way of a scheme involving forgery and deceit, the City extracted $205,000 in illegal payments from WELP.

194. Defendants worked in concert to perpetrate this fraud as evidenced by Capizzi's decision to sideline Ms. McCormick—who he knew would follow the law—to make way for D'Ambrosio and his firm to take over the 40U program with respect to 370 specifically. Defendants' concerted action to accomplish this plan is also evidenced by both Arrigo's decision to schedule a meeting to strongarm Ms. McCormick to falsely certify the 40U fines against WELP after she requested a confidential meeting, and the ensuing intimidation and attempted coercion of Ms. McCormick at this meeting by Wells, Capizzi, Cavagnaro, D'Ambrosio, Viscay, and Attorney Brunco to force Ms. McCormick to sign the Certification despite knowledge of the forgery.

*As a Result of the City's Relentless Unlawful Actions*
*WELP Cannot Refinance its Properties and is Forced to File for Bankruptcy*

195. To give WELP the necessary cash flow to address the renovations and repairs needed at 364 and 370, WELP sought to refinance the Water's Edge property.

196. Given that the projected renovations and repairs at 364 and 370 required millions of dollars in upgrades, no contractors would begin work without a down payment and proof of funds. In fact, WELP had obtained a master permit to commence work at 370, after almost a year of permitting delays, and simply needed the financing to get work underway.

197. As of June 2022, when the fire at 370 occurred, WELP's financing consisted of a customary secured term loan on very favorable terms with M&T Bank in the approximate amount of $18,000,000.

198.    Although the M&T Bank note matured by its terms by late 2023, WELP continued to make payments from Ms. Carabetta's personal finances, and the bank was willing to work with WELP to modify or extend the debt. However, when M&T Bank learned that the City had assessed massive Chapter 40U fines against WELP (such fines later struck down) and was attempting to "roll" those fines into liens that could prime the bank's senior mortgage position, the bank understandably refused to continue working amicably with WELP as to a possible refinancing.

199.    Indeed, counsel for M&T Bank relayed that "the vast number of notices of violation and the amount of money at stake have made it necessary for the Bank to pause on any potential loan extension."

200.    Upon information and belief, Defendants—including the D'Ambrosio Firm—were in direct contact with M&T Bank about the Chapter 40U violations assessed to WELP. In addition, upon information and belief, they also spoke with other banks with whom WELP was attempting to refinance its debt and disclosed the existence of the potential for a 40U priority tax lien, even though the fines had not yet been certified on WELP's tax bill.

201.    Indeed, the D'Ambrosio Firm sent letters to counsel for M&T Bank dated January 26, 2024, regarding 364, 370, and 388. The D'Ambrosio Firm relayed what it alleged was due to Revere in (among other things) Chapter 40U fines. This included reporting nearly $600,000 in Chapter 40U fines for 370. That is, Defendants intentionally and egregiously interfered with WELP's advantageous financing relationships, further pushing WELP towards the end the Defendants desired—financial ruin and loss of the property altogether.

202.    The D'Ambrosio Firm letters to M&T prompted two demand letters from M&T Bank to WELP dated February 7 and May 14, 2024, in which M&T directly relied on the D'Ambrosio Firm letters to inform WELP that it was in default and demanded payment.

41

203. Upon information and belief, the D'Ambrosio Firm's direct communication with WELP's lender in this manner was intended to harm WELP and push the Carabetta family out of Revere. Worse, although the Housing Court later invalidated the Chapter 40U fines on 370, it does not appear that the D'Ambrosio Firm ever informed M&T of this fact after poisoning the relationship.

204. The D'Ambrosio Firm further obstructed WELP's efforts to refinance with M&T Bank. In late 2023, it knew WELP was working to pay overdue amounts to Revere and clear title for refinancing purposes, but it rushed to add Chapter 40U fines to WELP's tax bill anyway and poisoned the well by informing M&T Bank about the specter of such fines being added as a priority lien in the near future.

205. For example, on December 6, 2023, Attorney Brunco told WELP's counsel—after receiving an initial payment from WELP—that "I know that your client was planning to send a second disbursement for the remaining water/sewer, code tickets, and tax delinquencies" *yet* "the City is in the process of completing its 40U certification for Fiscal Year 2024 and is slated to be finished by early next week." There was no legitimate reason for the rush to add the Chapter 40U fines to the tax bill when Defendants were aware that WELP was attempting to clear title and gathering payment.

206. WELP also turned to other banks such as Newburyport Bank and Middlesex Federal Savings Bank in an attempt to refinance its debt and unlock necessary cash flow. Indeed, an appraisal was done on the property for the purposes of this refinancing.

207. Representatives from Newburyport Bank visited the property, saw significant value, and put together refinancing documents, including a term sheet. WELP was approved for a new $17,000,000 loan to refinance existing debt and a $5,000,000 line of credit to fund property

improvements. In addition, WELP was approved for a further, potential line of credit up to $25,000,000.

208.     The refinancing efforts with Newburyport Bank were essentially "a done deal" at the time the fire occurred at 370. Even after the fire, the deal was not dead, and the bank stayed on. But ultimately Newburyport Bank decided to halt the refinancing deal because of the bad publicity and actions described above initiated by Defendants following the fire.

209.     WELP made other attempts to secure financing, trying everything it could, including talking to hard money lenders. But as Defendants ramped up their attack against WELP including in public litigation, WELP's occupancy rate plummeted, its financial condition worsened, and its refinancing options dwindled. At this point, banks and financial companies pivoted to offering to buy the Properties rather than refinance with WELP. Ms. Carabetta, however, desperately wanted to hold onto the family's precious legacy, their irreplaceable ocean front Properties, and to rebuild.

210.     In September 2024, M&T Bank sold WELP's note and assigned the mortgage to a competitor of the Carabetta Companies—DIV OA Lender, LLC ("DIV LLC"), a new entity formed by The Davis Companies to buy the loan and attempt to ultimately take ownership of Water's Edge. Almost immediately after obtaining the note, DIV LLC scheduled a foreclosure auction for the Properties for December 5, 2024. Facing foreclosure and with all loan modification and refinancing efforts nuked by Defendants' actions, WELP had no practical ability to avoid financial ruin.

211.     But for Defendants' unlawful pursuit of Water's Edge, which included Defendants' media smear campaign, the illegal Chapter 40U fines on 370 (which have since been invalidated), the improper condemnation of 364 and imposition of nearly $500,000 dollars in fire watch fees,

43

and Defendants' obstruction of WELP's efforts to refinance its debt, WELP would have refinanced and obtained the necessary cash flow to make any and all necessary renovations and repairs at 364 and 370.

212.    Ultimately, through the abuse of each Defendant's individual position of authority, and as evidenced by the vilification of WELP and Ms. Carabetta in the media; slow walking permits and impeding WELP's efforts to repair and stabilize its Properties; levying $30,000 per day fines against WELP; seeking condemnation orders and receiverships against WELP's Properties when the damages suffered at the buildings occurred through no fault of ownership; and, finally the obstruction of WELP's efforts to refinance its debt, Defendants acted in concert to target WELP, take control of its Properties, and drive WELP into financial ruin.

### **_WELP is Forced Into Bankruptcy_**

213.    Without necessary cash flow, and with the term note having been sold to an investor and subject to immediate foreclosure auction, WELP had no choice but to file for Chapter 11 bankruptcy protection on December 5, 2024.

214.    To repay its creditors in bankruptcy, WELP was forced to sell Water's Edge in a competitive process supervised by this Court at a loss of over $100 million compared to its value before Defendants' wrongful actions. The sale price, $44.8 million, was _less than what Joseph paid to acquire the complex 40 years prior to that._ This massive diminution in value occurred despite the fact that one of the three WELP buildings, 388 Ocean Avenue, was fully operating and had positive cash flow.

215.    Indeed, during a May 13, 2024 hearing before Judge Bagdoian concerning WELP's motion to rescind the 40U fines, Attorney Tellier touted the value of the three buildings at $100 to

$150 million. Judge Bagdoian stated that "$100 million dollars seems almost laughably low" and Attorney Tellier agreed, stating that the value "should be 150 [million]" and could be even higher.

216.    The D'Ambrosio Firm, representing the City in the bankruptcy, has been directly enriched as a result thereof, as the City has paid or will pay its fees for the case.

217.    Defendants' actions in total forced WELP into bankruptcy, forced it to sell the Properties it had owned since the 1980s, and forced it out of Revere Beach completely. This was their clear goal all along, and it was mission accomplished. As a result of all the above events, WELP has been forced into financial ruin.

218.    Keefe wasted no time in celebrating. He commented publicly: "***We are happy*** to see the buildings take on a new life, and expect the appropriate investments be made to ensure the buildings provide safe and healthy living accommodations to our residents." *City looks to work with new owners of Ocean Avenue apartment buildings*, THE REVERE JOURNAL, Jan. 21, 2026, at 3 (emphasis added).

***The City Ignores the Housing Court's Orders***
***<u>and Seeks Repayment of all Invalidated Fines in the Bankruptcy</u>***

219.    On February 14, 2025, the D'Ambrosio Firm on behalf of the City filed a Proof of Claim in the bankruptcy action, claiming that WELP owed the City ***$5,679,522.44 in secured debt***. The submission was made under the pains and penalties of perjury, yet contains multiple statements that are false.

220.    Part of the City's claimed alleged debt was ***$600,500*** in Chapter 40U fines for 370. But as the City and the D'Ambrosio Firm knew when it filed its claim, the Chapter 40U fines had been ***revoked*** by the Housing Court in May 2024. Shockingly, Revere painted the Housing Court's Order as a mere "suspension" of the Chapter 40U fines. This was a false statement; the fines had

been revoked and rescinded, not merely "suspended," and therefore should not have been part of the claim given the Housing Court's preceding Order.[5]

221. The claim also included **$417,032** in alleged secured debt for the fire watches for 364. As noted, these fire watches were illegally forced upon WELP and the fees themselves were exorbitant. And at bottom, neither the fees nor the purported lien are valid under M.G.L. c. 148, § 5.

222. The City's claims also include a massive amount of accrued interest, on top of the substantial interest charges already paid by WELP on illegally asserted liens (and on water and sewer and tax bills that WELP could not timely pay because it was instead forced to pay the illegally asserted amounts). Although WELP and its advisors have spent months (and considerable sums of professional fees) to try to determine how much interest is embedded in the City's claims and the financial effect of the City's conversion of illegal assessments and fines into interest-bearing liens, the City's records are so jumbled and incoherent—perhaps intentionally so—that WELP has not yet been able to determine the impact of the accumulated interest, and compounded effect of that. WELP reasonably believes and so asserts that the amount of illegally charged interest, some already paid and some embedded in the City's present claims, is in the millions of dollars.

223. Furthermore, the Proof of Claim asserted that the *entirety* of Revere's claim was secured debt. This is an inexplicably false assertion given that most of the alleged amounts due and owing were never added to the tax title—for example, the $600,500 in Chapter 40U fines (which were, as noted above, also rescinded anyway).

---

[5] Even if the City could and did appeal the Housing Court's revocation order, the order remains binding unless and until overturned or vacated. Thus, it is a false statement to convey that the fines at issue were merely suspended.

***During These Events, City Officials Launched a***
***Vicious Defamation Campaign Against WELP and Ms. Carabetta***

224.    As if the above events were not bad enough, they were made worse by a vicious, coordinated public campaign by Defendants to speak ill—and falsely—about WELP and Ms. Carabetta to the media.

225.    Arrigo, while Mayor, regularly berated Plaintiffs, including labeling them as "irresponsible and careless landlords." *Water's Edge Apartment owners release statement on 370 Ocean Avenue building*, THE REVERE JOURNAL, Jul. 27, 2022, at 1, 8.

226.    Also referring to Plaintiffs, Arrigo stated that "[t]his organization has acted more like a criminal organization than it has a property management company." *Revere seeks emergency action against property owner of condemned high-rise building*, CBS NEWS (Jul. 14, 2022), https://www.cbsnews.com/boston/news/revere-mayor-files-for-receivership-of-waters-edge/.

227.    Arrigo further commented that Plaintiffs have "total disregard for human dignity and decency" and, based on that falsity, threatened that "the city will take every legal action possible." *Id.*

228.    Moreover, Arrigo repeatedly accused Plaintiffs of committing "criminal" acts and threatened "to take every legal action available to hold the [Plaintiffs] accountable for their continued disregard for their properties and tenants."  Mark Herz, *Revere tenants still in limbo weeks after high-rise fire*, WGBH (Jul. 22, 2022), https://www.wgbh.org/news/local/2022-07-22/revere-tenants-still-in-limbo-weeks-after-high-rise-fire; Thea DiGiammerino, *Court Orders High-Rise Owners to Offer Temporary Housing for Residents After Fire*, NBC10 BOSTON (Aug. 27, 2022), https://www.nbcboston.com/news/local/court-orders-high-rise-owners-to-provide-temporary-housing-for-residents-displaced-by-fire/2819286/.

47

229.    The defamation was often directed personally at Ms. Carabetta. As just one example, a D'Ambrosio Firm attorney, arguing to condemn 364, stated that "Water's Edge Limited and Evelyn Carabetta … have utterly failed to satisfy the minimum standards for the health, safety, and well-being of their tenants under the state sanitary code. They have had an egregious history and repeated code violations. ... Over the past 20 months, Water's Edge has failed to take action … The residents are living in a moldy, rat-infested building with no fire alarm and no fire safety system. They have not paid their contractors or paid the city of Revere for the 24/7 fire protection in the building. They have not paid their taxes and they are delinquent on its mortgage." *364 Ocean Ave. building condemned*, THE REVERE JOURNAL, Sep. 4, 2024, at 1.

### *Ms. Carabetta Has Been Injured as a Result of Defendants' Actions*

230.    Ms. Carabetta has suffered greatly as a result of Defendants' actions.

231.    The stress associated with Defendants' actions have taken a toll on her physical and mental well-being.

232.    The loss of Water's Edge has been particularly devastating given that it was part of her father's legacy. When Joseph passed in 2025, it was clear by that point that Water's Edge would be lost. Ms. Carabetta had to grieve the loss of her father while dealing with this horrible reality.

233.    Ms. Carabetta has been humiliated by how Defendants have vilified her in the local media.

234.    In addition, Ms. Carabetta, as the ultimate owner of WELP, received profits from the management of Water's Edge. In the midst of coming out of COVID, Ms. Carabetta had financing lined up to reposition the buildings to generate substantial positive cash flow year after year. That revenue stream is now lost as well. And Ms. Carabetta lost substantial funds that she

48

personally poured into Water's Edge in an attempt to save it, now forever lost with the sale of Water's Edge for a reduced value.

### *Plaintiffs Have Timely Brought Suit*

235.   Plaintiffs' claims did not accrue until Defendants' continuing course of conduct resulted in the injury at issue—WELP being forced into bankruptcy and ultimately losing Water's Edge.

236.   Further, Plaintiffs were not aware of the fraud relating to the Chapter 40U fines committed against them until the filing of Ms. McCormick's Complaint in May 2024.

237.   WELP's claims are further timely under 11 U.S.C. § 108(a)(2) and the Modified Plan filed in this case, as confirmed by the Court. *See* ECF No. 539, ¶ 5.9.

### *Defendants Are Not Immune from Suit*

238.   Immunity afforded to public employees by M.G.L. c. 258 § 2 expressly excludes intentional torts from its waiver of sovereign immunity. *See* M.G.L. c. 258, § 10. As such, Defendants are not immune from suit under the Massachusetts Tort Claim Act.

239.   Further, Revere waived sovereign immunity relating to the objection, counterclaims, and claims herein when it filed its Proof of Claim. *See* 11 U.S.C. § 106.

240.   None of the Defendants, including those who are attorneys, are shielded from suit under any common law litigation privilege, as the subject predicate events occurred outside of judicial proceedings or are otherwise exempt from the privilege.

## CAUSES OF ACTION

### COUNT I
**Disallowance of the Entirety of the City's Claims**
**(Against City of Revere by WELP)**

241.    The allegations in Paragraphs 1 – 240 are repeated and realleged as if fully set forth herein.

242.    Pursuant to Bankruptcy Code Section 502(b), this Court is authorized to disallow the entirety of the City's claims.

243.    As detailed above, the City's demonization and unlawful pursuit of WELP has caused WELP to incur over $100 million in damages and immense reputational harm. Accordingly, WELP respectfully requests disallowance in full of all City claims, and return to WELP (with interest) of all amounts previously paid "On Account" as to such claims.

### COUNT II
**Declaratory Judgment**
**(Against City of Revere by WELP)**

244.    The allegations in Paragraphs 1 – 243 are repeated and realleged as if fully set forth herein.

245.    Pursuant to Fed. R. Bankr. P. 7001(i), Fed. R. Civ. P. 57, and 28 U.S.C. § 2201, this Court is authorized to issue a declaratory judgment where a "case of actual controversy" exists "within its jurisdiction" and may thus "declare the rights and other legal relations of any interested party seeking such declaration."

246.    As detailed above, an "actual controversy" exists between and among WELP and Revere regarding the validity of Chapter 40U fines on 370 that WELP has already paid the City and those that the City is still claiming, via its Proof of Claim, are due and owing to it on both 364 and 370, as well as the alleged fire watch fees and lien on 364.

50

247. As detailed above, the Chapter 40U fines are not valid, and should be declared as such. Moreover, the City should pay to WELP the $205,000 it extracted, the remaining alleged amounts owed of $600,500 on 370 and $28,500 on 364 should be stricken from the City's claim and denied, and Revere should be declared to be in violation of Chapter 40U because, among other things:

a. Revere issued Chapter 40U fines on 370 beginning in 2022 and totaling $30,000 per day, violating Chapter 40U's requirement that any fines issued be uniform, given that Revere was not ticketing any other property owner more than $490 per day;

b. Revere violated its 40U Rules by ticketing $30,000 per day when the maximum allowable under its rules was $490 per day;

c. Revere improperly based Chapter 40U fines on alleged violations under local ordinances inapplicable to vacant buildings and for alleged violations WELP had already corrected;

d. Revere rejected WELP's request to appeal all Chapter 40U fines under a consolidated appeal, and its appeal was heard by a member of Arrigo's staff who was not neutral, effectively eliminating WELP's appellate rights under Chapter 40U;

e. Revere, its officials, and its outside law firm falsely certified the fines on 370 such to be added to the WELP's tax bill;

f. The Housing Court revoked and rescinded all of the 370 Chapter 40U fines by Order dated May 13, 2024, thus to the extent there is any argument they were once valid, they are void and no longer exist;

g. Revere has falsely claimed in its Proof of Claim that $600,500 is still due and owing despite the Housing Court's Order revoking and rescinding these fines; and,

h. The $28,500 allegedly due and owing on 364 is also void because, like with 370, the City violated Chapter 40U and its 40U Rules in assessing these fines.

248. Given that the City continues to seek payment of the Chapter 40U fines from WELP via its Proof of Claim in this case, the fundamental disagreements between WELP and Revere

regarding the validity of the Chapter 40U fines cannot be resolved except by a declaration of this Court.

249. Therefore, WELP respectfully requests that this Court enter a declaratory judgment determining that: (a) any and all Chapter 40U fines on 364 and 370 alleged to be due and owing to the City are void; (b) the $205,000 extracted by the City from WELP previously was not legally due; (c) the City violated Chapter 40U with respect to these events; and (d) the City violated its own 40U Rules with respect to these events.

250. In addition, WELP requests a declaratory judgment that the entirety of the alleged $417,032 for the fire watches for 364 and the City's alleged lien on the property to secure such alleged debt are void because, among other reasons, neither the fees nor the purported lien are valid under M.G.L. c. 148, § 5.

## COUNT III
### Violation of 42 U.S.C. § 1983, Substantive Due Process
### (Against all non-City Defendants in their individual capacities by WELP)

251. The allegations in Paragraphs 1 – 250 are repeated and realleged as if fully set forth herein.

252. At all relevant times, WELP possessed a constitutionally-protected property interest in its Properties, Water's Edge.

253. Defendants engaged in conduct that shocks the conscience to deprive WELP of its property interest, in violation of its substantive due process rights under the Fourteenth Amendment.

254. Defendants all acted under color of state law either as officials elected to City leadership or employed by the City (Arrigo; Keefe; Capizzi; Wells; Viscay; Cavagnaro; Fabiano) or as de facto City officials (D'Ambrosio and the D'Ambrosio Firm).

52

255. For example, and as detailed above:

a. Following the fire at 370, D'Ambrosio, the D'Ambrosio Firm, Capizzi, and Wells acted in concert to impose unprecedented and unlawful $30,000 per day fines against WELP in blatant violation of the City's rules that no property owner be assessed more than $490 per day, in an obvious attempt to bury WELP financially;

b. Wells forged the signature of the City's Assistant Solicitor and 40U compliance officer in an attempt to falsely certify the 40U fines on 370 such that they could be added to WELP's tax bill;

c. Arrigo, Capizzi, Viscay, Cavagnaro, D'Ambrosio, and the D'Ambrosio Firm were all aware that Wells had forged Ms. McCormick's signature, and took no remedial action;

d. Arrigo rejected Ms. McCormick's pleas for help with the forgery and instead arranged a meeting to pressure her to falsely certify the fines;

e. Capizzi and Viscay openly pressured Ms. McCormick to falsely certify the fines;

f. Wells, D'Ambrosio, and the D'Ambrosio Firm actively participated in the false amended certification of the 40U fines such that they were added to WELP's tax bill;

g. The D'Ambrosio Firm represented that the 40U fines on 370 were still a valid debt owing to the City despite knowing they had been rescinded;

h. D'Ambrosio, the D'Ambrosio Firm, Wells, Cavagnaro, Capizzi, and Keefe all participated in the condemnation of 364, not for any legitimate purpose, but to further harm WELP and ensure payments of the illegal fire watch fees;

i. Cavagnaro and Fabiano actively and intentionally obstructed WELP's attempts to remediate 364 and 370 and get them back into full operation; and

j. D'Ambrosio and the D'Ambrosio Firm actively interfered with WELP's relationship with its lenders and prevented WELP from obtaining refinancing, ultimately leading to WELP's bankruptcy.

256. Defendants' actions shock the conscience. Instead of discharging their municipal duties faithfully and impartially, they specifically targeted a single property owner—WELP—for their own personal benefit and not for any legitimate City business, using methods such as forgery,

53

bullying of a City employee, misrepresentations made during judicial proceedings, and the secret alteration of a City website intended for use by residents.

257.    As a direct and proximate result of Defendants' conduct and reckless and callous disregard for WELP's constitutional rights, WELP has been financially ruined—including but not limited to the devastation of its refinancing efforts, harm to its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in the buildings. WELP seeks compensatory and punitive damages under § 1983 from Defendants, as well as reasonable attorneys' fees and all other damages recoverable by law.

<div align="center">

**<u>COUNT IV</u>**
**Violation of 42 U.S.C. § 1983, Equal Protection**
**(Against all non-City Defendants in their individual capacities by WELP)**

</div>

258.    The allegations in Paragraphs 1 – 257 are repeated and realleged as if fully set forth herein.

259.    Defendants, acting under color of state law, denied WELP fair treatment without equal protection of law in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

260.    Specifically, Defendants treated WELP differently than similarly situated property owners, including but not limited to:

a.  Following the fire at 370, Arrigo held an unprecedented press conference at the property where he vilified WELP and the Carabetta family, chilling WELP's efforts to refinance the property;

b.  Capizzi, Wells, D'Ambrosio, and the D'Ambrosio Firm hatched a plan after the fire at 370 to impose unprecedented $30,000 per day fines on WELP, purportedly under Chapter 40U;

c.  Upon information and belief, the City had never assessed any property owner more than $490 per day in Chapter 40U fines, let alone $30,000;

<div align="center">

54

</div>

d. Defendants continued to impose these daily fines even after WELP was actively remediating 370, in deviation from the City's practices with other property owners;

e. Defendants side-lined the City's 40U compliance officer and falsely certified the 40U fines for 370 using a special amended certification from the D'Ambrosio Firm;

f. Cavagnaro and Fabiano denied WELP's requests or permits routinely granted to property owners that were necessary for WELP to timely and effectively remediate 364 and 370; and,

g. Defendants misrepresented the need for condemnation of 364, which was done in part to secure the payment of allegedly overdue but illegal fire watch fees.

261. WELP was selectively treated by Defendants compared to other similarly situated property owners, and such selective treatment was caused by a malicious or bad faith intent to injure WELP.

262. As a direct and proximate result of Defendants' conduct and reckless and callous disregard for WELP's constitutional rights, WELP has been financially ruined—including but not limited to the devastation of its refinancing efforts, harm to its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in the buildings. WELP seeks compensatory and punitive damages under § 1983 from Defendants, as well as reasonable attorneys' fees, and all other damages recoverable by law.

## COUNT V
### Conspiracy to Violate Rights Pursuant to 42 U.S.C. § 1983
### (Against all non-City Defendants in their individual capacities by WELP)

263. The allegations in Paragraphs 1 – 262 are repeated and realleged as if fully set forth herein.

264. As described more fully above, Defendants, acting under the color of state law, deprived WELP of its property interest in Water's Edge, in violation of its substantive due process rights, and further denied WELP equal protection of law in violation of the Fourteenth Amendment of the United States Constitution.

55

265.    A conspiracy under Title 42 of the United States Code is an agreement between two or more people to engage in certain activities, including the deprivation of another person's rights or privileges, as was the case with WELP.

266.    As described above, Defendants conspired to drive WELP out of Revere and into insolvency by obstructing WELP from repairing its Properties, repeatedly dragging WELP into court in receivership actions, issuing unprecedented fines and obstructing WELP's ability to appeal them, unnecessarily condemning two apartment buildings under the guise of tenant safety, vilifying WELP to the press, and interfering with WELP's efforts to refinance the Properties. Ultimately, their actions resulted in the financial ruin of WELP, as intended.

267.    Defendants' joint plan and agreement to ruin WELP and deprive WELP of its constitutionally-protected rights were undertaken through the abuse of each of the Defendant's position of authority. This joint plan and agreement is evidenced by, among other things:

a. Capizzi's decision to sideline Ms. McCormick—who he knew would follow the law—to make way for D'Ambrosio and his firm to take over the 40U program with respect to 370 specifically;

b. Arrigo's decision to schedule a meeting to strongarm Ms. McCormick to falsely certify the 40U fines against WELP after she requested a confidential meeting, and the ensuing intimidation and attempted coercion of Ms. McCormick at this meeting by Capizzi and Viscay to force Ms. McCormick to sign the Certification despite their knowledge of the forgery;

c. D'Ambrosio joining in the attempts to have Ms. McCormick falsely certify the 40U fines against WELP, and when that did not work, directing Attorney Brunco of his firm to sign the false amended certification instead;

d. Cavagnaro and Fabiano actively obstructing WELP from making repairs necessary to stabilize its Properties to get them back into full operation; and,

e. Keefe, Capizzi, Cavagnaro, D'Ambrosio, and the D'Ambrosio Firm falsely representing that the condemnation of 364 was for the health and safety of the tenants but, in reality, was done at least in part to secure payment of allegedly overdue fire watch fees.

56

268.     As a direct and proximate result of Defendants' conspiracy and reckless and callous disregard for WELP's constitutional rights, WELP has been financially ruined including, but not limited to, the devastation of its refinancing efforts, harm to its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in the buildings. WELP seeks compensatory and punitive damages under § 1983 from Defendants, as well as reasonable attorneys' fees, and all other damages recoverable by law.

**COUNT VI**
**Fraud**
**(Against all non-City Defendants in their individual capacities by WELP)**

269.     The allegations in Paragraphs 1 – 268 are repeated and realleged as if fully set forth herein.

270.     The above-named Defendants engaged in a wide-ranging fraudulent scheme against WELP that led to its financial ruin and loss of Water's Edge, which was their goal.  At the most basic level, the fraud was perpetuated through Defendants feigning adherence to the City's codes, rules, and regulations while knowingly overriding and ignoring those requirements behind the scenes and instead using the powers of the City dishonestly to punish and harm Plaintiffs— with the end goal of defaming their character and taking away their property. In all actions undertaken by WELP to comply with City laws, restore the Properties, and interact with the City, WELP relied on Defendants' alleged good faith adherence to the City's requirements, and that WELP was being treated similarly to all other property owners.

271.     As set forth in more detail above, there were many aspects to this fraud, which included extracting knowingly illegal taxes from WELP. Namely, under Massachusetts law, the City was only permitted to assess taxes to WELP that were duly certified to the City's Assessor's

57

Office. Knowing this, Capizzi, Wells, Viscay, D'Ambrosio, and the D'Ambrosio Firm all knowingly participated in the false certification of the 40U fines on 370 for the FY23 tax bill.

272. As noted above, Wells participated in this scheme by forging Ms. McCormick's signature and then later falsely certifying the inclusion of the 40U fines for 370 specifically, which such false amended certification was relied upon by the City's Assessor's Office to add the fines to WELP's tax bill.

273. Arrigo participated in this scheme by scheduling a meeting to strongarm Ms. McCormick to falsely certify the 40U fines against WELP, after Ms. McCormick requested to meet with him in confidence to discuss the forgery of her signature.

274. Capizzi and Viscay participated in this scheme by pressuring Ms. McCormick to falsely certify the 40U fines against WELP, knowing that Wells had first attempted to forge her signature on the certification. Upon information and belief, both Capizzi and Viscay knew of, participated in, and/or approved the false amended certification signed by Wells and Attorney Brunco.

275. D'Ambrosio participated in this scheme by also joining in the attempts to have Ms. McCormick falsely certify the 40U fines against WELP and, when that did not work, directing Attorney Brunco of his firm to sign the false amended certification instead. D'Ambrosio also acted as the point person for Defendants and coordinated and/or directed the wrongful conduct described above.

276. The D'Ambrosio Firm participated in this scheme by and through D'Ambrosio directing an attorney of the firm, Attorney Brunco, to sign the false amended certification that was sent to and relied upon by the City's Assessor's Office, and by Attorney Brunco falsely attesting that the 40U fines against WELP had gone through "all required processes and protocols."

58

277.   The above Defendants' fraudulent scheme resulted in, among other things, the fraudulent tax bill on 370 that included $205,000 in 40U fines. And the scheme ultimately led to Plaintiffs losing Water's Edge. Defendants participated in this scheme and made the above false representations with the intent that the fines be added to the tax bill such that WELP would be forced to pay the fines.

278.   WELP reasonably relied upon these false representations, to wit, by processing and paying its tax bill that incorporated the false certification, of which WELP was not aware at the time.

279.   The above-named Defendants continued this scheme with later Chapter 40U fines on 370, totaling $600,500, falsely representing that these fines were being assessed pursuant to the City's Chapter 40U program (and purporting to use the standard form, signed by Wells) when in reality they were being assessed far outside of the City's Chapter 40U program and pursuant to a secret scheme to financially ruin WELP.

280.   WELP did not know at the time that Defendants had acted in concert to concoct the secret and unprecedented $30,000 per day scheme. Thus, WELP was forced to rely on their representations that the growing fines were assessed pursuant to the City's Chapter 40U program, therefore requiring WELP to administratively appeal the fines to the best of its ability before the Housing Court would consider rescinding them. This delay was devastating to WELP, as its refinancing efforts were destroyed in that interim period.

281.   The above-named Defendants engaged in many other instances of fraud against WELP. For example, Cavagnaro and Fabiano knowingly misrepresented certain State Sanitary Code and/or other safety requirements for repair work and remediation at 364 and 370 that simply did not exist, which WELP had to rely upon and comply with, severely delaying and obstructing

59

WELP's ability to bring the buildings back into good repair—which was Cavagnaro and Fabiano's intent.

282.    Further, Capizzi, D'Ambrosio, the D'Ambrosio Firm, Keefe, Cavagnaro, and Wells made false representations concerning the purported need for condemnation of 364, while concealing their true motives for condemnation (which included extracting payment of the illegal fire watch fees). WELP was forced to move tenants out of the buildings at its expense and incur other damages in reliance on and as a direct result of Defendants' misrepresentations.

283.    As yet another example, Capizzi, D'Ambrosio, and the D'Ambrosio Firm continued to falsely represent, including in the City's Proof of Claim, that the $600,500 allegedly owing in Chapter 40U fines on 370 were still valid even after the Housing Court unequivocally rescinded them.

284.    The above-named Defendants' false representations and material omissions were all done with the intention of defrauding WELP and financially ruining it.

285.    WELP reasonably relied upon Defendants' false representations and material omissions, ultimately causing it financial ruin. In particular, because these Defendants purported to act with the imprimatur of the City, WELP had no choice but to comply with their requests and demands in an effort to repair 364 and 370 and save Water's Edge. As such, WELP relied on the City's alleged good faith adherence to the City's requirements, and that WELP was being treated similarly to all other property owners.

286.    As a direct and proximate result of the above-named Defendants' fraud, WELP has been financially ruined including, but not limited to, the devastation of its refinancing efforts, harm to its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in the buildings.

60

## COUNT VII
### Aiding and Abetting Fraud
### (Against all non-City Defendants in their individual capacities by WELP)

287.    The allegations in Paragraphs 1 – 286 are repeated and realleged as if fully set forth herein.

288.    As detailed above, Capizzi, Wells, Viscay, Cavagnaro, Fabiano, Keefe, D'Ambrosio, and the D'Ambrosio Firm committed wide-ranging fraud against WELP, including, but not limited to: participating in a scheme to falsely issue unprecedented fines under the guise of the City's Chapter 40U program but in reality pursuant to a secret scheme against WELP; forging a City attorney's signature in an attempt to falsely certify the FY23 Chapter 40U fines on 370; signing a false amended certification for those same fines; representing that WELP needed to comply with certain State Sanitary Code or other safety requirements that did not exist to delay its repair of 364 and 370; and falsely representing that 364 needed to be condemned and concealing the true reasons for condemnation, which had nothing to do with the health and safety of tenants but in reality was done at least in part to secure payment of allegedly overdue fire watch fees.

289.    As stated more fully above, all these Defendants knew of and substantially assisted each other's fraud. For example, Wells had knowledge that Ms. McCormick had repeatedly objected to Capizzi about the unlawful 40U fines assessed against WELP and that these fines violated both Chapter 40U and the City's own 40U rules, and he substantially assisted the fraud by forging Ms. McCormick's signature on the 40U Certification.

290.    Arrigo had knowledge of the fraudulent and unlawful Chapter 40U fines through Ms. McCormick informing him that Wells had forged her signature. Arrigo also knew or should have known at this point that the entirety of the Chapter 40U fines assessed against WELP were not actually issued pursuant to the City's Chapter 40U program and instead were part of a

61

fraudulent scheme against WELP. Rather than honor Ms. McCormick's request for a confidential meeting, or report the forgery to appropriate City or State officials, or discipline Wells, or immediately direct that the purported 40U fines against WELP be removed from the FY23 certification, or take any other remedial action, Arrigo substantially assisted in this fraud by arranging a meeting attended by Wells, Capizzi, Viscay, D'Ambrosio, Attorney Brunco, and Cavagnaro with the express purpose of pressuring Ms. McCormick to falsely certify the 40U fines against WELP.

291.    At this meeting, despite their knowledge from Ms. McCormick that the 40U Certification was forged by Wells and the 40U fines were unlawful, Capizzi and Viscay substantially assisted in the totality of the fraud by intimidating and attempting to coerce her to sign the 40U Certification. D'Ambrosio also had knowledge of this fraud as he attended this meeting and substantially assisted in the fraud by directing Attorney Brunco of his firm to sign the false amended certification instead. Likewise, the D'Ambrosio Firm had knowledge of and substantially assisted in the fraud through the involvement of D'Ambrosio and Attorney Brunco in this scheme.

292.    The above Defendants were also aware of and substantially assisted the other instances of fraud cited above, including the obstruction of repair and remediation efforts at 364 and 370. For example, Arrigo furthered the scheme by vilifying WELP to the press and publicly supporting the other Defendants' actions against WELP.

293.    Upon information and belief, Capizzi, D'Ambrosio, the D'Ambrosio Firm, Keefe, Cavagnaro, and Wells all knew of and substantially assisted the fraudulent condemnation of 364, which Defendants falsely represented was for the health and safety of the tenants but, in reality,

was done at least in part to secure payment of allegedly overdue fire watch fees. These Defendants still internally and publicly assisted and supported these actions.

294. Cavagnaro and Fabiano both had knowledge of and substantially assisted in each other's obstruction of WELP's ability to bring 364 and 370 into good repair by working in concert to knowingly misrepresent certain State Sanitary Code and/or other safety requirements for repair work and remediation at 364 and 370 that simply did not exist.

295. As yet another example, Capizzi, D'Ambrosio, and the D'Ambrosio Firm knew that the 40U Fines assessed against WELP were unlawful and fraudulent, yet substantially assisted in trying to recoup these unlawful fines by falsely representing, including in the City's Proof of Claim, that the $600,500 allegedly owing in Chapter 40U fines on 370 were still valid even after the Housing Court unequivocally rescinded them.

296. As a direct and proximate result of Defendants' conduct in aiding and abetting each other's fraud, WELP has been financially ruined including, but not limited to, the devastation of its refinancing efforts, harm to its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in the buildings.

<div align="center">

**<u>COUNT VIII</u>**
**Common Law Civil Conspiracy**
**(Against all non-City Defendants in their individual capacities by WELP)**

</div>

297. The allegations in Paragraphs 1 – 296 are repeated and realleged as if fully set forth herein.

298. As detailed above, Capizzi, Wells, Viscay, Cavagnaro, Fabiano, Keefe, D'Ambrosio, the D'Ambrosio Firm, and Arrigo acted in concert and in furtherance of a common design or agreement to commit fraud against WELP.

<div align="center">63</div>

299.    This common scheme included but was not limited to, as noted above: falsely issuing unprecedented fines under the guise of the City's Chapter 40U program but in reality pursuant to a secret scheme against WELP; forging a City attorney's signature in an attempt to falsely certify the FY23 Chapter 40U fines on 370; signing a false amended certification for those same fines; representing that WELP needed to comply with certain State Sanitary Code or other safety requirements that did not exist to delay its repair of 364 and 370; and falsely representing that 364 needed to be condemned and concealing the true reasons for condemnation, which had nothing to do with the health and safety of tenants but in reality was done at least in part to secure payment of allegedly overdue fire watch fees.

300.    The existence of Defendants' common design or agreement is evidenced by, among other things, the joint participation of Capizzi, D'Ambrosio, Wells, Arrigo, Viscay, and Cavagnaro at the meeting intended to pressure Ms. McCormick to falsely certify the Chapter 40U fines on 370. Their common design or agreement is further evidenced by the fact that Defendants' actions individually and in concert deviated in every way from the City's official procedures and practices with respect to all other property owners in the City; it was no accident or coincidence that each Defendant was targeting WELP in unique ways.

301.    Alternatively, Capizzi, Wells, Arrigo, Viscay, Keefe, D'Ambrosio, the D'Ambrosio Firm, Cavagnaro, and Fabiano—all purporting to wield the power and imprimatur of the City— acted in concert against WELP to force it into bankruptcy and strip it of Water's Edge, and in doing so combined to form a peculiar power of coercion over WELP, which they would not have had individually.

302.    For example, and as noted more fully above:

a. Capizzi abused his decision-making authority as City Solicitor to approve 40U fines in an unprecedented and illegal amount of $30,000 per day against WELP, and D'Ambrosio and the D'Ambrosio Firm helped hatch the plan to do this;

b. Wells signed off on each illegal 40U fine against WELP and later forged Ms. McCormick's signature on the certification to add the fines to WELP's tax bill;

c. Arrigo knew of the forgery and arranged a meeting to pressure Ms. McCormick to falsely certify the 40U fines against WELP;

d. Viscay knew of the forgery and personally pressured Ms. McCormick to falsely certify the 40U fines against WELP;

e. Cavagnaro knew of the forgery and did nothing to intervene with the other Defendants' fraud on WELP;

f. Cavagnaro actively obstructed WELP's efforts to remediate 364 and 370 including by slow-walking or failing to approve necessary permits;

g. Fabiano obstructed WELP's efforts to remediate 370 by refusing to allow electricity there as needed to prevent mold, for no valid reason;

h. Keefe, Capizzi, D'Ambrosio, D'Ambrosio LLP, Cavagnaro, and Wells falsely represented that the condemnation of 364 was for the health and safety of the tenants but, in reality, was done at least in part to secure payment of allegedly overdue fire watch fees;

i. D'Ambrosio and D'Ambrosio LLP actively participated in all these events, including when Attorney Brunco signed the false amended certification to include the 40U fines against 370 on the FY23 tax bill; and

j. Defendants acted in concert to commit other misconduct against WELP, including but not limited to the unnecessary and illegal condemnations of 364 and 370, the imposition of illegal fire watch fines and lien, and the public defamation of WELP.

303. Ultimately, through the abuse of each of the Defendant's position of authority, as evidenced by the above conduct, Defendants gained a peculiar power of coercion over WELP that they would not have individually, and acted in concert to target WELP, condemn and take control of its Properties, and drive WELP into financial ruin.

304. As a direct and proximate result of Defendants' conspiracy, WELP has been financially ruined including, but not limited to, the devastation of its refinancing efforts, harm to

65

its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in

the buildings.

<div align="center">

**COUNT IX**
**M.G.L. c. 93A**
**(Against D'Ambrosio, in his individual capacity, and the D'Ambrosio Firm by WELP)**

</div>

305.    The allegations in Paragraphs 1 – 304 are repeated and realleged as if fully set forth

herein.

306.    Massachusetts General Laws Chapter 93A, § 2 prohibits unfair or deceptive acts in

the conduct of trade or commerce. Chapter 93A, § 11 applies to an entity like WELP "who engages

in the conduct of any trade or commerce and who suffers any loss of money or property, real or

personal, as a result of the use or employment by another person who engages in any trade or

commerce of an unfair method of competition or an unfair or deceptive act or practice …"

307.    D'Ambrosio and his law firm, the D'Ambrosio Firm, committed the following

unfair and deceptive acts, among others:

  a.  D'Ambrosio and the D'Ambrosio Firm hatched a plan to impose unprecedented
      and unlawful $30,000 per day fines against WELP in blatant violation of the City's
      40U Rules that no property owner be assessed more than $490 per day—the very
      40U Rules that the D'Ambrosio Firm helped create;

  b.  D'Ambrosio and the D'Ambrosio Firm participated in the fraudulent certification
      of the 40U fines against WELP, including when D'Ambrosio directed Attorney
      Brunco to sign the false certification; and

  c.  The D'Ambrosio Firm obstructed WELP's efforts to refinance with its lender by,
      among other things, sending letters to M&T Bank alleging that WELP owed
      $600,000 in unlawfully imposed Chapter 40U fines.

308.    The unfair and deceptive acts committed by D'Ambrosio and the D'Ambrosio Firm

occurred in the conduct of trade or commerce, as they purported to act during these events as the

City's outside counsel, for which they would receive payment of their fees and costs. Further, upon

<div align="center">

66

</div>

information and belief, all or many of their actions described herein were motivated by a desire to enrich themselves—including by proliferation of additional legal work and fees.

309.    As a direct and proximate result of D'Ambrosio and the D'Ambrosio Firm's unfair and deceptive acts, WELP has been financially ruined including, but not limited to, the devastation of its refinancing efforts, harm to its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in the buildings. Furthermore, because D'Ambrosio and the D'Ambrosio Firm's unfair and deceptive acts were willful and knowing, WELP seeks treble damages under M.G.L. c. 93A as well as its attorneys' fees.

## COUNT X
**Defamation**
**(Against Arrigo and Keefe, in their individual capacities, by WELP and Ms. Carabetta)**

310.    The allegations in Paragraphs 1 – 309 are repeated and realleged as if fully set forth herein.

311.    As set forth more fully above, Arrigo published statements of fact to the public and/or local media, accusing Plaintiffs of criminal behavior and a "total disregard for human dignity and decency," among other false statements.

312.    In addition, and also as set forth more fully above, Keefe published statements of fact to the public and/or local media about Plaintiffs that were likewise false, including but not limited to calling Plaintiffs "negligent" and stating they had "a total disregard for [tenant] wellbeing and dignity."

313.    These statements were false and untrue.

314.    Arrigo's and Keefe's statements about Plaintiffs to the public are not protected by any privilege and/or other defense.

67

315.    Arrigo and Keefe each made these statements with knowledge that they were false or, at a minimum, with reckless or wanton disregard for the truth.

316.    These statements proximately and directly caused harm to Plaintiffs' reputation in the community and caused economic loss, or alternatively they were of the type that are actionable without proof of economic loss.

## COUNT XI
### Intentional Interference with an Advantageous Business Relationship
**(Against D'Ambrosio, in his individual capacity, and the D'Ambrosio Firm by WELP)**

317.    The allegations in Paragraphs 1 – 316 are repeated and realleged as if fully set forth herein.

318.    As described more fully above, WELP reasonably expected future economic benefits from an advantageous business relationship with M&T Bank, its lender, as well as Newburyport Bank and Middlesex Federal Savings Bank.

319.    D'Ambrosio and the D'Ambrosio Firm knew that M&T Bank was WELP's lender and that WELP was actively working together with the bank to refinance its note to secure the necessary funding to bring 364 and 370 back into good repair. Upon information and belief, these Defendants were also aware that WELP had been working closely with other potential lenders, including Newburyport Bank and Middlesex Federal Savings Bank, to refinance its debt on the buildings and free up necessary cash flow.

320.    As set forth more fully above, D'Ambrosio and the D'Ambrosio Firm intentionally and unnecessarily interfered with the foregoing business relationships, including by sending letters to M&T Bank's counsel asserting that $600,000 was allegedly due in 40U fines at 370, which they knew were subject to challenge in ongoing litigation. Further, though those fines were later

68

rescinded by the Housing Court, these Defendants still represented that they were due and owing thereafter.

321.    D'Ambrosio and the D'Ambrosio Firm had improper motives in communicating with M&T Bank, including to obstruct WELP's efforts to refinance and retain Water's Edge.

322.    D'Ambrosio and the D'Ambrosio Firm knowingly induced M&T Bank to forego future relations with Plaintiffs, as M&T severed its relationship with Plaintiffs, stopped refinancing efforts, and sold the note upon learning of the purported 40U fines on 370.

323.    As a direct and proximate result of Defendants' actions, WELP has been financially ruined including, but not limited to, the devastation of its refinancing efforts, harm to its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in the buildings.

## COUNT XII
### Malicious Prosecution
**(Against Capizzi and D'Ambrosio, in their individual capacities, and D'Ambrosio, LLP, by WELP)**

324.    The allegations in Paragraphs 1 – 323 are repeated and realleged as if fully set forth herein.

325.    Capizzi, D'Ambrosio, and the D'Ambrosio Firm decided to pursue and file complaints in the Housing Court seeking to appoint receivers for 364 and 370.

326.    The complaints were brought with malice and without probable cause, as there was no legitimate legal basis for these Defendants to seek appointment of a receiver on the Properties at the time the complaints were filed and on the bases purportedly cited therein.

327.    For example, Defendants purported to reply on past events predating the emergency situations at 364 and 370, which had all been resolved pursuant to agreements between WELP and the City.

69

328.    In both cases, the Housing Court refused to grant the City's request for a receiver and thus the requests for receivership terminated in WELP's favor.

329.    As a direct and proximate result of the filing and prosecution of these cases by Defendants, WELP has been financially ruined including, but not limited to, the devastation of its refinancing efforts, harm to its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in the buildings.

## COUNT XIII
### Abuse of Process
**(Against all non-City Defendants in their individual capacities by WELP)**

330.    The allegations in Paragraphs 1 – 329 are repeated and realleged as if fully set forth herein.

331.    The above-named Defendants, as set forth more fully above, abused various processes for an ulterior or illegitimate purpose. This included but is not limited to: the purported use of Chapter 40U to impose unprecedented $30,000 per day fines pursuant to a secret scheme that fell far outside the City's 40U Rules (Wells, Capizzi, D'Ambrosio, and the D'Ambrosio Firm); the false certification of the FY23 Chapter 40U fines against WELP (Arrigo, Capizzi, Wells, Viscay, Cavagnaro, D'Ambrosio, and the D'Ambrosio Firm); the condemnation of 364 and 370 for improper purposes, not for the health or safety of tenants (Cavagnaro, Capizzi, Wells, D'Ambrosio, and the D'Ambrosio Firm); the pursuit of appointment of receivers for 364 and 370 despite WELP's ongoing good faith efforts to remediate the Properties (Capizzi, D'Ambrosio, and the D'Ambrosio Firm); the denial of necessary permits for WELP to remediate 364 and 370, and the imposition of purported requirements that did not exist under the State Sanitary Code or otherwise (Cavagnaro); and, the refusal to allow emergency remediation of 370, including the safe use of electricity to prevent mold growth (Fabiano and Cavagnaro).

332.    Defendants abused the above processes to ensure that WELP could not make necessary repairs to the Properties; to ensure that it would be financially buried in illegal fines; and to obstruct it from refinancing its note or otherwise obtaining the necessary financing to repair the buildings and retain Water's Edge.

333.    Defendants' abuse of process is evidenced by the fact that they treated WELP differently than any other property owner in the City, and actively obstructed, rather than helped, WELP's efforts to bring the buildings back in good repair for safe occupancy by tenants.

334.    As a direct and proximate result of Defendants' actions, WELP has been financially ruined including, but not limited to, the devastation of its refinancing efforts, harm to its reputation, the filing of bankruptcy, the sale of Water's Edge, and the loss of WELP's equity in the buildings.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.    Disallow in full all City Claims, and order disgorgement, with interest at the same rates as previously imposed by the City on WELP, of all amounts provisionally paid "On Account" by WELP, as well as disgorgement of all amounts paid prior to the commencement of this case and during the pendency of this case by WELP on account of amounts illegally asserted by the City, and on account of its other claims that were paid by WELP in an effort to minimize the harm suffered by WELP by the wrongful conduct described herein;

B.    Enter a declaratory judgment as requested in Count II;

C.    Enter judgment in Plaintiffs' favor and against each Defendant, jointly and severally, on each Count of this Complaint;

D.    Award Plaintiffs damages in an amount to be calculated at trial, along with pre- and post-judgment interest, costs, and expenses;

71

E.      Award Plaintiffs reasonable attorneys' fees incurred in connection with this litigation, pursuant to 42 U.S.C. § 1988, and any other applicable statute or law;

F.      Award Plaintiffs treble damages under M.G.L. c. 93A, as well as attorneys' fees and costs; and

G.      Grant Plaintiffs such other relief as the Court deems equitable and just.

Respectfully Submitted,

WATER'S EDGE LIMITED PARTNERSHIP
and EVELYN M. CARABETTA,

By their attorneys,

/s/ *William C. Nystrom*
William C. Nystrom (BBO No. 559656)
Christine M. Kingston (BBO No. 682962)
Sean P. Kelly (BBO No. 704226)
Alden Piper (BBO No. 713549)
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, MA 02210
(617) 778-9100
wnystrom@nbparis.com
ckingston@nbparis.com
skelly@nbparis.com
Dated: May 15, 2026            apiper@nbparis.com

**CERTIFICATE OF SERVICE**

I, William C. Nystrom, hereby certify that on this 15th day of May, 2026, I caused a copy of the foregoing Amended Objection to Claim, Counterclaims, and Pendent Claims to be served by the Court's CM/ECF system upon all parties entitled to notice thereunder.

*/s/ William C. Nystrom*