4/4

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

HOUSING COURT DEPARTMENT
EASTERN DIVISION
DOCKET NO. 19-CV-0521

JOCELYN SIERRA and BALMIRO RUIZ

Plaintiffs

v.

WATER'S EDGE LIMITED PARTNERSHIP

Defendant

MEMORANDUM OF DECISION AND ORDER AFTER TRIAL

This long-delayed civil action originally commenced in June of 2019 as a

summary process action by Water's Edge Limited Partnership ("Water's Edge") against

Jocelyn Sierra ("Sierra") and Balmiro Ruiz ("Ruiz") (together, "the Tenants") seeking

possession of an apartment unit located at 370 Ocean Avenue, Unit 701, Revere,

Massachusetts ("the Unit") for alleged non-payment of rent. The Tenants timely

responded to the Summary Process Summons and Complaint with an Answer,

Counterclaim, and Request for Jury Trial.   On August 20, 2019, by agreement of the

parties, Water's Edge's claim for possession and rent was dismissed, and the Tenants'

counterclaims were transferred to the civil docket.

On January 8, 2020, this Court (Malamut, J.) issued a Scheduling Order setting for

the time frame for various discovery-related events in the litigation.  Shortly thereafter,

none of these time frames were possible because of COVID-related interruptions of court

procedures. The case was dormant until December of 2021, when this Court (Kelleher, J.) conducted a case management conference and thereafter issued another Scheduling Order dated December 3, 2021.

Thereafter, there were failed attempts at mediation and at least two more amended scheduling orders before the parties reported the case as settled in December of 2022, and a 45-Day Nisi Order was issued on December 8, 2022.

In January of 2023, the Tenants filed a motion to return the case to the trial schedule, which was allowed in February of 2023. The case was thereafter mistakenly scheduled for a bench trial.

The case was reassigned to the Second Session in May of 2023. At that time, this judge issued a Revised Final Pretrial Order dated May 11, 2025. That Order scheduled a Final Pretrial Conference for November 16, 2023 and a Jury Trial to commence on December 4, 2023.

When the parties failed to prepare the joint pretrial memorandum, along with other jointly-prepared items required by this judge in preparation for a jury trial, this Court threatened to strike the jury demand if they did not file the required items by November 22, 2023. On November 22, 2023, the parties filed a jury waiver. The matter was scheduled for a trial to commence on January 31, 2024.

The trial occurred over two days commencing January 31, 2024 with the direct examination and cross-examination of Ruiz and continued on March 27, 2024 with the direct and cross-examination of Sierra and the direct examination of Aldo Parnasso (the Operations Manager for Water's Edge's management company.) The case was continued to November 15, 2024 for the purpose of continuing the direct and cross-examination of

2

Aldo Parnasso, but this witness failed to appear for the trial. This Court ultimately declared the trial over and took the matter under advisement to write the trial decision.

Shortly thereafter - before this Court could begin to prepare the trial decision - Water's Edge filed for bankruptcy protection with the United States Bankruptcy Court for the District of Massachusetts, and that an automatic stay was put in effect. Thus, this Court necessarily stayed the drafting and issuance of a trial decision.

On April 25, 2025, the Bankruptcy Court (Panos, J.) issued an Order Modifying the Automatic Stay to permit this Court to issue a judgment in this case. This Order only permits this Court to draft a decision and enter judgment, but does not permit this Court to conduct any further proceedings, enforcement, or processing of appeals without further express order of the Bankruptcy Court.

Mindful of these limitations, this Court finds as follows with respect to the issues before the Court in this action based upon all the credible testimony and evidence presented at trial[1] and the reasonable inferences drawn therefrom.

## FINDINGS OF FACT

At all times relevant to this action, Water's Edge owned a residential complex consisting of several high-rise buildings located at 364, 370 388, and 394 Ocean Avenue in Revere, Massachusetts ("the Complex").[2] At the time of most events alleged in this

---

[1]     The Court's findings of fact are drawn from the credible parts of the testimony of witnesses Ruiz, Sierra, and Aldo Parnasso, as well as from the evidence drawn from the documents admitted as exhibits at the trial. Virtually all of the testimony of Ruiz and Sierra was uncontradicted and highly credible. Aldo Parnasso, who testified on behalf of Water's Edge, was neither the property manager nor routinely working at the Building during the time of the complained-of events. Moreover, he failed to appear to complete his testimony on November 15, 2024, the scheduled third day of trial. Thus, this Court has been obliged to parse out the morsels of Aldo Parnasso's testimony to determine his credibility on relevant topics.

[2]     It is unclear to this Court — as of the date this decision is being drafted — whether Water's Edge still owns the Complex.

action, the Complex was managed – to some extent - by the Carabetta Company, an entity closely related to Water's Edge because Carabetta family members are involved with both entities. According to Aldo Parnasso, the Director of Operations for the Carabetta Company, his organization "takes care of" contract work and capital improvements at the Complex.

Sierra and Ruiz got married in March of 2017 and "dreamed of having a place by the ocean." About 15 days after their wedding, Water's Edge's Leasing Agent, Allison Bradley, and Water's Edge's Assistant Property Manager, John Bassar, gave Sierra and Ruiz a tour of a few apartments at the building located at 370 Ocean Avenue, Revere, Massachusetts ("the Building"). While Sierra and Ruiz were touring apartments in the Building, Water's Edge's agents pointed out the Building's "amenities" including the pool, gym, laundry, covered parking and security.

Of the apartments Sierra and Ruiz toured, Unit 701 ("the Unit") was the nicest because the Unit had a full ocean view from the seventh floor. They also liked that heat and hot water were included in the rent, and that the Unit as a three-minute walk to the Blue Line T station. They were impressed by the garage parking and the laundry facilities on every floor. Thus, Sierra filled out a leasing application for the Unit.

On April 1, 2017, Sierra and Ruiz (together, "the Tenants") signed an Apartment Lease Contract ("the Lease") dated March 31, 2017 relative to the Unit. Kim O'Keefe signed the Lease on behalf of Water's Edge on April 13, 2017. [By stipulation of the parties, a copy of the Lease was entered into evidence at trial as Exhibit 1.]

Under the terms of the Lease, the Tenants' tenancy commenced on April 1, 2017 and ended on April 1, 2018. Lease, ¶ 3. The agreed-upon rent under the Lease was $2,060.00 due on the first day of each month, with a late fee of $50.00 to be assessed if rent was more than 30 days overdue. Lease, ¶ 6. Included within the rent was heat, hot water, air conditioning, water, and trash, but not electricity, which was separately metered to each tenant. Lease, ¶ 7. In addition to rent for the Unit, the Tenants agreed to pay an additional $50.00 per month for garage parking as set forth in the Resident Parking Addendum to the Lease.

Paragraph 4 of the Lease indicates that the Tenants presented to Water's Edge a security deposit in the amount of $2,010.00 at the time they executed the Lease.

After the Tenants moved into the Property on April 1, 2017, they discovered that the conditions at the Unit and at the Property were far from what they were led to believe.

On April 15, 2017, the Tenants filled out an Apartment Condition Statement listing conditions in the Unit at the time they moved in. The Apartment Condition Statement was signed by "Kim O'Keefe" for Water's Edge on April 18, 2017. [A copy of the Apartment Condition Statement was entered into evidence as Exhibit 2.] The Apartment Condition Statement included issues with a malfunctioning air conditioner, 3 electrical outlets not working, toilet in the first bathroom kept running, broken kitchen cabinet drawer, problems with adhesive on kitchen shelves, broken refrigerator bottom shelf, paint blistering in the bathroom, patched tiles in the kitchen, and hard-to-open sliding doors and windows.

5

According to a Work Order/Resident Service Request form apparently created by Water's Edge's management [a copy of which was entered into evidence as Exhibit 3], Water's Edge sent maintenance staff to correct the conditions cited in the Apartment Condition Statement on April 19, 2017.   There appears to be no apparent dispute that two new outlets were installed in the living room, a new handle was installed on the toilet in the first bathroom, a kitchen drawer was replaced, shelf laminate was re-glued, the bottom shelf of the refrigerator was replaced, and rollers were replaced and lubricated for the sliding windows and doors.

Later in April, the Tenants discovered mice in the kitchen, living room and dining room of the Unit.   They first verbally complained to management, and then sent a written complaint.   Their complaint was turned into a work order for extermination.   [A copy of a work order relative to the extermination of mice was entered into evidence as Exhibit 4.] Thereafter, Water's Edge conducted exterminations, but the mice issue was never completely resolved.   Mice were frequently observed in the common areas of the Building.

Soon after moving in, Ruiz entered the pool area and discovered that the pool was dirty – not in a hygienic condition to be used.   There was trash strewn around the pool, a green stain over the water, and cockroaches around the pool. Thereafter. the pool door was always locked.   To get into the pool area, he had to go to the office to ask for access.

Ruiz also entered the gym and discovered that the machines were obsolete.   The room was very humid and "smelled ugly."   After discovering the true condition of the gym, Ruiz never used it.

6

The first Saturday after the Tenants moved in, they were planning on doing laundry using the machines on their floor. They quickly discovered that the washing machine on the 7th floor was filled with water and had a bad smell. The Tenants reported this condition to Water's Edge's management and were told to use the laundry machines on the 11th floor. Instead of repairing the broken machines, Water's Edge allowed the laundry machines to remain in a broken and unusable condition for more than a year. The Tenants were uncomfortable carrying laundry to other floors looking for available laundry machines, especially since many of the machines on other floors were not functioning either. Thus, the Tenants were obliged to bring their laundry to a laundromat on Shirley Avenue at greater expense.

According to Aldo Parnasso, new laundry machines were finally installed in August of 2019. Sierra was very happy when the new machines came because she would be able to load money onto a card and pay for laundry using the card. However, it was not long before the laundry card machine was broken and never fixed. The "solution" was to pay cash to Water's Edge's management, who would then load money onto the laundry card so that Sierra could do the laundry.

The Tenants were required to pay an additional $50.00 per month on top of their rent for the privilege of parking in the Building's "secured" garage. In theory, the garage was accessible by remote control device which would open and close the garage door. In reality, the garage door was left open 80% of the time and no security was present at the site. Ruiz observed that homeless people could get into the Building through the open garage door and into the first-floor lobby. Ruiz was afraid for the security of himself and his car. Ruiz complained to a person named "Leslie" about these issues.

7

While the garage doors were mostly left open, there was one occasion when Ruiz was late to work because the garage door was stuck closed and he could not get out of the garage.

The elevators in the Building became an issue soon after the Tenants moved in. For many months, only one elevator in the Building was working. Whenever the Tenants tried to take the elevator, they would have "to wait and wait and wait," sometimes waiting as long as 20 minutes for the elevator to arrive. Starting on February 16, 2018 and continuing for a period of 54 days, there were no working elevators servicing the high-rise Building. According to Aldo Parnasso, "the State" shut down the elevators in February of 2018.

On March 5, 2018 – 17 days after both elevators in the Building stopped functioning - Water's Edge and the Otis Elevator Company entered into a Standard Form of Contract Agreement and Scope of Work Between Owner and the Contractor ("Elevator Installation Contract") relative to the installation of a "Complete and Operational, Federal, State, and Municipal Code Compliant, State of the Art Turn Key Modernized Elevator System[."] [A copy of the Elevator Installation Contract was entered into evidence as Exhibit 6.] Aldo Parnasso testified that he was "personally involved" in reviewing the Elevator Installation contract.

The total lack of elevators for a protracted period was a significant hardship to both Tenants.

For Sierra, who works at Harvard University as a staff assistant, she would need to climb down flights of stairs from the 7th floor Unit, walk to the Blue Line station, change

8

to the Red Line, and then walk over a bridge to the Harvard Business School. At the end of every exhausting day, she had the same one-hour long reverse commute and then had to climb the stairs to the 7th floor Unit. This was particularly challenging when she had to climb the stairs with laundry and/or groceries. Equally troubling, Sierra "did not know what [she] would find walking on the stairs." She observed no security in the Building, and found trash in the staircases. Sierra implied that she feared that unknown people entering the unsecured Building could be lurking in the stairwells.

For Ruiz, the lack of elevators was worrisome because he has a variety of health conditions and is overweight. Climbing up to the 7th floor Unit was difficult for him. Along the way up the stairs, he found lots of trash and used needles. He observed that the homeless people getting into the Building through the open garage door could also enter the staircases to inject themselves with drugs. Ruiz specifically worried that these people, if found in the staircases, could hurt him physically.

Ruiz complained to management verbally – not in writing – concerning the homeless people in the common areas.

The Tenants had no direct communication with Water's Edge's management during the time the elevators were not working. They received no emails or communications from management. The only communication was a "posted" notice that management would offer $150.00 per night compensation for a hotel and food allowance. The Tenants did not accept the posted offer because there was no hotel convenient to the Blue Line available for $150.00 per night.

9

The intercom system in the Building did not work when the Tenants moved into the Unit. Sierra complained to Water's Edge's management. Nothing was done; the intercoms never worked at any time the Tenants lived at the Unit. Aldo Parnasso "personally never used the intercom system."

Aldo Parnasso testified that at some point, Water's Edge upgraded the security system at the Complex to install 927 cameras among the four buildings in the Complex. Aldo Parnasso claimed it was a "closed circuit system" accessible to management through a log-in system. He did not indicate who – if anyone – was monitoring the input of the cameras.

In June of 2021 or 2022[3], a fire broke out on the roof at the 11th floor of the Building. Sierra was at work when the fire started; her two children were at home. The firefighting efforts in the Building caused water to infiltrate into the Unit. Water accumulated in a light fixture. An air conditioner leak damaged the furniture and carpeting in the master bedroom and in the guest room. Water's Edge took "months" to repair the leaks, but did not replace the carpet. The Tenants threw away the damaged furniture. Aldo Parnasso testified that he was unable to view any footage to determine the cause of the roof fire because there were no cameras installed on the 11th floor roof.

The Tenants moved out of the Unit on August 31, 2022. There is no apparent dispute that, after the Tenants moved out, Water's Edge returned to them their security deposit, minus $300.00 for "attorney's fees."[4]

---

[3]  Sierra testified that the fire occurred in June of 2021. Aldo Parnasso testified that the fire occurred in June of 2022.

[4]  Neither party introduced into evidence the accounting for the Tenants' security deposit.

10

According to Aldo Parnasso, the Building is "not operational now."

## RULINGS OF LAW

As noted at the outset of this decision, the causes of action under consideration in this civil action are the six counts asserted in the Answer, Counterclaim, and Request for Jury Trial filed in the original summary process action.  The Tenants asserted counterclaims for:  (Count I) breach of the covenant of quiet enjoyment under G.L. c. 186 § 14, (Count II) breach of contract, (Count III) breach of the warranty of habitability, (Count IV) Interference with Quiet Enjoyment, (Count V) Negligence, and (Count VI) violation of the consumer protection statute, G.L. c. 93A.  All these claims arise out of the same facts and caused the same injuries.  Thus, the questions for this Court are (a) which of these claims have been proven and (b) which of the proven claims renders the highest damages for the Tenants.

To be clear, this Court finds that there was no time during the Tenants' tenancy when they received the benefit of their bargain.  At the commencement of their tenancy, the Tenants were led to believe that they were renting a unit in a "luxury" oceanfront apartment complex with a year-round pool, adjacent garage parking, laundry facilities and other amenities.  They never had a usable pool, the parking was unsecured, the laundry facilities were frequently broken, there was no working intercom system, security throughout the Building was virtually non-existent and for a period of months, they were

---

This Court cannot ascertain whether the Tenants' security deposit was returned in accordance with G.L. c. 186 §15B.

unable to access their 7th floor Unit by elevator and were forced to climb unsecured staircases littered with trash and used needles.

This Court is persuaded that Water's Edge failed to comply with its obligations under the Lease and under Massachusetts law to provide safe and habitable housing for the Tenants. It appears to this Court that the Building was spectacularly mismanaged before and during the Tenants' tenancy. This Court finds that the Tenants were directly and substantially harmed by the substandard on-going conditions at the Property. Thus, this Court shall analyze the various counts in the Tenants' complaint.

Breach of Covenant of Quiet Enjoyment

The Tenants assert two nearly identical "quiet enjoyment" claims, which this Court infers was unintentional. The quiet enjoyment statute, G.L. c. 186 G.L. c. 186 § 14 provides that any landlord who "directly or indirectly interferes with the quiet enjoyment of any residential premises" shall be liable for actual or consequential damages or three months' rent, whichever is greater, together with reasonable attorney's fees.

To prove their claim, the Tenants do not need to prove that the conduct of Water's Edge in allowing the Property to remain in a substandard condition was "intentional" or that Water's Edge had "malicious intent." Simon v. Solomon, 385 Mass. 91, 101 (1982). They only need to prove that Water's Edge's acts or omissions impaired the character and the value of their Unit in the Building. Doe v. New Bedford Housing Authority, 417 Mass. 273, 284-285 (1994). Put differently, the Tenants must demonstrate that the breach is a "natural and probable consequence of what the landlord did, what [their landlord] failed to

do, or what [their landlord] permitted to be done." Id., quoting Blackett v. Olanoff, 371 Mass. 714, 716 (1977).

This Court finds that Water's Edge's failure to take prompt and effective actions to correct serious defective conditions affecting the Unit and the common areas of the Building – for which Water's Edge had notice - constitutes a breach of the covenant of quiet enjoyment for which damages may be assessed.

The usual measure of damages for breach of the covenant of quiet enjoyment is lost rental value, that is, "the difference between the value of what the lessee should have received and the value of what he did receive." Darmetko v. Boston Housing Authority, 378 Mass. 758, 761 n. 4 (1979) G.L. c. 186, § 14 additionally allows tenants to recover "actual and consequential damages." This provision "was intended to expand the damages recoverable for breach of the covenant of quiet enjoyment," allowing tenants to be compensated for "all reasonably foreseeable losses—personal as well as economic— within the scope of statutory recovery." Accordingly, the Tenants are entitled to recover for all such losses attributable to Water's Edge's interference with their use of the laundry facilities, pool, parking, and elevators, as well as the issues in the Unit.

The Court heard testimony that Sierra was sometimes obliged to use outside laundry facilities, inferring that this endeavor added extra cost to each load of laundry. However, this Court heard no specific evidence concerning how many times the laundry was taken out and what the difference in cost was for using the Building's laundry facilities versus outside-the-Building laundry facilities. Similarly, the Court heard no specific evidence of personal or economic injury caused to the Tenants from the lack of

13

access to the pool, the diminished access to the parking garage, or the non-existence of elevators.

Thus, the Tenants' damages under this cause of action equals the loss of rental value, plus costs, plus attorney's fees, or, in the alternative, three times the amount of their rent plus costs, plus attorney's fees.

Breach of Contract

The Tenants assert a claim for breach of contract on the theory Water's Edge failed to deliver fully habitable premises as promised in the Lease. While there is ample evidence to support such a breach of contract claim, there is no evidence of any damages separate from those caused by Water's Edge's failure comply with its obligation under Massachusetts law to provide safe and habitable housing.

Breach of the Implied Warranty of Habitability

Existing within every residential tenancy in Massachusetts is an implied warranty from the landlord that the premises are fit for human habitation. Boston Housing Authority v. Hemingway, 363 Mass. 185, 199 (1973). A landlord is in breach of this implied warranty when defects exist which may materially affect the health or safety of occupants. Id. Strict liability is imposed on the landlord starting from (a) the commencement of the tenancy if the condition existed at the time the tenancy commenced or (b) as of the date the landlord was put on notice or became aware of the condition. The breach continues until the defect is remedied.

In this case, it is clear that Water's Edge was put on notice of defects within the Unit and the Building based on the uncontroverted testimony of Sierra and Ruiz, who

14

reported substandard conditions to Water's Edge' management regularly. This Court finds that there was a breach of the warranty of habitability affecting the Tenants' tenancy from the time they moved in – and throughout the duration of their tenancy.

The measure of damages for breach of warranty of habitability is the diminution of value of the Unit for the period when the Unit as affected by the substandard conditions at the Property.

<u>Negligence</u>

The Tenants assert a claim for negligence. It is clear to this Court that Water's Edge knew or should have known that its failure to manage the Building responsibly and in accordance with the applicable codes could cause injury. This Court finds that the Tenants were injured by living in a Unit which was not worth what they were expected to pay for it. However, here was no evidence of any damages separate from those caused by Water's Edge's failure comply with its obligation under Massachusetts law to provide safe and habitable housing. To be clear, they made out no claim for personal property damage or personal injuries.

<u>Violation of the Consumer Protection Statute, G.L. c. 93A</u>

Normally, a litigant must serve a demand letter in advance of asserting a claim under the Massachusetts Consumer Protection Statute, G.L. c. 93A, § 9. However, a litigant is not required to serve a demand letter as a prerequisite to making a claim under G.L. c. 93A when asserting that consumer protection claim as a counterclaim. Here, the Tenants asserted their G.L. c. 93A claim as a counterclaim to the original action, and their claim was preserved in the successor civil action.

15

The Massachusetts Consumer Protection Statute prohibits a wide variety of unfair and deceptive acts and practices, including in the sphere of the landlord/tenant relationship. The Attorney General's Regulations amplifying the scope of G.L. c. 93A relative to landlord/tenant issues are set forth in 940 C.M.R. 3:17. Prohibited practices include many of the practices engaged in by Water's Edge in the course of the Tenants' tenancy including:

° Failing to provide services and/or supplies after the making of any representation or agreement, that such services would be provided during the term or any portion of the term of the tenancy agreement. 940 C.M.R. 3:17(1)(f);

° Failing to comply with the State Sanitary Code or any other law applicable to the conditions of a dwelling unit within a reasonable time after notice of a violation of such code or law from the tenant or agency. 940 C.M.R. 3:17(1)(i); and

°Willfully violating any provision of G.L. c. 186 §14. 940 C.M.R. 3:17(6)(f).

This Court finds that that Water's Edge represented to the Tenants that they would be renting a unit in a "luxury" oceanfront apartment complex with a year-round pool, adjacent garage parking, laundry facilities and other amenities. In violation of G.L. c. 93A, they never had a usable pool, the parking and access to the Building were unsecured, the laundry facilities were frequently broken, there was no working intercom system, security throughout the Building was virtually non-existent, and for a period of months, the Tenants were unable to access their 7th floor Unit by elevator and were forced to climb unsecured staircases littered with trash and used needles.

16

This Court finds that inadequate security and failure to fully exterminate for rodents are two of the many Sanitary Code violations which affected the Tenants' tenancy. The failure of the Tenants to introduce into evidence any code violations in the Building which may have been cited by the City of Revere's Inspectional Services Department is not fatal to their claim that code violations existed throughout the duration of their tenancy.

This Court also finds that the damage suffered by the Tenants (as measured in the diminished value of the Unit) was a "natural and probable consequence" of Water's Edge's chronic failure to maintain its facilities. It is clear to this Court that the problem with the elevators in the Building should have been well known to Water's Edge's management, yet they failed to take reasonable steps to remedy the issues before the elevators were forcibly taken off-line by "the State." The issues with the garage, the pool, the gym, and the intercoms are similarly indicative of unabated, willful neglect.

The measure of damages for a violation of G.L. c. 93A can be double or triple damages, plus costs, plus reasonable attorney's fees.

Measure of Damages

All the Tenants' claims are supported by the evidence. However, they are all based on a diminution of value of the Unit during the periods when the Unit was affected – to a greater or lesser extent - by the habitability issues in the Building.

Unfortunately, the testimony presented to this Court was imprecise on the dates when, for example, there was only one working elevator at the Property.

17

Despite these impediments, this Court is persuaded that the value of the Tenants' tenancy in the Premises was diminished by 20% for the seven-month period between April 1, 2017 to October 31, 2017 as a result of substandard conditions which existed at the Property at the time the Tenants commenced their tenancy. This totals $2,884.00.[5] The value of the Tenants' tenancy was later diminished by 35% during the period there was only one working elevator in the Building to serve the 7th floor, which this Court will estimate occurred from November 1, 2017 to February 15, 2018. This totals $2,549.25.[6] The value of the Tenants' tenancy was diminished the 100% for the 54-day period between February 16, 2018 and April 10, 2018 when both of the Building's elevators were shut down and occupancy of the Unit became a hardship. This totals $3,776.68.[7] The Court also finds that the value of the Tenants' tenancy was diminished – on average - by 40% during the rest of their tenancy on account of the inadequate elevator access to the 7th floor and the continuing issues plaguing the Property. This amounts to **$37,972.69**.[8]

---

[5] This amount is calculated as follows: $2,060.00 (monthly rent) x .20 (20% diminution of value) = $412.00 per month x 7 months = **$2,884.00**.

[6] This amount is calculated as follows: $2,060.00 (monthly rent) x .35 (35% diminution of value) = $721.00 per month x 3 months = **$2.163.00**. Plus, the per diem rate for the 15 days in February when one elevator was working calculated at $721.00 ÷ 28 (days in February) = $ 25.25 per diem diminution of rent x 15 days = **$386.25**. The total diminution of rent for this period is $2,163.00 + 386.25 = **$2,549.25**

[7] This sum was arrived at by calculating the per diem rate for the 14 days in February, whole month of March and 10 days in April when the defendants had no elevator, as follows: February's rent of $2,060.00 ÷ 28 days of February = $73.57 per diem x 14 days = **$1,029.98**. Plus March's rent of **$2,060.00**. Plus April's rent of $2,060.00 ÷ 30 days of April = $ 68.67 per diem x 10 days of April = **$686.70**. The total diminution of rent for this period is $1,029.98 + $2,060.00 + $686.70 = **$3,776.68**.

[8] This amount was calculated at April's diem rate of $ 68.67 x 20 remaining days in April 2018 ($1,373.00) x .35 (35% diminution of value) = **$480.69**. Plus the diminution of value for the 52 months of May 2018 through August 2022 calculated as follows: $2,060.00 (monthly rent) x .35 (35% diminution of value) = $721.00 per month x 52 months = **$37,492.00**. The total diminution of rent for this period is $537.31 + $2,373.00 = **$37,972.69**.

18

Thus, the total diminution of value of the Tenants' tenancy as calculated by this Court is $47,182.62.[9]

This Court finds that the Tenants are entitled to damages available under their cause of action under G.L. c. 93A, which entitles them to multiple damages. This Court finds that the Tenants are entitled to a **double** damage award of **$94,365.24**, plus costs and attorneys' fees.

## ORDER

Based upon the foregoing, the Court ORDERS as follows:

1.  The plaintiffs, Jocelyn Sierra and Balmiro Ruiz, are awarded judgment in their favor against Water's Edge Limited Partnership on their claim for violation of the Consumer Protection Statute, G.L. c. 93A, and are awarded damages in the amount of **$94,365.24**, plus costs and reasonable attorneys' fees.

2.  By June, 13, 2025, plaintiffs' counsel shall file with this Court and serve upon the defendant, Water's Edge Limited Partnership, a motion for the assessment of attorney's fees and costs accompanied by (a) an affidavit of their attorney and (b) detailed contemporaneous time records for services provided in connection with this action. The Clerk's Office shall schedule this motion for a hearing on the earliest available date.

**SO ORDERED:**

IRENE H. BAGDOIAN
ASSOCIATE JUSTICE

Date: 5-27-2025

---

[9]  This amount is calculated by adding the diminution of value for each period as follows: $2,884.00 + $2,549.25+ $3,776.68 + $37,972.69 = $94,365.24.

19